Estate of Isaac W. Baldwin, Deceased, Florence E. Baldwin and George A. Baldwin, Executors v. Commissioner.
Baldwin v. Commissioner
Docket No. 9446.
United States Tax Court
T.C. Memo 1959-203; 1959 Tax Ct. Memo LEXIS 44; 18 T.C.M. (CCH) 902; T.C.M. (RIA) 59203; October 28, 1959
*44 Until June 1940 decedent and his older brother were partners in the real estate and construction business. The brother was domineering, grasping and dishonest. He had dominated decedent since childhood, and was cheating him in business matters. Decedent's activity was limited to construction work, while his brother handled all financial, legal and other office and paper work, except during a period in or about 1936 when the latter was gravely ill. From time to time the partners would divide their real property holdings. In June 1940 the partnership was terminated and a final division of properties occurred. One contract then executed authorized decedent's brother to manage decedent's real estate, and by a second, contemporaneously executed contract each ex-partner assumed and agreed to pay one-half of all liabilities of each other and of the firm. Decedent died May 9, 1941. 1. The value of, inter alia, two certain parcels of real estate is in issue. Values thereof are determined in accordance with all evidence of record. 2. An issue as to the valuation of eight parcels of real estate transferred to decedent's brother by the executors in October of 1941 is rendered moot by the result *45 reached in issue 29, infra, and will not be decided. 3. Decedent in fact owned only a one-half interest in certain real property at his death, and only the value of that one-half interest may be included in the computation of the estate. 4. In June 1940 deeds to six properties were executed in blank and delivered to an attorney, who had variously acted for decedent, his brother and the firm. The properties were charged to decedent's account in the division of partnership assets, and were thereafter managed by decedent's brother under color of the contract authorizing him to manage decedent's property. Income therefrom was credited to or expended on behalf of decedent and his estate. After decedent's death one of his sons obtained the deeds and inserted as named grantees trustees for the benefit of decedent's children. Petitioner has failed to prove that the attorney held the deeds other than as decedent's agent. The values of the six properties must be included in the computation of the estate. 5. A recorded deed to a parcel of realty named one of decedent's sons as grantee, but neither the deed itself nor possession and control of the property was actually delivered to the named grantee, *46 who learned of the deed only by perusal of reports of official recordings. Income was credited to decedent and his estate. Petitioner has failed to show error in the inclusion of this property for estate tax purposes. 6. About the same time as the dissolution of the firm, decedent's brother executed a deed to a property previously held in his name, designating a daughter of decedent as grantee, but with a clause requiring her to first offer the property to him (the brother) at a stated price if she should wish to sell within 15 years. Delivery was not to take place until April 1, 1942, which was subsequent to the date of decedent's death. This property was charged to decedent's account in the final division of partnership property, was managed by decedent's brother on the strength of his contractual authority over decedent's real property, and income was credited to decedent and his estate. The deed was delivered to the same attorney who held those deeds executed in blank. The value of this property is properly includible in the computation of the estate. The first-offer price in the restrictive clause is a factor affecting value, but does not conclusively set a ceiling thereon. Valuation *47 is made on the basis of all available evidence. 7. A similar deed was executed at about the same time in favor of decedent's other (and older) daughter, covering a property in which she then resided and on which she was then paying rent. Thereafter she continued to reside there but paid no further rent. There was a complete delivery of the property to the daughter during decedent's lifetime, and no retention of possession or enjoyment by the decedent. The property must be excluded from the estate. 8. In June 1941 decedent's brother rendered an accounting of his real estate management, which purported to show a balance of $625.37 in favor of the estate. However, a payment of $10,000 on the principal of a mortgage, one-half of which was a liability of decedent, was deducted as an expense, and there is no evidence of the actual date of payment, whether before or after death, of various items of expense exceeding $100,000. No payment was actually made in respect of this accounting. Petitioner has not shown error in the inclusion of $625.37 as a debt due decedent from his brother as of the date of decedent's death in respect of the management of real properties, and the denial of any deduction *48 in respect of an alleged debt due to the brother arising from such management. 9. Decedent transferred in trust for the benefit of his wife and children two policies of insurance upon his own life. On the facts, the transfers were in contemplation of death. 10. On the facts, petitioner has failed to prove that decedent's wife contributed toward the purchase of certain property held by the entirety. Further, petitioner's present contention of a partition of the properties is outside the scope of the pleadings. 11. Petitioner has failed to prove erroneous respondent's determination that decedent owned an interest in market stores at the time of his death, having a value of $6,500. 12. In 1944 suit was commenced by petitioner and the beneficiaries of decedent's estate against decedent's brother, based principally on fraud and breach of fiduciary duty during decedent's lifetime. Certain equitable relief and damages were sought amounting to approximately $2,000,000. Determined from all of the facts that on the date of his death decedent had a claim against his brother having a net value of $150,000. 13. A number of properties (44 in all) were deeded to decedent's wife and children (including *49 two such children adopted by decedent's brother) and the deeds were recorded. The named grantees were not consulted, and discovered the transactions only by perusal of reports of recordings. Neither the deeds nor possession or control of the properties were actually given to the grantees during decedent's lifetime. Income, to the extent traceable, was credited to decedent, and the properties, to the extent evidence is available, were charged to his account in the division of partnership properties. Respondent has conceded that the inclusion of an additional parcel was erroneous. Delivery was incomplete during decedent's lifetime, and decedent in fact retained possession and enjoyment of the 44 properties until his death, requiring inclusion of their values in the computation of the estate. 14. The value placed on the claim against decedent's brother was a net valuation, taking into account all prospective legal fees and other costs and expenses. Petitioner may not additionally deduct the fee actually paid the attorney as a result of the actual settlement in 1947, no part of the proceeds of which is includible in the gross estate. Further, additional legal fees and expenses at and after *50 trial herein, if not agreed upon in the Rule 50 recomputation, are to be determined under Rule 51. 15. The amount of certain expenses of administration determined. 16. Deductions for alleged debts to two sons of decedent denied for failure of proof. 17. Mere good faith of executors in paying claims asserted against an estate is insufficient to sustain deductions. Decedent's actual liability is determined from all available evidence. 18. Deductions in respect of loans on policies of insurance on life of decedent's brother denied for failure of proof. 19. Deduction in respect of a certain alleged mortgage denied for failure to prove existence of the mortgage. Further, as to mortgages constituting valid liabilities, interest accrued to the date of death is deductible, along with the principal amount of the liability thereon. 20. Petitioner may deduct one-half of the amount of a mortgage on a parcel of real property the value of which was held includible in the estate under 13, supra. 21. Deduction in respect of an alleged mortgage denied for failure of proof. 22. Decedent's date-of-death liability on eight bills determined. Further, the full amount of such liability as determined is *51 deductible, notwithstanding that subsequently decedent's brother may have compromised some debts by payments to the creditors of smaller, compromised amounts, and entirely avoided payment of other obligations. Further, the pleadings sufficiently apprised respondent that petitioner sought to deduct, under this issue, one-half of the charge by decedent's brother for his services in managing decedent's realty. 23. In view of the determination in issue 11, supra, that decedent owned an interest in market stores, petitioner may deduct one-half of the amount of certain unpaid bills resulting from the operation of such stores. 24. Lots having an aggregate value of $800 were encumbered by sewer and paving assessment liens aggregating $1,979.88 at the time of decedent's death. Petitioner may deduct only $400, or one-half of the value of the encumbered property on account of the liens. 25. The agreement whereby each brother assumed one-half of all liabilities of the other is valid, and petitioner may accordingly deduct one-half of the amount of improvement liens on properties owned by decedent's brother. 26. Petitioner may deduct one-half of the amount of taxes on properties held by decedent *52 and his brother as tenants in common. 27. Petitioner may deduct one-half of delinquent city and school taxes, as determined on properties owned by decedent's brother. 28. Decedent's date-of-death gift tax liability, as affected by determinations as to the includibility of certain items in the tax base, is deductible. Computation of the actual amount of gift tax liability is to be made as a part of the Rule 50 recomputation. 29. On decedent's death in May 1941 his executors, his widow and a son, had little or no pertinent experience, and no idea of the nature and extent of decedent's estate. Decedent's brother, who alone had virtually all records and information essential to orderly administration, became hostile, and refused to cooperate in any manner. In October 1941 the executors and the brother settled their differences pursuant to an agreement, as a result of which a net consideration was transferred to the brother, and the latter thereupon cooperated in the administration of the estate. Petitioner deemed many of the brother's claims and contentions baseless, but had to come to terms with him because of his position, in order to make even the beginnings of an intelligible administration *53 of the estate. The executors believed, with reason, that it would be far more satisfactory and probably less expensive to do this than to engage in a prolonged and bitter legal battle, the only other alternative. Held, the net consideration so paid is a deductible expense of administration. 30. (a) As a result of the assumption by each brother of one-half of the liabilities of the other, certain adjustments are made, halving certain deductions previously allowed in full. (b) At date of death, a loan was outstanding on one of the policies assigned to the insurance trust, issue 9, supra. Such insurance loan may only reduce the net amount of proceeds includible, and may not be independently deducted as a debt of the estate. Annie S. Kennedy et al., Executors, 4 B.T.A. 330, followed. Allen H. Gardner, Esq., for the petitioner. Albert J. O'Connor, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined a deficiency in the estate tax of the Estate of Isaac W. Baldwin, Deceased, in the amount of $656,369.94. Petitioner challenges the deficiency so determined, and, in addition, claims an overpayment. The issues, too numerous *54 for purposeful enumeration here, will be separately set forth and treated. A number of concessions and stipulations have been made with respect to various issues, and will be given effect in the recomputation under Rule 50. The testimony herein was taken at Erie, Pennsylvania, before a Commissioner of this Court. The Commissioner's report of his findings of fact was duly served upon both parties, and objections were made thereto by their respective counsel. We have considered those findings and objections in the light of the entire record before us, and have resolved them in accordance with our interpretation of that record. Findings of Fact The stipulated facts are so found, and are incorporated herein by this reference. General Facts 1. The petitioner is the Estate of Isaac W. Baldwin, Deceased, who died May 9, 1941, a resident of the Commonwealth of Pennsylvania. An estate tax return was duly filed with the collector of internal revenue for the 23rd district of Pennsylvania, reporting a total gross estate of $1,480,188.91, total deductions of $498,194.26, a net estate for the basic tax of $981,994.65, and a net estate for the additional tax of $1,041,994.65. An estate tax liability *55 in the amount of $218,073.45 was reported. 2. In the statutory notice of deficiency respondent advised petitioner that, after making numerous adjustments to the net estate as reported, he had determined a net estate for the basic tax of $2,555,484.25, a net estate for the additional tax of $2,615,484.25, an estate tax liability in the amount of $874,443.39, and a deficiency of $656,369.94. The additions to the value of the net estate and the decreases in the deductions allowed by the respondent, were, by categories and amounts, as follows: Real estate
$ 68,716.00
Mortgages, notes and cash
5,249.88
Insurance
142,314.25
Jointly owned property
43,810.00
Other miscellaneous property
1,004,000.00
Transfers
126,050.00
Executors' commissions
10,000.00
Legal fees
5,000.00
Debts of decedent
168,952.47
Total
$1,574,092.60
The foregoing categories follow in order the schedules of the estate tax return, and the issues hereinafter described tend to follow the same order. Unless otherwise stated, the terms "Schedule" and "Subschedule" refer to the estate tax return. All real properties hereinafter referred to are, unless otherwise stated, located in Erie, Pennsylvania. Historical Facts 3. From 1909 to 1940, the decedent, *56 Isaac W. Baldwin (hereinafter called "Isaac"), and his brother, G. Daniel Baldwin (hereinafter called "G. Daniel"), carried on a real estate business in Erie, Pennsylvania, as partners, doing business under the firm name of Baldwin Brothers. Their father, James Baldwin, had first engaged in the real estate business prior to 1900. Isaac and G. Daniel entered into their first formal contract of partnership on June 26, 1909. By this contract, they agreed to carry on the business as equal partners. This partnership continued in existence and actively carried on the real estate business under various agreements until formally terminated in June of 1940, as will be hereinafter described in greater detail. 4. The partnership agreement of June 26, 1909, provided that the partnership should engage in the purchase, improvement, lease, sale, and exchange of real estate and in a general contracting and building business. The partnership was to continue for 5 years, and the real estate owned was to be held in the names of the individual partners. Other written agreements were entered into after 1909, the last of which was executed on November 15, 1923. This contract was similar to the original *57 agreement of June 26, 1909, covered a 3-year period, and provided that partnership real estate should be "held in the names of the individual partners, each party to have and carry in his name such proportionate part in valuation of the firm real estate as his share or investment is of the whole capital of the said partnership." This contract was extended by endorsement to November 15, 1927. With certain modifications hereinafter described with greater particularity, made on December 1, 1938, it apparently was the contract under which the partnership continued to operate until its termination on June 5, 1940. 5. The original and primary business of Baldwin Brothers was the construction of small, low-priced houses for sale. The partnership would both build houses on the land of others and buy land and construct houses thereon. The houses were usually sold for cash plus either first or first and second purchase-money mortgages. Sometimes a house was taken in trade, and rented. In some cases, the houses constructed could not be immediately sold, and were rented. The partnership carried mortgages for an average of 30 days or less, until it could find a buyer. It occasionally repossessed *58 and rented houses on which the purchasers had failed to make agreed payments. During the late 1920's, more than 300 houses a year were built. At other times, as in the depression of the 1930's, there was little or no construction, and the handling of rental properties constituted the firm's main business activity. The partnership also owned and rented some commercial property, including two large Erie markets, respectively known as the Twelfth Street Market and the Central Market. It held many rental properties, and the maintenance of these properties and the collection of rentals was an important part of its business. 6. Isaac's brother, G. Daniel, took charge of the financial end of the business. He was in charge of purchases of land, sales of houses, legal work, and maintenance of records. Isaac was in charge of construction, and hired and fired men, designed the buildings, and purchased materials. In the late 1920's, when the partnership was building about 300 houses a year, Isaac advertised in various European newspapers for building tradesmen and brought them to Erie. He would occasionally perform other functions, but normally confined his activities to construction. 7. G. Daniel *59 had a strong, overpowering personality, and dominated almost everyone with whom he came in contact. Isaac was several years younger, and especially susceptible to domination by G. Daniel. Almost without exception, he yielded to G. Daniel in partnership matters. In addition, G. Daniel's control over Isaac extended to personal and family matters, and was so complete that he dictated what Isaac's children should do in purely personal affairs. 8. The partnership's extensive real properties were held in the individual names of Isaac and G. Daniel. Their agreement called for each of them to hold in his name partnership real estate in proportion to his capital investment, and there were many property transfers between them to cause their respective individual holdings to conform thereto. Isaac and his wife, Florence, one of the co-executors herein, immediately upon their marriage in June of 1911, executed a power of attorney in favor of G. Daniel. On December 13, 1911, Isaac and Florence executed another power of attorney authorizing G. Daniel to collect and sue for all sums of money payable to them, to give discharges for all such collections, to compromise all such claims, to release *60 mortgages due them, to lease, sell, and convey realty upon such terms as he should see fit, to borrow money on their names and execute evidence of indebtedness therefor, and to perform other specified acts. Under this power, G. Daniel transferred many properties out of the name of the decedent and performed other acts until Isaac's death. 9. In the latter part of 1935 or early in 1936 G. Daniel became critically ill with appendicitis and peritonitis, and was hospitalized for some time. As a result, he was unable to perform his partnership duties for a year or more, or until about the spring of 1937. During this period, Isaac was in complete charge of all phases of the business, including those which had previously been performed by G. Daniel alone. G. Daniel's illness left him with a fistula, and his doctors cautioned him not to engage in certain forms of physicial activity to which he had been accustomed. He was irritated by his condition and by the restraints imposed, and frequently disregarded them, causing further physical difficulties and discomfort. After his illness and as a result of his physical condition and its aggravation due to his disregard of medical advice, G. Daniel *61 became increasingly disagreeable and uncompromising. Whereas he and Isaac had previously gotten along fairly well, in spite of G. Daniel's domination and criticisms, increasing friction now began to develop between them. 10. George A. Baldwin (hereinafter called "George"), one of decedent's sons and co-executor of the estate, was in his second year at Colgate University when G. Daniel became ill. He feared that his uncle's illness would prevent him from finishing the school year. He was able, however, to complete the college year, and upon returning home at the close thereof worked full time for the partnership, as he had done each summer since he was 7 or 8 years of age. He worked with his father who was then in complete charge of the business, drove him around, visited G. Daniel in the hospital with Isaac, and attended to various things necessary to keep the partnership operating. In the fall of 1936, G. Daniel decided that he needed George and requested the latter to move in with him. Accordingly, George left his parents' home and lived with G. Daniel and his family until March of 1940. While G. Daniel was still partially incapacitated, George drove him around and served as liaison *62 between G. Daniel and the business. George's position in the business at that time was not clearly defined, but the fact that he acted as the representative of his uncle enabled him to exercise substantial authority. 11. During the period of G. Daniel's incapacity, Isaac observed various aspects of G. Daniel's partnership activities which he did not like. Things that he observed, of which he had been previously unaware because of the limitation of his activity to the construction phase of the business, reduced his confidence in the soundness of some of G. Daniel's business policies. To an even greater degree, he lost confidence in G. Daniel's honesty and fairness, especially where he, Isaac, was concerned. 12. Upon G. Daniel's resumption of active participation in the business in the early part of 1937, he made plans which Isaac thought too risky. The initial disagreement between them arose over the building of gas service stations for long-term lease. Isaac thought that this step involved too much financial hazard, and that the construction of one station in particular, which required a deep excavation next to a gravel bank, might endanger the lives of the laborers. Isaac suggested *63 that it would be better to pay off the partnership debts so that the firm would be in a more liquid position. He was concerned about possible losses on mortgages guaranteed by G. Daniel during the early 1930's and prior thereto, and about outstanding municipal improvement liens on a large tract of land acquired by the partnership in the late 1920's. By 1937, the aggregate amount of these liens exceeded the value of the tract of land, and G. Daniel had made their payment a personal obligation. G. Daniel scoffed at Isaac's attitude and said that he would construct the gasoline stations with his own funds if Isaac was unwilling to proceed. Isaac refused to undertake the project, and G. Daniel had George take charge of construction under his direction. The gasoline stations were built during the summer of 1937. This was the first time in their partnership relations that Isaac had ever refused to abide by G. Daniel's business decisions. 13. Beginning at some undisclosed time, and with noticeable effects at least as early as the fall of 1938, Isaac suffered from an incapacitating nervous and mental ailment due to his affliction some years earlier with Parkinson's disease. By reason thereof, *64 he was ordered by his physician to take a rest and vacation in Florida, for which he began to prepare no later than the latter part of 1938. He was never able at any subsequent time to resume active participation in partnership affairs. 14. As a result of Isaac's foregoing illness and his disagreement with G. Daniel, Isaac gradually withdrew from the business. He avoided G. Daniel wherever possible, and timed visits to the partnership office so as to miss seeing him. G. Daniel took everything out of Isaac's hands, put George in charge of construction, and generally tended to ignore Isaac's status as a partner. Isaac made no effort to assert his legal rights or to reassume his former control over construction. He felt that the new situation benefited George and avoided quarrels with G. Daniel, and, in any event, his physical condition prevented further active participation in the business. 15. Construction activity of the partnership increased in 1938. All construction undertaken in 1938 was on property owned by G. Daniel or standing in his name. Isaac discussed operations with George, visited construction sites at times, and gave George valuable advice on construction problems. 16. *65 In the summer of 1938, G. Daniel told Isaac that there would have to be a division of partnership assets between them. He did not, however, propose termination of the partnership. In earlier years there had been frequent divisions of the partnership real estate in accordance with provisions of the various partnership agreements requiring the realty to be held in the names of the individual partners in proportion to the capital interest of each in the partnership. These previous divisions appear either not to have been intended as final determinations of the partnership's assets and liabilities at a given date, or, if so intended, that a given partner was thereafter to be liable only for indebtedness on his own properties. By 1938, considerable time had elapsed since the last such division. G. Daniel's foregoing proposal called for action different from previous divisions, in that each partner was thereafter to have exclusive ownership of property in his name, but was to be liable for one-half of all obligations of every kind, whether partnership or individual. 17. G. Daniel pressed Isaac for such division, and presented long lists of properties showing the proposed ownership for each *66 partner. Isaac agreed that it was time for another property division, but considered G. Daniel's specific proposals unfair. He wanted to be certain, especially in view of the finality of the proposed division and the provision for equal assumption of all liabilities, that he receive a proper share of the real estate. Isaac, with the assistance of George, spent considerable time on the lists of properties as prepared by G. Daniel. They both concluded that the arrangement was unfair. George urged his father to insist on changes, but G. Daniel pressed Isaac to sign the agreement as proposed by him. Isaac was unable to resist G. Daniel in the discussions without considerable emotional tension and the resulting arguments over a period of months worried him and made him nervous. He finally executed the agreement (hereinafter called the Division Agreement) under date of December 1, 1938, in the form in which it had been originally submitted. This agreement (provisions of which are hereinafter set forth) provided that each partner assumed one-half of all liabilities, that neither partner had any interest in real estate held in the name of the other, and that the settlement, evidenced by the *67 concurrent deeds and the contract itself, should constitute a final agreement. 18. From the time of the disagreement of the partners in 1937 until March of 1940, George remained on good terms with his uncle. During this period, G. Daniel praised George's ability and said that George would succeed him in the partnership, and that J. Robert Baldwin (a younger brother of George and an adopted son of G. Daniel) would take Isaac's place. 19. In or about March 1940, George informed G. Daniel that he had married secretly in November 1939. G. Daniel disapproved of the marriage and insisted that George have it annulled, get a divorce, or separate. When George refused, G. Daniel had no more use for him. He forced George out of his (G. Daniel's) home, insisted that Isaac deny his home to George, and demanded that Isaac change his will and disinherit George. G. Daniel was thereafter critical of everything George did, told him he was not fit to hold the position he held in Baldwin Brothers, and demoted him. Isaac steadfastly refused to disinherit George. G. Daniel then stated that he would no longer work for Isaac and his family, and that the partnership would have to be dissolved. 20. G. Daniel *68 took immediate steps to terminate the partnership. He pressed first for the execution of an agreement, similar to the Division Agreement, which would provide for a final division of real estate between the partners, and for the assumption by each of one-half of all liabilities of the partnership and of the individual partners. Lists of properties were submitted showing the proposed division of the real estate, and long, hard negotiations followed. In 1938 George, because of his then position in the partnership, had stayed out of the discussions with G. Daniel leading up to the Division Agreement. He had at that time limited himself to making suggestions to his father. He now took an active part in the controversy and let G. Daniel know that he did not approve of the proposed agreement and division of real estate. Isaac and George both considered the proposals unfair, and George strongly urged his father not to agree to the proposed terms. 21. The controversy and discussions appeared to be having a detrimental effect upon Isaac's health, his illness having progressed, and his condition having become more pronounced. George and others in the family finally withdrew their opposition so *69 that the controversy, with its injurious effects upon Isaac, could be ended. When active objection to the agreement for the equal assumption of liabilities and division of real estate (hereinafter called the Assumption Agreement) had ended, G. Daniel presented a second agreement (hereinafter called the Management Agreement). This provided for termination of the partnership, allowed G. Daniel to conduct a real estate business under the name of "Baldwin Brothers," and made him manager of Isaac's real estate for a period of 3 years. 22. Isaac and George welcomed the termination of the partnership, but George objected to the provision making G. Daniel the manager of Isaac's properties. He feared that G. Daniel, given such power, would continue his unfair practices and further reduce Isaac's holdings. But, as in the case of the Assumption Agreement, the family abandoned its opposition in deference to Isaac's physical and emotional problems. Isaac remarked to George during this time that the two of them could make more money building houses together on land that Isaac owned than by fighting G. Daniel. He also told George that the Management Agreement permitted him to terminate the management *70 arrangement at the end of a year, and that if G. Daniel were unfair in his management, he (Isaac) would make a complete break with G. Daniel at the end of a year and go into business with George. Both contracts were signed under date of June 5, 1940. 23. The Assumption Agreement was signed by G. Daniel, Isaac, and their wives, and was approved in writing by all the children. Each partner assumed one-half of all liabilities of the partnership and of the partners, agreed that the settlement of real estate interests as evidenced by concurrent deeds and by the contract, should be a final settlement between the parties, and that a given partner and his wife should have no interest in real property in the name of the other partner or of the other partner and his wife. The Management Agreement was signed by G. Daniel, Isaac, and their wives. It provided that the partnership was thereby dissolved; that G. Daniel should be free to continue the business under the name "Baldwin Brothers"; that Isaac employ G. Daniel to manage for 3 years all of Isaac's realty; that G. Daniel should render an account of his management on June 5, as of June 1, of each year of the contract period; and that either *71 party might cancel the contract on August 5, 1941, or August 5, 1942, by giving 30 days' written notice of his intention to cancel. 24. After the two agreements were signed on June 5, 1940, Isaac avoided G. Daniel almost completely. He spent the winter of 1940-1941 in Florida, as he had done the two preceding winters. Upon his return to Erie in March or April 1941, he discussed business matters with George and asked how G. Daniel was handling the properties under the Management Agreement. George told his father that G. Daniel had not been dealing fairly with them, that Isaac would find this out beyond any room for doubt, and that he (George) expected his father to make a complete break with G. Daniel and go into business with George as he had promised the previous year. Isaac believed, from what George had said, that the account due June 5, 1941, would show that G. Daniel had taken advantage of him. He was upset by this and seemed to dread the forthcoming account and inevitable controversy with G. Daniel. He paid one visit to G. Daniel's office, came out of the conference visibly shaken, went home and to bed, and died a few days later on May 9, 1941, at the age of 58 years. 25. Isaac, *72 who was born December 5, 1882, was survived by his widow, Florence E. Baldwin (hereinafter sometimes called "Florence"), and seven children, whose names and dates of birth are as follows: Esther B. Allen
October 12, 1912
James D. Baldwin
May 18, 1914
George A. Baldwin
January 20, 1916
J. Robert Baldwin
November 3, 1918
Margaret B. Thomson
February 16, 1920
Richard O. Baldwin
August 31, 1922
Arthur W. Baldwin
October 23, 1925
Isaac's Health and Mental Attitude 26. In or about 1931, Isaac was first observed to have a tremor in his right hand, at a time when he was temporarily under a severe emotional strain. A little later, especially from and after 1933, the tremor was again noticed. Prior to April 1937, it did not seem to bother him, other than the fact that he was somewhat sensitive about it. He was an active man, engaged in various forms of recreation, usually ran, whistling, wherever he went, and devoted long hours to the partnership business. During the period in 1936 and early 1937 when G. Daniel was incapacitated, Isaac had assumed complete charge of the business, handled matters without fear or hesitation, and worked from early morning until late at night. When, upon G. Daniel's return to *73 active participation in the partnership business in the early part of 1937, the aforementioned disagreements arose between the two partners, Isaac was emotionally upset and the shaking became more apparent. On April 9, 1937, he consulted a physician. 27. The physician diagnosed Isaac's ailment as paralysis agitans or Parkinson's disease. He prescribed medicine and relaxation. Noting that Isaac's condition was greatly aggravated by disputes with G. Daniel, the physician advised him and the family that Isaac should stay away from G. Daniel. The physician also advised Isaac to spend the winter in a warmer climate. Such winter trips would have a dual advantage; the warmth would contribute to greater relaxation and the distance would make it more difficult for G. Daniel to see Isaac. Between April 9, 1937, and May 9, 1941, the physician saw Isaac approximately 40 or 50 times. In December 1940, the last time the physician saw the decedent before his last illness, Isaac was sufficiently alert mentally to have participated in a real estate business in an advisory capacity, but was unable to do manual labor. 28. Paralysis agitans, or shaking palsy, is incurable, but some persons afflicted therewith *74 have lived for many years. The exact cause of the disease is unknown but heredity may be a contributory factor. The disease is not, in and of itself, a cause of death. Complications often resulting therefrom, such as encephalitis, thrombi, shock, or excessive nervous strain, are the immediate causes of death. These complications may arise at any time, since paralysis agitans lowers resistance to other ailments, and one of the most frequent is encephalitis, or inflammation of the brain. Since the complications are the immediate causes of death, no prognosis can be made. The immediate cause of Isaac's death was encephalitis lethargica, which began about 4 days before he died. 29. Isaac thought that he had inherited the tremor in his right hand from his father, James, whose hand had shaken for many years. This, however, had not prevented James from patching the roofs of his houses when 80 years of age. Isaac stated on occasion that he expected to live to be as old as his father, who had died at the age of 89 years. Isaac tended to feel insulted when others directed attention to his shaking, and he would sometimes tell such persons that he would be shaking after they were dead. His reaction *75 to such comments or misguided sympathy appears to have taken either the form of a positive assertion that he expected to outlive many persons not so afflicted, or, negatively, that many persons (and inferentially the sympathizer) drop dead despite a perfectly sound appearance until their last moments. He worried about business matters and about the amount of property he would have left after negotiations with G. Daniel, but gave no indication to his physician or his family that he was concerned about death. His wife and family felt no alarm until very shortly prior to his actual demise. 30. In or about April 1937, when Isaac first began treatment for his ailment, Dorothy Goetz, a practical nurse, was brought into his household to assist in caring for him. She thereafter accompanied Isaac as a nurse and companion until his death. Isaac did not at first like this arrangement, but soon became reconciled to it and found her assistance valuable. Although Isaac could still drive a car, his nurse would drive him to nearby towns for lunch to escape G. Daniel, and drove him to Florida and California on his winter trips. She did some paper work for him during the course of his various negotiations *76 with G. Daniel. She kept his clothes cleaned and repaired, rubbed his back when he was tired, entertained him, and engaged with him in various sports and recreations, such as horseback riding and shuffleboard. While in Florida in March 1941, Isaac generally swam and relaxed on the beach in the sun every day, weather permitting. He took walks alone, drove along the ocean front, and went down to the pier to watch people fishing. His ailment, even at this late date, did not confine him to a chair or to his bed. However, his need for the services of his nurse was sufficiently acute that when his wife arrived in West Palm Beach, Florida, where he was staying in March 1941, and his apartment was too small for three people, the nurse remained with him in the apartment while his wife rented another apartment for herself. 31. Isaac's wife accidentally came across his will while he was in Florida in the winter or spring of 1939-1940, and noticed that he had given G. Daniel considerable control over his estate. The will had been executed on February 27, 1937. G. Daniel was named co-executor and co-trustee and received the power to designate his successor and to distribute the shares of any child *77 attaining the age of 21 years if in his (G. Daniel's) opinion such distribution should be advisable. He was made sole judge of the value of property turned over to each legatee and received other important rights and powers. 32. When Isaac returned to Erie in the spring of 1940, Florence asked him to change the will. Accordingly, on September 5, 1940, Isaac executed a new will which named Florence, together with his son, George, who had been previously so named, as coexecutors and co-trustees. This will also eliminated the various other powers and rights conferred upon G. Daniel in the earlier will, and was Isaac's last will and testament. It provided in part as follows: One-third of the estate, after legal obligations and funeral expenses, was left to Isaac's wife, Florence; the residue was left to his five children (meaning those not adopted by G. Daniel) in equal shares, with further provision that if any of them should be under the age of 30 years at Isaac's death, his or her share should be held in trust until he or she should reach 30 years of age and be then paid over. The executors and trustees were empowered to distribute funds to any of the children after reaching 21 years *78 of age if in their opinion such distribution should be advisable. Facts and Circumstances Respecting Various Transfers 33. During their boyhood, G. Daniel and Isaac worked hard on their father's farm and in his real estate business. They lived on the farm under conditions of severe austerity with no opportunity for recreation. These conditions were apparently imposed by their parents as a matter of taste or choice in method of discipline and character building, rather than by virtue of actual poverty. When their father was away, G. Daniel was in complete charge of the farm, the employees, and also of Isaac, who was about 7 or 8 years younger. His authority over Isaac included the right to punish him, such punishment normally being physical, in the nature of whippings. The father of G. Daniel and Isaac kept a record of the time worked by his sons but gave them no money or property until they reached 21 years of age, at which time he made a settlement with each of them. G. Daniel entered into partnership with his father when he became 21. Later the father became dissatisfied with G. Daniel and offered Isaac the same opportunity. Isaac rejected this offer and entered into partnership *79 with G. Daniel. 34. G. Daniel and his wife, Mabel L. Baldwin, had no children. G. Daniel desired to have some boys, and, when Isaac's youngest son, Arthur, was about 18 months of age, which would be about June 1927, he persuaded Isaac to let him adopt Arthur. Isaac strongly urged his wife to agree to this, and she finally consented. About 2 years later, G. Daniel urged Isaac and his wife to let him have another of their sons as a companion for Arthur. After some consideration, Robert, who was then about 11 years of age, volunteered to go. He was formally adopted a few months later. Isaac and Florence continued to look upon Robert and Arthur as their sons, despite their legal adoption by G. Daniel. 35. Isaac's five sons were required to work for Baldwin Brothers by G. Daniel and Isaac from the time each was about 8 years of age. They left for work at 7 a.m. and did not return until after 5 p.m. They worked about 9 hours a day on the job and loafing was not permitted. They worked Saturdays and holidays during school months and on week days during the summer and vacations. When they became 10 or 12 years of age they also worked after school. Frequent quarantines for childhood diseases *80 kept the children out of school, but the boys who were not sick were required to work during the quarantine periods. This work, like the lives the girls were required to lead (hereinafter described) was a method of discipline or characterbuilding, and was not viewed as compensable labor as such. 36. The first job assigned the boys was nailing on wood laths. As they became older, they worked as helpers for carpenters, plumbers, and electricians, and did pick and shovel work. At 15 years of age, they were doing a carpenter's job, and by 16 or 17 years of age some of them were serving as foremen on some jobs. G. Daniel and Isaac also used the boys in other phases of the partnership business, such as collecting rents, putting signs on vacant properties, cleaning up rental properties after the tenants left, showing properties to prospective tenants, working at the warehouse, checking operations at the Twelfth Street Market, and learning the office routine. 37. Isaac and G. Daniel agreed on the methods to be used in rearing and disciplining the children and about the training the boys should have to enter the partnership business. They believed that children should work, and regarded the *81 customary activities of neighborhood children as frivolous and wasteful. They were very exacting in their requirements, and the boys were punished immediately and physically either by G. Daniel or Isaac for any infraction of the rules imposed. No distinction in this respect was made by G. Daniel or Isaac between the adopted boys and the other children. The boys received no money to compensate them for their services to the partnership and no allowance before they reached college age. They usually obtained spending money by mowing lawns, shoveling walks, selling junk, and similar chores. The girls, too, were subjected to rigid discipline. They were denied lipstick, nail polish, silk stockings, party dresses, beautyshop treatments, etc., but were not expected to work for the partnership nor subjected to corporal punishment by G. Daniel or Isaac. Discipline was enforced in their case by deprivation of privileges. This was more burdensome to the girls, because their duties did not keep them as occupied as were the boys. The girls worked in the family home at Erie or in the summer home at Manchester Beach, a summer colony where the family, including the boys adopted by G. Daniel, resided *82 during the summer months. Both Isaac and G. Daniel wanted the children to become leading citizens, marry well, and attain a high standing in the community. They were convinced that the most important factor in achieving such position and standing was the ownership of a substantial amount of property. 38. When the boys first began working for Baldwin Brothers, they were told by Isaac and G. Daniel that some day they would receive property for their submission to this type of training. From time to time, Isaac and G. Daniel would point out to the boys that this way they would appreciate property more when they received it. It was also explained that working would develop character, keep them from developing frivolous habits and tastes, and would teach them not to dissipate what they acquired. There was no definite understanding about when the boys would receive property for their work and lack of privileges, but the idea was implanted in their minds that eventually each would receive substantial property at an age when he was able to appreciate its value. There was, however, no indication as to the meaning of such "age." The boys were also told that when they demonstrated their ability *83 they would be taken into the partnership business. This promise was no more specific than those with respect to the receipt of property. 39. The girls were assured that if they lived sensibly and did not develop frivolous and expensive tastes, they too would receive property, and would thus become substantial persons. The promise of property was used by Isaac and G. Daniel as a means of securing compliance by all the children to a rigid course of conduct, which in the case of the boys happened to include long, hard work from an early age, and in the case of the girls meant certain other forms of acts or restraints normally obnoxious to children of their age and not normally enforced by other parents in like circumstances. 40. As the children grew older, the promises of G. Daniel and Isaac respecting property became somewhat more definite. Certain favorably located properties were pointed out by Isaac as the type or class of property that would some day be transferred to the children. The transfers were a constant subject of family discussions, during the course of which George gradually became and was recognized by Isaac as spokesman for the children. George also discussed the matter *84 of transfers with G. Daniel prior to the latter's serious illness of 1935 or 1936. Thereafter, G. Daniel was so unapproachable that most of George's discussions were with Isaac. 41. The purpose of Isaac and G. Daniel in transferring property was to elevate the social status of the children. Both elder Baldwins considered such status to be inextricably bound up with the ownership of substantial property. The labor of the boys, and the various restraints and duties placed upon them and upon the girls were, in the minds of Isaac and G. Daniel, a method by which their characters would be molded so as to make them the type of people Isaac and G. Daniel wanted them to be and to make them sufficiently responsible to hold and use property wisely. When property was from time to time transferred to the children it was done for the above purposes, and not as actual compensation for services performed. Had a child rebelled, and refused to abide by the disciplinary regime imposed, he would have received no property, as punishment for disobedience. None of the children did so rebel, and receipt by them of property was in the nature of a reward for being good, i.e., for doing as Isaac and G. Daniel *85 wished. 42. Esther, the oldest child, was the first to receive any property. She received a flat in 1927, when she was about 15 years of age, and a house in 1935. She did not make any payment for either of these properties. James, the second oldest child, received two properties in 1932 when about 18 years of age, and George, the third child, received a house in 1934, also at about 18 years of age. In 1935, James was given a mortgage through which he later acquired a house. In 1936, James and George each received a property, and George received another property in 1937. 43. The foregoing transfers were mostly made by G. Daniel, since it was the practice, with hardly an exception, for him to make all transfers regardless of whether title was in him or in Isaac. When title was in Isaac, G. Daniel made the transfer under the aforementioned power of attorney. Some of the properties received by James and George were lots encumbered by municipal improvement liens which they had to satisfy. They built houses on some of these properties, using the facilities of Baldwin Brothers. James and George would do some of the work on the houses themselves, and would given Baldwin Brothers a note to *86 cover the cost of construction. If the lot was not received from Baldwin Brothers, a separate payment was made for it. The building costs were so low that James and George received these properties at bargain prices. The rentals from the improved properties owned by James and George were deposited in their bank accounts, and used to pay off the notes to the partnership. Sometimes, contrary to the strongly expressed wishes of G. Daniel, they were used for nonbusiness purposes. Robert, the fourth oldest child and one of the two boys adopted by G. Daniel, acquired two houses before 1938. 44. In June of 1938, Richard, the sixth oldest child and the youngest of the Baldwin boys not adopted by G. Daniel, purchased a vacant lot. The purchase was from persons other than the partners. Richard chose the type of house to be built thereon, and assisted in its designing and construction during the summer of 1938. The partnership, as already described with respect to James and George, supplied materials and some labor. This was one of the better types of property acquired by the children and later became Richard's home. The foregoing method of acquisition was viewed as part of the children's education. *87 45. When G. Daniel proposed the division of partnership assets and equal assumption of liabilities in the summer of 1938, James and George let Isaac know that they thought it was time the children received some tangible benefits, in view of frequent remarks to that effect by G. Daniel and Isaac over many years. George repeatedly urged his father to discuss the matter with G. Daniel. Isaac was sympathetic but was reluctant to face G. Daniel and insist that the partners transfer property to the children. Nevertheless, Isaac and G. Daniel did discuss the matter, and during December of 1938 deeds were made out covering various properties and purporting to convey them to or for the benefit of the children. 46. Several factors influenced Isaac and his family to press for property transfers while the December 1, 1938, contract was being discussed. The family knew that G. Daniel took advantage of Isaac in partnership matters, and was concerned over the possibility of further mistreatment under the new arrangement. James and George were afraid that G. Daniel would manipulate matters so as to further reduce Isaac's holdings and would refuse to make the promised transfers. There was also some *88 concern about certain liabilities, and Isaac desired to place some property beyond the reach of contingent creditors. 47. The amount and the extent of Baldwin Brothers' contingent liabilities were unknown. From 1919 to 1931, inclusive, G. Daniel, on behalf of the partnership, had guaranteed the payment of many purchasemoney mortgages in connection with the construction and sale of homes. Such mortgages were assigned for cash to banks or other long-term investors, and the guarantees were made to facilitate assignment. No records had been kept by Baldwin Brothers as to the number or the aggregate amount of such guaranteed mortgages, and G. Daniel did not personally know such facts. Purchase-money mortgages usually ran for 5 years, but if the mortgage was a good investment, the mortgage owner and the debtor often continued it without formal extension. When mortgage debtors began to default in the early 1930's, Baldwin Brothers honored many guarantees, and no one knew how many more would be presented. Sometimes the assignee permitted the partnership, in effect, to repossess the property and assume payment of the mortgage, but some assignees demanded cash payment. Usually the matter could *89 be and was handled by the former method. By the end of 1938, demands for payment of mortgages guaranteed by G. Daniel prior to 1931 had almost disappeared, but Isaac considered it possible that some remained outstanding and in the case of another economic disaster might be presented later for payment. Isaac was also concerned over a second category of possible or contingent liabilities. During the peak building activity of the late 1920's the partnership had purchased a farm tract known as the "Morrison and Dinsmore Subdivision," and comprising approximately 150 acres. The partners induced the City of Erie to make substantial municipal improvements on the tract, and in order to obtain prompt action, had personally guaranteed payment of the resulting liens. During the depression construction activity dwindled and the value of the property depreciated. The improvement liens remained unpaid, and far exceeded the value of the land. No demand had actually been made by the city in respect of the guarantee, but Isaac feared that such demand might be made in the future. The vacant land was in his name, and he was genuinely worried over the possibility of a suit against him in which he alone *90 would be held personally responsible to satisfy the liens to the extent they exceeded the value of the encumbered realty. This concern was a factor in Isaac's acceptance of the contract of December 1, 1938, since that contract assured him that G. Daniel would be accountable for one-half of any such liability which might be enforced against Isaac. 48. Prior to the execution of the Division Agreement, Isaac had two policies of insurance upon his life, each in the face amount of $100,000. One policy, dated January 14, 1927, with Connecticut Mutual Life Insurance Company (hereinafter referred to as Connecticut), named as equal beneficiaries, his wife and G. Daniel, equally, or, if only one should survive Isaac, such survivor. If neither survived, the policy named as beneficiaries Isaac's executors, administrators, or assigns. The other policy, dated March 5, 1928, with Massachusetts Mutual Life Insurance Company (hereinafter referred to as Massachusetts), named as equal beneficiaries Isaac's wife and G. Daniel, or, if only one of them should survive Isaac, named that survivor as sole beneficiary. Prior to December 5, 1938, Isaac's children could have derived no direct benefits under either *91 of these policies by virtue of Isaac's death. 49. On December 5, 1938, Isaac created a trust, naming G. Daniel, his wife, and George as trustees. Concurrently with the execution of the trust agreement, he irrevocably assigned and delivered to the trustees the two insurance policies aforementioned. The trust provisions read in part as follows: "TRUST AGREEMENT "THIS AGREEMENT Made this 5th day of December, A.D., 1938, by and between ISAAC W. BALDWIN, of the City of Erie, County of Erie and State of Pennsylvania, hereinafter called the "Insured", party of the first part, and GEORGE DANIEL BALDWIN, FLORENCE E. BALDWIN and GEORGE A. BALDWIN, of the City of Erie, County of Erie and State of Pennsylvania, hereinafter called the "Trustees" parties of the second part; " - WITNESSETH - "FIRST: The Insured has delivered and caused to be made payable to the Trustees the insurance policies upon his life set forth in Schedule "A", hereto attached, made a part hereof and identified by the signatures of the parties hereto, the proceeds thereof, upon the death of the first party during their continuance, and prior to maturity of the endowment in such thereof as are on the endowment plan, are to be *92 held and disposed of by the Trustees for the uses and purposes hereinafter set forth; it being understood and agreed that the Insured shall pay the premiums and other charges on the said policies as and when the same shall become due and payable, or the premiums may be paid by any beneficiary or beneficiaries of this Agreement, and that the Trustees shall be under no obligation and assume no liability nor responsibility to see that the premiums are paid or to pay the same. "SECOND: As soon as practicable after the death of the Insured, the Trustees shall make proper proof of the Insured's death and shall collect all moneys due under said policies, and any other policy or policies which may be in the place of any or all thereof, either by conversion, reissuance, consolidation or otherwise, together with any additional policies made subject to this agreement by the Insured, and shall then hold and dispose of the same as a trust fund with full authority to manage, control, sell, invest, reinvest and otherwise deal therewith as they shall deem advisable and for the best interests of the beneficiaries hereunder, to the same extent as the Insured might do if living, without being confined *93 to such investments as are considered legal investments for trust funds by the Commonwealth of Pennsylvania. "THIRD: From and after the death of the Insured, the Trustees shall collect and receive the income from the trust fund, and after deducting all lawful costs, charges, taxes and expenses incident to the care and management of said trust, together with One ($1.00) Dollar per year for each Trustee, as full compensation for their services for acting as Trustee, shall use, pay and apply the net income, and shall hold, pay over and distribute the principal thereof in the following manner: "(a) The Trustees shall pay the first twenty-four hundred ($2400.00) Dollars of net income therefrom, in each year, commencing with the date of death of the Insured, in convenient installments, preferably monthly, to FLORENCE E. BALDWIN, wife of the Insured, for and during the full term and period of ten years from the date of death of the Insured. Provided however, that should FLORENCE E. BALDWIN, wife of the Insured, predecease the Insured, or should she, FLORENCE E. BALDWIN, survive the Insured, but die before the termination of the Trust Estate, then the income herein directed to be paid to *94 her shall be paid and distributed by the Trustees to the same children of the Insured and in the same manner as the Insured has herein directed the disposal of the remaining net income. "(b) The remaining net income, that is to say, all net income in excess of Twenty-four Hundred ($2400.00) Dollars in each year, commencing with the date of death of the Insured, shall be paid by the Trustees, in convenient installments, equally, to ESTHER, JAMES, GEORGE, MARGARET and RICHARD, children of the Insured, share and share alike, for and during the full term and period of ten years from the date of the death of the Insured. Provided however, that if ESTHER, JAMES, GEORGE, MARGARET or RICHARD or any of them, shall have predeceased the Insured, without leaving child or children, him or her surviving, or if such children of the Insured, or any of them shall have survived the Insured, but shall have died before the termination of the Trust Estate, without leaving a child or children him or her surviving, then the share of the income directed to be paid to such child of Insured dying without leaving child or children surviving, shall be paid equally by the Trustees to the surviving child or children *95 of Insured, and the surviving child or children of such deceased child of the Insured, who leave children surviving, per stirpes, until the termination of the Trust Estate. "AND PROVIDED FURTHER, that if ESTHER, JAMES, GEORGE, MARGARET or RICHARD, or any of them, shall have predeceased the Insured, leaving child or children him or her surviving, or if such child or children of the Insured, or any of them shall have survived the Insured, but shall have died before the termination of the Trust Estate, leaving a child or children him or her surviving, then the share of income directed to be paid to such child of the Insured so dying, shall be paid by the Trustees equally to the child or children of such deceased child of the Insured, until the termination of the Trust Estate. "(c) Ten years after the date of the death of the Insured, the Trust herein created shall cease and terminate, and the Trustees shall distribute the principal or corpus of the Trust Estate, equally, to ESTHER, JAMES, GEORGE, MARGARET and RICHARD, children of the Insured, share and share alike. In the event, however, of the death of any child or children of the Insured either before the death of the Insured or before *96 the termination of the Trust Estate, then the share of the child or children of the Insured so dying, shall be paid by the Trustees at the termination of the Trust Estate, to the child or children of such deceased child of the Insured, per stirpes, and should such child or children of the Insured so dying, not leave child or children him or her surviving, then the share of such deceased child of the Insured shall be paid by the Trustees, equally, at the termination of the Trust Estate, to the child or children of the Insured, and the child or children of any deceased child or children of the Insured leaving children who are living at the termination of the Trust Estate, per stirpes. "In event that any grandchild of the Insured, who may be entitled to any income and/or principal from the Trust Estate, should die before the termination of the Trust Estate, then the income and/or principal to which such deceased grandchild would be entitled shall be paid to such deceased grandchild's brothers and sisters, and in event such deceased grandchild does not have brothers and/or sisters, then such income shall be paid equally to the children of the Insured, and the child or children of deceased *97 children of the Insured, per stirpes. "FOURTH: Neither the principal nor the income of the Trust Fund shall be liable for the debts of any beneficiary hereof, nor shall the same be subject to seizure or attachment by any creditor or any beneficiary under any writ or proceeding at law or in equity, and no beneficiary hereunder shall have any power to sell, assign, transfer, encumber or in any other manner to anticipate or dispose of his or her interest in the Trust Fund or the income produced thereby so long as the same is held by the Trustees. * * *
"SIXTH: The Trustees are authorized and empowered to change and convert and to sell, assign, transfer and convey, any and all property constituting such trust fund at either public or private sale, at such time or times, for such price or prices, upon such terms as to cash and credit as they may seem best, and to make, execute and deliver to the purchaser thereof good and sufficient deeds of conveyance therefor, and all assignments, transfers and other legal instruments either necessary or convenient for passing title and ownership thereto, free and discharged of all trusts, and the purchaser shall not be bound to see to the application *98 of the purchase money arising therefrom, or to inquire into the validity, expedience or propriety of such sale. The Trustees are authorized and empowered to make all leases for any real estate for such term, at such rents and upon such conditions as the Trustees may deem expedient. Furthermore, the Trustees, may in their discretion, pay and discharge any liens, debts or obligations existing or chargeable on any such assets. * * *
"The Trustees, at their election, may borrow money on such terms and conditions and at such times, and for such purposes, as they may deem proper, and for such borrowings, they may issue their promissory note and notes, as Trustees, and secure the same, by pledging, mortgaging or hypothecating any or all assets of the Trust Estate. "SEVENTH: Until the death of the Insured he reserves the right, power and authority at all times, by his own act alone and without the consent or approval of the Trustees, or any beneficiary of this Trust, by an instrument in writing directed to the Trustees. "(a) To cause additional policies of insurance to be made payable to the Trustees and to bring same within the operation of this Agreement by affixing hereto additional policies, *99 and may add any other improved real estate or first bonds and mortgages upon improved real estate all in the City of Erie, County of Erie and State of Pennsylvania. "EIGHTH: It is hereby declared by the said Insured that he has been fully advised as to the legal effect of the execution of this Agreement and informed as to the character and amount of the property hereby transferred and conveyed; and further that he has given consideration to the question whether the settlement herein contained shall be revocable or irrevocable, and he hereby declares the same to be irrevocable, and that it shall stand without power in him, the said Insured, at any time to revoke, change or annul any of the provisions herein contained, or to cancel, revoke, recall or otherwise control any insurance policies or property made a part of this Agreement. * * *
"ELEVENTH: The Insured has named three individual Trustees in this Agreement, and specifically directs that any act, or action by a majority of Trustees shall be binding and conclusive on all the Trustees and on the Trust Estate. In event of the death or resignation of a Trustee, the vacancy so created need not be filled, unless the surviving Trustee *100 or Trustees shall so desire, in which event, if my brother, G. Daniel Baldwin is living, he is to have the sole authority to appoint a Trustee or Trustees to fill said vacancies, and in case my brother, G. Daniel Baldwin, should resign, or die, he may appoint his successor to take his place as Trustee, either by writing filed with the surviving Trustees, or such Trustee may be named in the Last Will and Testament of G. Daniel Baldwin. * * * In event of the death or resignation of one of the Trustees, G. Daniel Baldwin, and the surviving Trustees cannot agree then a successor Trustee shall be named by the Orphans' Court of Erie County, Pennsylvania. * * *" Schedule "A" referred to in paragraph "FIRST" listed and identified the Connecticut and Massachusetts policies. The value of these policies for gift tax purposes on December 5, 1938, was $34,183.50. 50. During December 1938, G. Daniel and Isaac caused deeds to be made to 23 parcels of real estate. Isaac's children, other than George, were named as grantees. Deeds to two other parcels named Isaac's wife as grantee. Nineteen of these properties had been held in Isaac's name, and were transferred on December 16, 1938, by deeds executed *101 in the name of decedent by G. Daniel Baldwin, attorney in fact. The remaining properties had been held in G. Daniel's name, and were the subject of deeds executed by G. Daniel on December 17, 1938. The deeds were recorded on December 19, 1938. 51. The named grantees were not informed in advance, and first learned of the transactions when the fact of their recording was published in the Washburn Confidential Report. This publication, which was subscribed to by Baldwin Brothers, reported transfers recorded, judgments entered, and other legal matters of record at the Erie County Courthouse. The children were at first elated, and felt that they were finally realizing something after the years of harsh discipline they had undergone. Their elation, however, turned to disappointment upon inspection of the properties, which were old and low-grade, fully depreciated on the partnership books, and would be vacated first upon any reduction in demand for rental properties. 52. Upon Isaac's return from his winter trip of 1938-1939, George discussed the foregoing transfers with him. These discussions continued from time to time throughout the year until December of 1939. George explained the children's *102 disappointment to Isaac and their feeling that Isaac and G. Daniel had not treated them fairly. Isaac agreed that the transfers were insufficient and that something further should be done. He discussed the matter with G. Daniel and between December 15 and 18, 1939, 14 properties previously held in the name of decedent, and 7 held in the name of G. Daniel were the subjects of deeds executed by G. Daniel Baldwin, either individually or as attorney in fact. The named grantees were George, Robert, and a trust, with George and Robert as trustees, and Arthur, Richard, James, Esther, and Margaret as beneficiaries. Five deeds were executed, and all five were recorded on December 27, 1939. 53. The grantees learned of the 1939 transactions, as in the case of those of the previous year, by their appearances in the Washburn Confidential Report. They were at first pleased, but were again disappointed after inspecting the properties involved. When Isaac returned in 1940 from his winter trip to Florida, George again stressed the disappointment of the children. Isaac again agreed that the children were entitled to some additional property; the difficulty was in persuading G. Daniel. During the protracted *103 negotiations that preceded the dissolution of the partnership on June 5, 1940, George, now openly at odds with G. Daniel, pressed the partners to make good their promises with additional transfers to the children. In June 1940, G. Daniel deeded 7 additional properties standing in his name to or for the benefit of the children, as follows: On June 5 and 7, 1940, 5 properties were transferred to G. Daniel, Florence, and George, trustees under the insurance trust of December 5, 1938; on June 5, 1940, single properties were transferred by separate deeds to Margaret and to Esther. The deed to Esther was recorded July 3, 1940; the remaining deeds were recorded almost a year later on June 25, 1941. 54. The foregoing deeds provided that the grantees, their heirs and assigns were to have and hold the described property "forever." Some of the deeds contained limitations, restrictions or conditions hereinafter more fully considered. The deeds were not personally delivered to the grantees, and the grantees did not assume actual control over the properties. The properties covered by the deeds were rented, and rents were usually collected by Baldwin Brothers and credited to the grantee's account. *104 Such rental income was to be used primarily for maintenance and for the acquisition of new properties. G. Daniel strenuously objected to the children spending rental income for any other purpose, and referred to "wasteful" expenditures as "running with the money" or "eating your seed potatoes." The children were convinced that failure to follow G. Daniel's policies, to which their father also subscribed, would make it much more difficult if not impossible to secure any additional property. Liability for One-Half of All Indebtedness 55. The Division Agreement of December 1, 1938, contained the following paragraph on the subject of liabilities: "1. Each of the parties to this contract have agreed to assume, and do assume, payment of an undivided one-half of all the liabilities and obligations of every kind and character of the partnership known and trading as "Baldwin Brothers" and of each of the co-partners thereof either in their individual or partnership capacities. Each of the parties hereto specifically agrees to pay one-half of all the notes, mortgages, liens, bills payable, claims, obligations and liabilities of every kind and character with respect to properties owned by either *105 of the parties hereto, and with respect to properties the title to which is in either of said parties. Each of the said parties agrees to pay one-half of all the obligations, claims and liabilities of every kind and character created by reason of any guarantees or agreements heretofore made by either or both of said parties with respect to any mortgages, notes, liens, agreements to purchase and contracts of every kind, together with any costs or expenses incident thereto, which have been entered into either by the partnership or by the co-partners thereof individually. Payment shall only be made when it shall have been legally and finally determined that said partnership or either of said co-partners, as individuals, is liable, or when in the judgment of either party hereto said obligations should be paid. The provisions of this contract shall not in any wise inure to the benefit of any third party. Said contract is made for the purpose of fixing and defining the rights of the parties with respect to each other, their heirs, executors, administrators and assigns. This contract shall be binding upon the parties hereto, their heirs, executors, administrators and assigns." 56. During *106 the negotiations leading up to the two contracts of June 5, 1940, Isaac feared that if he were to break completely with G. Daniel by refusing to sign the Management Agreement his brother would pay and then demand contribution of one-half the amount of all liabilities under the Division Agreement. This fear was one of the factors which influenced Isaac to sign the two agreements. 57. The Assumption Agreement, after reciting that "obligations of the partnership known as 'Baldwin Brothers' have been or may have been assumed by individual members of said partnership" and that "it is understood and agreed that all obligations and debts of every kind of both individual members of said partnership are actually debts of said partnership" contained the following additional paragraphs relating to liabilities: "1. G. Daniel Baldwin of the first part and Isaac W. Baldwin of the second part hereby agree to assume and do assume, payment of an undivided one-half (1/2) of all liabilities and obligations of every kind and character of the partnership known and trading as "Baldwin Brothers" and of each of the co-partners thereof either in their individual or partnership capacities. Both G. Daniel Baldwin *107 and Isaac W. Baldwin and each of them of the parties hereto specifically agree to pay one-half (1/2) of all the notes, mortgages, liens, bills payable, claims, obligations, liabilities, loans on life insurance policies, contingent liabilities and all other liabilities of every kind and character owed by either the said G. Daniel Baldwin or Isaac W. Baldwin. The said G. Daniel Baldwin and Isaac W. Baldwin, and each of them agree to pay one-half (1/2) of all obligations and liabilities of every kind and character with respect to properties, the title to which is in either of them or is in either of them as tenants by the entireties with their wives or with respect to which they or either of them have any equitable interest; and each of them particularly agrees to pay and assume one-half (1/2) of any and all obligations in connection with real estate where agreements have been made for the payment of City improvements where a liability or obligation has been created by reason of any guarantees or agreements heretofore made by either or both of the said parties, G. Daniel Baldwin and Isaac W. Baldwin. And they, the said G. Daniel Baldwin and Isaac W. Baldwin hereby assume and agree to *108 pay one-half (1/2) of any and all obligations and liabilities with respect to any mortgages, notes, legal agreements to purchase, loan on insurance policies and contracts of every kind and nature, together with any costs or expenses incidental thereto which have been entered into either by the partnership or by either of the co-partners thereof individually. Payment shall only be made when it shall have been legally and finally determined that said partnership or either of said co-partners as individual is liable, or when in the judgment of either the said G. Daniel Baldwin or Isaac W. Baldwin, said obligations should be paid. It is further agreed by said G. Daniel Baldwin and Isaac W. Baldwin that any amount due from either of them for personal service by any servant rendered to their Father or Mother or both shall be paid in equal parts by the said G. Daniel Baldwin and Isaac W. Baldwin if and when said obligations for personal service shall be legally established. The provisions of this contract shall not in any wise inure to the benefit of any third party. Said contract is made for the purpose of fixing and determining the rights of the parties hereto with respect to each of them *109 and his executors, administrators and assigns. This contract shall be binding upon the parties hereto, their wives, their heirs, executors, administrators and assigns. * * *
3. From and after the execution of this contract, G. Daniel Baldwin will no be required to pay any premiums or any portion of any premiums on any life insurance policies carried on the life of Isaac W. Baldwin; and Isaac W. Baldwin will not be required to pay any premiums or any portion of any premiums on any life insurance policies carried on the life of G. Daniel Baldwin. Any loans on said life insurance policies are to be paid by G. Daniel Baldwin and Isaac W. Baldwin; that is, G. Daniel Baldwin is to pay one-half of said loans and Isaac W. Baldwin is to pay one-half of said loans. Any of the provisions of this paragraph or the preceding paragraph which are in conflict with previous provisions of this contract are intended as exceptions to the said previous provisions. Neither Mabel L. Baldwin nor Florence E. Baldwin shall be liable for any of the debts or obligations of the co-partnership known as "Baldwin Brothers" nor of the individual members of said co-partnership who are G. Daniel Baldwin and Isaac W. Baldwin. *110 The provisions of this contract are intended to apply only to obligations of Baldwin Brothers and of the individual partners thereof which are legal, valid and binding obligations. This contract is intended by the parties hereto to be a complete settlement as of this date between the parties and in no wise defines or affects the rights or duties of the parties hereto with respect to any other person or persons. Wherever in this contract any of the parties hereto have assumed and agreed to pay any obligations or liabilities, it is understood and agreed that they assume and agree to pay said obligations or liabilities only after they have been legally established or when in the judgment of the parties hereto or their personal representatives, said obligations or liabilities should be paid." This contract was executed, as previously noted, by Isaac, G. Daniel, and their wives. In addition, there was attached a separate addendum in which the children stated that they had examined and did approve the contract. 58. The Management Agreement contained various provisions which directly and indirectly affected Isaac's liability for expenses incurred. It read as follows: "CONTRACT "Made and entered *111 into this 5th day of June, 1940, between G. DANIEL BALDWIN and MABEL L. BALDWIN, his wife, of the City of Erie County of Erie and State of Pennsylvania, parties of the first part, and ISAAC W. BALDWIN and FLORENCE E. BALDWIN, his wife, of the City, County and State aforesaid, parties of the second part. "WHEREAS, G. Daniel Baldwin and Isaac W. Baldwin, two of the parties to this agreement have for many years been co-partners in the partnership known as Baldwin Brothers with offices at 1002 State Street, Erie, Pennsylvania, and "WHEREAS, it is the desire of the said partners that the partnership heretofore known as Baldwin Brothers be dissolved and that Isaac W. Baldwin, one of the said partners, withdraw from the said business, and "WHEREAS, a contract between the parties hereto was made on the 5th day of June, 1940, according to the terms of which the rights of the said partners with respect to indebtedness and ownership of real estate was established, and "WHEREAS, it is the wish of the said Isaac W. Baldwin that his brother, G. Daniel Baldwin, continue to manage certain real estate owned by him, said Isaac W. Baldwin and Florence E. Baldwin, his wife, or both of them. "NOW THIS *112 INDENTURE WITNESSETH that for and in consideration of the premises and for and in the further consideration of One ($1.00) dollar paid to first parties by second parties and paid to second parties by first parties, the receipt of which is hereby acknowledged, and for and in the consideration of any sums hereinafter mentioned, it is agreed as follows: "1. The partnership heretofore known as Baldwin Brothers which partnership consisted of G. Daniel Baldwin and Isaac W. Baldwin, is dissolved as of June 5, 1940. From and after said date, the said partnership shall cease to exist. "2. Isaac W. Baldwin, as of June 5, 1940, withdraws from the business known as Baldwin Brothers and agrees that his brother, G. Daniel Baldwin, may continue such business under the name of Baldwin Brothers upon his filing the fictitious name certificate required by the Laws of Pennsylvania. "3. A settlement between the parties hereto shall be made as of June 5, 1940 with respect to all personal property, cash or cash in the bank. "4. From June 5, 1940, and for a period of three (3) years, to June 5, 1943, Isaac W. Baldwin agrees and does hereby employ his brother, G. Daniel Baldwin, to manage all of the real estate *113 owned by the said Isaac W. Baldwin, and Florence E. Baldwin, his wife, or both, formerly handled by Baldwin Brothers. "5. G. Daniel Baldwin agrees to manage said real estate, to procure tenants, collect rentals, pay taxes, make repairs and do all of the things needful for the proper management of the said property, as an employee only. "6. G. Daniel Baldwin agrees to use the funds received from the rental of said property, and if any property is sold, the proceeds from the sales thereof, for the following purposes: "(a) to pay taxes on said property. "(b) to keep said property in repair. "(c) to pay one-half of the office expense attorney fees, incidental expenses, automobile expenses or any other expenses not mentioned herein, necessary for the carrying out of this contract, including office rent, warehouse rent, and other incidental expenses, incurred by G. Daniel Baldwin incidental to the management of his own property and the property of Isaac W. Baldwin. "(d) to place in the bank account of Florence E. Baldwin and subject to her check, the sum of One hundred fifty ($150.00) Dollars on Monday of each week. "(e) to pay to Isaac W. Baldwin such sums as he may request for his personal *114 use. "(f) to apply all of the balance received from the rental or sales of the property of the said Isaac W. Baldwin toward the payment of the one-half of the obligations owned by the said Isaac W. Baldwin, G. Daniel Baldwin and Baldwin Brothers in accordance with the terms of the contract dated June 5, 1940, and hereinbefore mentioned. "7. It is agreed by all the parties hereto that the cost of the repairs and other expenses of Isaac W. Baldwin's property shall be determined by dividing the total cost of repairs and other expenses of all the property of Isaac W. Baldwin, Isaac W. Baldwin and Florence E. Baldwin, G. Daniel Baldwin, and G. Daniel Baldwin and Mabel L. Baldwin, as shown by the report made to the Internal Revenue Department for income tax purposes, by two. "8. G. Daniel Baldwin agrees to make a complete, correct and accurate account of all of his transactions with respect to the property of Isaac W. Baldwin, said report to be made every June 5th as of June 1st of each and every year during the continuance of this contract, and G. Daniel Baldwin is not to be required to make reports in any year prior to June 5th of each year. At the time of making the report, the cost *115 of repairs on property of Isaac W. Baldwin for the first five (5) months of the current calendar year is to be estimated as being five-twelfths (5/12) of one-half (1/2) of the cost of all repairs on property belonging to the parties hereto of the previous calendar year and is to be adjusted on the basis of the current calendar year at the time of making the next report or, if this contract is cancelled, then said cost of repairs is to be adjusted on or before June 5th of the following year. "9. It is agreed by all of the parties hereto that this contract may be cancelled by either party on Aug. 5, 1941, or Aug. 5th, 1942, providing, however, that the parties desiring to cancel said contract shall give the other parties thirty (30) days written notice of their intention so to do. It is also agreed that the death of either G. Daniel Baldwin or Isaac W. Baldwin shall cancel this contract. "10. Upon the giving or receiving of such notice, G. Daniel Baldwin agrees to render a complete, accurate and correct account with respect to the property of Isaac W. Baldwin, as of the date when such cancellation shall become effective. "11. G. Daniel Baldwin is instructed by parties of the second part *116 to use his best judgment in matters concerning this contract, and is specifically instructed not to carry insurance of any kind or character on property belonging to second parties and under his management unless it is his judgment that insurance should be carried. The said G. Daniel Baldwin is not to be held individually responsible for loss as a result of the failure of any bank or banks or any robberies or any happening beyond his control. "12. It is further agreed between the parties hereto that G. Daniel Baldwin in the performance of his duties as set forth in this contract shall be personally and financially responsible only for the funds which he collects and for the exercise of such care and judgment as would be exercised by an ordinarily prudent man engaged in similar employment. "13. It is further agreed between the parties hereto that in case the said G. Daniel Baldwin feels that he should be paid for his work, he is to receive at the time of the annual settlement or at the time the annual report is to be filed on June 5th of each year, the sum of Six thousand ($6000.00) dollars together with any legal expenses or accounting expenses incurred on account of the accounting *117 or filing of the report hereinbefore mentioned, for each year that he is employed by Isaac W. Baldwin and Florence E. Baldwin, payable from second parties funds. "14. An inventory of the personal property as of June 5th, 1940, is hereto attached and made part of this contract. "IN WITNESS WHEREOF the parties to this contract have hereunto set their hands and seals as of June 5th, 1940." This contract was executed by Isaac, G. Daniel, and their wives. Unlike the Assumption Agreement, there was no addendum covering the children. 59. The inventory of "personal property as of June 5th, 1940," referred to in paragraph 14 of the Management Agreement, listed, without valuation, construction materials and supplies, 17 automobiles and trucks separately by engine numbers, and office furniture grouped as one item. In addition, there was listed "Cash in Security Bank - $3700," and "Cash in Marine Bank - $1165." The inventory did not mention or refer to personal property at the market stores. Early Administrative Problems of Decedent's Estate 60. Upon Isaac's death, G. Daniel wanted to continue his management of decedent's properties. When the executors requested that such properties be turned *118 over to them for purposes of administration and management, G. Daniel refused to cooperate or furnish the executors with information relative to Isaac's properties, leases, rentals, tenants, and the like. Prior to the dissolution of the partnership, such matters were handled and recorded by G. Daniel through Baldwin Brothers, a partnership. After the dissolution, G. Daniel handled such matters through Baldwin Brothers, a sole proprietorship managing Isaac's properties pursuant to the Management Agreement. G. Daniel refused to assist the executors upon the ground that they were not paying him for any services. 61. The attorney requested by Isaac in his will, C. T. Bryan, was employed by the executors as counsel for the estate. Neither Florence nor George was conversant with the management and administrative problems which confronted them, and Bryan advised them in detail regarding such matters. He went to G. Daniel's office and requested a list of Isaac's properties, which was refused. Upon his advice the executors secured from the office of the city assessor, by virtue of a search of the assessment rolls, a separate card for each property listed in the name of any member or members *119 of the Isaac or the G. Daniel Baldwin families. These cards, which were acquired about the end of June 1941, showed the address, the city index number, a brief description of the property, the name of the record owner, and the assessed value, separately for land and building, if any, as of May 9, 1941. Such cards were known to be incomplete, but they constituted one source of information of Isaac's real properties at that time. In addition, the deeds for larger tracts of land from G. Daniel to Isaac, the Washburn Confidential Reports, and G. Daniel's accounting of his management under the June 5, 1940, contract were all studied. 62. On May 9, 1941, the operation of Baldwin Brothers as a sole proprietorship and the dissolution of the partnership were little known facts. The leases, keys, collection records and files of the former partnership, including those relating to Isaac's properties, continued in the hands of the sole proprietorship, meaning G. Daniel, by virtue of the Management Agreement. G. Daniel denied the executors access to the records and files of Baldwin Brothers, and refused to advise tenants of the estate to pay their rent to the executors. The executors tried to collect *120 rents where properties were known to belong to the estate. G. Daniel countered these efforts by reminding the tenants that their leases were with Baldwin Brothers, and that failure to pay their lessor might subject them to double rental payments. Some collections of rentals by Baldwin Brothers were turned over to the executors by G. Daniel, but others were not. Throughout the summer of 1941, the collection of rentals from properties of the estate was difficult and unsatisfactory. 63. Shortly after Isaac's death, G. Daniel presented a 3-page summary to the executors entitled "Obligations of Isaac W. Baldwin and G. Daniel Baldwin As of June 1, 1941." This summary showed obligations for notes, policy loans, mortgages, and unpaid bills totaling $429,552.77. G. Daniel represented that Isaac's estate owed one-half of such obligations under the Division Agreement and Assumption Agreement. He stated that the executors' plans for managing the estate would bankrupt it, demanded immediate payment, and threatened to attach the largest and most valuable properties of the estate in order to protect himself and secure payment of decedent's one-half of the obligations. At or about the same time, *121 G. Daniel informed the executors that the Twelfth Street and Central Market houses were run down, outmoded and obsolete, and that either several hundred thousand dollars would have to be spent in their renovation, or they would have to be closed, since physically the properties could be used for no other business. 64. There were also some threats made, the exact nature of which is not clear, with respect to partition proceedings. The executors were first under the impression that G. Daniel could cause their one-half interest in the market properties to be put up for sale. This caused them some concern, since they feared that bids might be low because potential bidders would find that G. Daniel was the owner of the other one-half interest. However, at least sometime prior to October 1, 1941, they became aware that partition would mean a sale of the entire fee, and the bidders would not be faced with G. Daniel as a tenant in common or joint tenant. They were also made aware that they, as well as G. Daniel, could bring about such a proceeding. 65. At the end of June 1941, G. Daniel submitted to the executors the accounting required by the Management Agreement of June 5, 1940. Therein, *122 G. Daniel showed "Receipts" for the "Isaac W. Baldwin Account" totaling $177,875.87, "Expenditures" totaling $178,140.64, and a balance due him from the decedent's estate of $264.77. He further requested payment of $6,000 for his services, as provided in the Management Agreement. The accounting included, on a separate page, market receipts and expenditures. This page showed a net balance of receipts over expenses in the amount of $11,780.28, prior to the deduction of a mortgage payment in the amount of $10,000. 66. The executors were unable to make the payments demanded by G. Daniel. They were also unable, in a practical sense, to cope with or counter his threats to take various legal steps against them, irrespective of the merits and notwithstanding their own belief that his claims were for the most part baseless. As a result of G. Daniel's control over the business and over Isaac's property during Isaac's life, and his sole possession of many records and much information needed by the executors, his position was such that little headway in proper administration of the estate could be made without some cooperation on his part. He was in a position to greatly harass the executors by *123 various means, including a variety of legal measures, however devoid of merit as a matter of substantive law. 67. In addition to the foregoing, the City of Erie commenced sequestration proceedings to seize the rentals of tenants and to apply them to improvement liens outstanding against some of decedent's properties. 68. The executors were advised by their attorney that even if G. Daniel was unfair in his accounting and dealings, he had all the advantages. They were advised to make peace with him and secure his cooperation, because without it they could not prepare an inventory or effectively administer the estate. In accordance with this advice and in spite of their knowledge that the demands of G. Daniel were unjust and excessive, the executors entered into a contract (hereinafter called the "Settlement Agreement") with G. Daniel on October 1, 1941, in settlement of their various differences. The Settlement Agreement was not presented to or approved by the court in which the estate was undergoing probate. 69. The principal provisions of the Settlement Agreement were, briefly, as follows. That the executors would (1) convey their interests in specified properties to G. Daniel, Robert, *124 and the City of Erie; (2) accept G. Daniel's accounting for the period June 5, 1940, to June 1, 1941; (3) execute a bond and mortgage in favor of G. Daniel to secure the payment of $86,810.24, the computation of such amount being set forth in the contract; and (4) release G. Daniel from liability on any claims against property of the estate owned prior to October 1, 1941. On his part, G. Daniel agreed that he would (1) convey specified properties to the executors; (2) release the executors from liability on any claims against his properties; (3) accept the bond and mortgage for $86,810.24 as full payment and settlement of all obligations of every kind due from the executors as of October 1, 1941; (4) turn over to the executors the leases and management of the properties belonging to the estate. 70. In preparing the Federal estate tax return some errors were made due to the difficulty of determining what properties the decedent owned at death. The cards which were made from the city assessment records were the principal means of ascertaining real estate includible in the return, although the information therein was supplemented with other available data. The cards did not reflect unrecorded *125 deeds or real estate outside of the city. The property descriptions were often erroneous or confusing with consequent inaccuracies in the cards. Because of these various difficulties, some properties which Isaac owned were omitted from the return and included in a supplemental return, and other properties which Isaac did not own were included. Specific Facts and Opinion, By Issues The foregoing findings of fact have been for the most part limited to general facts relating to the case as a whole. The voluminous nature of the present record and factual background, as well as the large number of issues to be resolved, make impractical the inclusion in the foregoing findings of specific facts relating to each issue. Such facts would in large measure have to be then repeated in order to make possible an intelligible discussion and resolution of legal issues involved or an explanation of the reasons for the ultimate resolution of specific issues of fact. Accordingly, to avoid such repetition, the general facts have been set forth in the above findings of fact, but the specific facts relating to each individual issue will be set forth with the discussion and resolution of such issue. As far *126 as practicable, the issues will be discussed in the order in which they arise as a result of the various allegations of error in paragraph 4 of the amended petition. A number of issues have been conceded or resolved by stipulation or deferred by agreement until the filing of computations by the parties, and no longer require a determination here on the merits. The issues so affected are those raised in paragraphs 4(c), (i), (j), (k), (l), (m), (p), (r), (s), (u), (w), (z), (ff), (hh), (vv), and (ww) of the amended petition. These concessions, stipulations and deferrals, along with others pertaining to parts of or specific items within various other issues, will be given effect in the recomputations pursuant to Rule 50. Issue 1. Valuation of Certain Real Estate Items Paragraph 4(a) of the amended petition alleges that respondent placed values upon various real estate and related items exceeding in the aggregate amount of $149,500 the true aggregate value of such assets on the date of decedent's death. Findings of Fact In the real estate schedule of the estate tax return, the executors listed 381 separate items of property and the rents accrued on some of such items at the date of decedent's *127 death. The aggregate value of the real properties and accrued rents was reported as $1,303,715.50, of which $1,298,427 was the reported value of 370 separate items of real property and $5,288.50 was the reported value of accrued rents thereon. The values used for the 370 items of real estate were the values placed thereon by a special appraiser for inheritance tax purposes for the Commonwealth of Pennsylvania. Respondent accepted the values reported by the executors for most of the properties listed. However, some adjustments were made, which increased to $1,372,431.50 the aggregate value of properties listed or determined by respondent to belong in the real estate schedule. The adjustments included increases in value over the values reported for 8 items, the valuation of 9 property items reported without value, the accrual of additional rentals on 3 items, the inclusion and valuation of 6 properties omitted, and the correction of an alleged error in addition. The valuation of 173 separate items on the real estate schedule was disposed of by the parties with the following stipulation: "1. The properties referred to in paragraphs 4(a) and 5(b) of the amended petition filed April 21, *128 1955 (hereinafter referred to as the amended petition) shall be deemed to have values at death equal to those reported therefor in the real estate schedule (Schedule A) of the estate tax return (Form 706) filed August 6, 1942 with the following exceptions: "(a) Item 114 shall be deemed to have a value at death of $5,500.00. "(b) Item 124 shall be deemed to have a value at death of $5,000.00. "(c) Item 295 shall be deemed to have a value at death of $2,800.00 instead of the $3,800.00 shown as the value of this item in Schedule A of the estate tax return. "(e) The value of Items 289 and 291 is not agreed to by this stipulation and evidence may be introduced by either party as to the value of such items. "(f) The value of the accrued rents on 232 E. 29th Street, on property owned jointly with G. Daniel Baldwin, and on property owned jointly with Florence E. Baldwin is not agreed to by this stipulation and evidence may be introduced by either party as to the value of such items." The real properties referred to in subparagraph (e) of the above-quoted stipulation, their descriptions, their valuation in the return and their valuation in the notice of deficiency, were as follows: Value in
Value
Deficiency
Item
Description
in Return
Notice
289
12th Street Market
$75,000
$92,500
291
1209 French Street
3,700
5,500
*129 Petitioner alleges in its amended petition that the values of the above items on the date of Isaac's death were "not more than" $75,000 and $3,700, respectively, as reported in the return. Petitioner called two expert witnesses, both eminently qualified, to testify as to the values of the above and other properties. One such witness testified that the value of the full interest in each was, respectively, $150,000 and $7,500. He also stated that in his opinion a discount of 20 per cent would be required in valuing one-half interests in these properties, in view of G. Daniel's ownership of the other one-half interests. The other witness testified that the full interests in the properties were worth, respectively, $150,000 and $9,000. He disagreed with the theory that a discount should be applied in valuing half interests, and concluded that the values of Isaac's one-half interests in the above properties on the date of his death were, respectively, $75,000 and $4,500. Opinion Having reviewed the record, we are inclined to find the testimony of the second of the above-mentioned witnesses more weighty as to this issue. Accordingly, we hold that the values of Isaac's one-half interests *130 in the two properties in question here on the date of his death were, respectively, $75,000 and $4,500. The question as to the accrued rents mentioned in subparagraph (f) of the above stipulation is more directly connected with matters raised by later paragraphs of the amended petition, and will be disposed of hereinafter. Issue 2. Value of Property Couveyed to G. Daniel Paragraph 4(b) of the amended petition alleges that respondent assigned excessive values to eight items of real property conveyed to G. Daniel pursuant to the Settlement Agreement of October 1, 1941. These properties include items 289 and 291, which we have already discussed. The allegation of error in paragraph 4(b) is an alternative to that contained in paragraph 4(uu), wherein petitioner asserts a right to deduct the net excess consideration paid to G. Daniel as a result of the Settlement Agreement. In view of our determination, infra, (issue 29 hereof) with respect to petitioner's primary position, the issue raised by paragraph 4(b) is moot, and requires no further consideration. Issue 3. Certain Unimproved Real Property Findings of Fact On or about December 1, 1938, in connection with the division of partnership *131 properties under the Division Agreement, Isaac transferred to G. Daniel an undivided one-half interest in an unimproved parcel of land located on the north side of West 24th Street between Berst Avenue and Geist Road. Isaac owned the other undivided one-half interest in this property on the date of his death. The deed was recorded July 16, 1940. This parcel was included as item 286 in Schedule A of the return at its full value of $280. Respondent made no adjustment with respect thereto. Petitioner now claims in paragraph 4(d) of the amended petition that there should be included only one-half of the value of this parcel. Opinion We find as ultimate facts and hold that Isaac had only a one-half interest in this parcel at the time of his death, and that such interest at that time had a fair market value of $140. Issue 4. Certain Properties Covered by Deeds in Blank Six items of improved property with an aggregate value of $27,600 were included in the gross estate, as properties owned by the decedent at date of death. They were listed in Schedule A under the title "Supplemental Return," and were identified as items 24 S.R., 25 S.R., etc. They are also identified as a part of the 381 *132 parcels itemized in Schedule A. Petitioner now alleges in paragraph 4(e) of the amended petition that decedent had no interest in these parcels at the time of his death. Findings of Fact The item numbers, the location of the six houses and lots here in issue and their values at date of death, as reported (and as accepted by respondent), were as follows: Value at
Item No.
Location
Date of Death
(366) or 24 S.R.
2518 Perry St.
$ 4,500
(167) or 25 S.R.
2521 French St.
5,500
(370) or 30 S.R.
1164 W. 5th St.
2,800
(371) or 31 S.R.
1146 W. 5th St.
4,500
(372) or 32 S.R.
1144 W. 5th St.
4,500
(373) or 33 S.R.
1006 W. 26th St.
5,800
Total $27,600
In 1933 Isaac conveyed these six properties to G. Daniel by three separate deeds, which were recorded November 29, 1933. G. Daniel remained the owner of record of these properties until June 25, 1941. During the negotiations in connection with the dissolution of the partnership and the execution of the Management Agreement, G. Daniel agreed to convey the six properties to the trustees under the Trust Agreement of December 5, 1938, but did not do so at that time. A number of deeds, including two deeds covering the foregoing six properties, and purporting to be executed in *133 June of 1940, were signed by G. Daniel, but with the names of the grantees left blank, and delivered to Bryan, the attorney for the estate. After Isaac died, George obtained the deeds, filled in the blanks by inserting the names of the trustees as grantees, and recorded the deeds. The six properties here in controversy were charged against Isaac's account in the division of properties pursuant to the Assumption Agreement of June 5, 1940. From June 5, 1940, until Isaac's death, G. Daniel, doing business as Baldwin Brothers, managed the six properties under the Management Agreement. After Isaac's death and prior to October 1, 1941, demand was made on G. Daniel for payment of the income derived from these six properties. G. Daniel acceded to this demand, and in the Settlement Agreement he allowed the following credit for the benefit of the estate against the amount allegedly due him: "Less credit on statement concerning properties deeded to Trust as of June 5, 1940 $2,681.50." The foregoing amount was substantially the amount of net income of the six properties from the execution of the deeds to the date of Isaac's death. The six properties were included in Schedule A upon the advice *134 of Bryan. Respondent made no adjustments with respect thereto. Opinion The evidence shows only that Bryan received deeds executed in blank, retaining them until after Isaac's death. But such receipt and retention are ambiguous. Bryan acted as attorney for both G. Daniel and Isaac at various times, and there is no evidence as to the capacity in which he acted on this occasion. For whom did Bryan act? This question is unanswered. It could have been G. Daniel, or Isaac, of the children. We simply do not know. If Bryan's possession of the deeds is to be imputed to Isaac, it seems clear that the properties must be included in the estate, as no enforceable obligation on Isaac's part to reconvey them to his children appears from the record. Bryan was called as a witness by petitioner, but was not asked for whom he acted. [1] *135 Petitioner bears the burden of proof here, and this failure is fatal to its position on this issue. The foregoing is strengthened by the facts that (1) G. Daniel managed these properties under the Management Agreement, (2) he credited to the estate income therefrom against amounts allegedly due him, (3) the deeds remained blank and unrecorded until after Isaac's death, (4) petitioner included the value of the parcels here in question in the estate tax return on advice *136 of counsel, and (5) these properties were apparently charged ot Isaac's account in the division of properties pursuant to the Assumption Agreement of June 5, 1940. [2] The Management Agreement related to Isaac's property, and did not authorize G. Daniel to manage that belonging to the children or their trustees. And the foregoing credit benefited only the estate. To be sure, G. Daniel may have acted under errors of law, or he may have intentionally arrogated to himself authority not juridically his to manage properties of the children, and deliberately misapplied funds of the trustees to the satisfaction of his alleged claims against the estate. This, however, is mere surmise. The uncertainties surrounding this entire issue require its resolution against petitioner. Inclusion of the properties here in controversy must, under the circumstances, be held proper. Petitioner also argues that G. Daniel and Isaac were both under obligation to transfer property to the children, as a result of the various labors, restraints *137 and deprivations to which they had been and were still being subjected. We have found as facts that the various unpleasant aspects of the upbringing of the children, described in greater detail in the foregoing findings of Historical Facts, constituted a method of discipline and character development rather than a contractual relationship or compensable services. Any obligation borne by Isaac and G. Daniel was merely a moral obligation, and, as far as these properties are concerned, simply remained unfulfilled. We cannot, because of any such moral obligation, supply facts absent from the record, but necessary to a finding that respondent erred. Moreover, G. Daniel, whatever his moral obligation to the children, had a legal obligation to Isaac in the division of properties required as a result of the dissolution of the partnership. These properties were applied by G. Daniel in partial satisfaction of that obligation. We agree with respondent that "G. Daniel could not reap a double benefit by claiming that the payment of his legal debt to decedent also discharged his supposed moral obligation to the children." In any event, the record fails to show that Bryan held the blank deeds to *138 these properties in any capacity other than as Isaac's representative. Petitioner correctly notes that delivery need not be directly to the donee, and cites In re Rynier's Estate, 347 Pa. 471, 32 A. 2d 736, where the court held sufficient a delivery to a third person for the use of the donee or to be turned over to him. In that case, however, the facts established such delivery. Here they do not. The court also noted (32 A. 2d at pp. 738-739): "The delivery to an agent or custodian is ineffective as a gift inter vivos if it is not accompanied with definite instructions to make delivery in turn to the donee." We are totally ignorant of any instructions to Bryan, and no witness has enlightened us. We are not free to presume an answer favorable to petitioner. Indeed, not until after Isaac's death, when George filled in the blanks, were the identities of the grantees finally established. The foregoing makes unecessary a consideration of respondent's alternative position to the effect that these properties were transferred in contemplation of death. Issue 5. 524 East 2nd Street A house and lot at 524 East 2nd Street valued at $2,200 at the date of death, was included in the return as *139 property then owned by decedent. Paragraph 4(f) of the amended petition alleges that decedent had no interest in this property at the time of his death, and that its inclusion was hence erroneous. Findings of Fact This property was erroneously described in a deed from Isaac to his son, George, in December 1939. As a result of that error the Erie assessment records and the card prepared from those records and used in preparing the return showed that title was in Isaac. The street address, 524, had been inadvertently substituted for the correct distance in feet (240) as the point of beginning from a certain street intersection. This parcel was one of several deeded to Isaac's children in December 1939, by Isaac and G. Daniel, after the children had expressed their disappointment with the 1938 transactions. The deed in question, dated December 15, 1939, and recorded December 27, 1939, was executed by G. Daniel as attorney in fact for Isaac. It covered two parcels of real property, namely, those appearing as items 30 and 19 of Schedule A of the return. On August 15, 1942, the executors delivered a deed to George which correctly described the property at 524 East 2nd Street. However, the *140 1941 accounting of G. Daniel under the Management Agreement credits $331.10 in rentals from this parcel to Isaac. Opinion The record here is in some respects more and in other respects less favorable to petitioner than was true of the immediately preceding issue. Here we have evidence of recordation prior to decedent's death. We have found as a fact that a mistake in the deed caused official records to show title in Isaac, and draw no inference unfavorable to petitioner therefrom. On the other hand, the deed in question was one of several executed after the children expressed disappointment over the original purported transfers, and was discovered by them only by a reading of reports of real estate recordings. Moreover, G. Daniel managed the parcel in controversy under color of the Management Agreement and credited rentals to Isaac's account. Any presumptions in favor of petitioner arising from recordation are, we think, at least counterbalanced by the adverse features above noted. Cf. Estate of John W. Mortimer, 17 T.C. 579. We cannot find that respondent has erred here. Issue 6. 421 Beverly Drive An improved property located at 419 (now 421) Beverly Drive, was included in Schedule *141 A of the return as item 368 (or 28 S.R.), as property owned by the decedent at death, with a value of $3,400. The respondent determined the value of this property to be $5,500, and acquiesced in its inclusion. Petitioner now alleges in paragraph 4(g) of the amended petition that decedent had no interest in this property at the time of his death. Findings of Fact G. Daniel acquired this property on or about June 29, 1935, from Roger A. and Margaret Withrow. The deed was recorded on July 11, 1935. G. Daniel was the owner of record at the time of the Division Agreement and during the negotiations prior to and on June 5, 1940. This was another of the several properties purportedly transferred to the children when the partnership was dissolved and the Management Agreement executed. G. Daniel deeded this property to Isaac's daughter, Margaret, by deed dated June 5, 1940. The deed was recorded on June 25, 1941, along with the June 5, 1940, deeds to the trustees of the December 5, 1938, trust. The deed provided that possession of the premises was to be given April 1, 1942. This provision was discovered after Isaac's death when the deed was obtained from Bryan, and an attempt was made to obtain *142 rents from G. Daniel in respect thereto. The deed also contained a clause to the effect that if Margaret wished to sell the property at anytime within 15 years from June 5, 1940, G. Daniel and his wife, Mabel, or their heirs, had the first right to purchase such property free and clear from any encumbrance for $3,500, such purchase to be made within 30 days from time of receiving notice of Margaret's intention to sell. Prior to April 1, 1942, Margaret received no rent from this property. Opinion This deed was held by Bryan, as were those mentioned in issue 4, supra. There is here the same lack of proof of Bryan's capacity. The property appears to have been charged to Isacc's account in the division of assets, pursuant to the Assumption Agreement. It was managed by G. Daniel under color of the Management Agreement, and income was applied for the benefit of Isaac or his estate until almost 1 year after Isaac's death. Petitioner claims that this deed was not executed in blank, and we are inclined to agree. A clause gives G. Daniel and his wife, or their heirs, the right to purchase the property for $3,500 if within 15 years after June 5, 1940, the grantee wishes to sell. The pronouns *143 used in that clause show that there is but one grantee, a female. We do not believe that Bryan, holding the deed as Isaac's agent or attorney, would permit the later insertion of such a clause. Yet when the clause was written, it was known that there was one female grantee. We must conclude either that Bryan held the deed other than as Isaac's agent, or that the clause and necessarily the grantee's name existed before he received it from G. Daniel. The former holding would require exclusion of the property from the estate. There being no actual proof of either point, we must make that finding least favorable to petitioner. We gold, therefore, that G. Daniel inserted Margaret's name as grantee (as Isaac's nominee) as well as the restrictive clause, before turning the deed over to Bryan, but that Bryan thereafter held it as Isaac's agent. Thus, there was a delivery not to Margaret, but to Isaac through his agent, Bryan. Margaret was merely Isaac's nominee as named grantee, and having furnished no legally cognizable consideration, could not have enforced a delivery to herself. Isaac retained ownership until his death, through the possession of the deed by Bryan, and the property was properly *144 included in his estate. Petitioner claims that the foregoing restrictive clause limits the value of the property to $3,500. The law is well settled to the contrary. That clause does not require the owner to sell. Nor does it constitute an option to G. Daniel to buy. Only if, within 15 years, the owner should wish to sell, must the property be offered to G. Daniel or his successors in interest for $3,500. Such a clause reduces the value of the property below its unrestricted value, but even where it is unlimited in time it does not conclusively fix the maximum value of the property. Worcester County Tr. Co. v. Commissioner, 134 F.2d 578 (C.A. 1). In Halsted James, 3 T.C. 1260, affd. 148 F. 2d 236 (C.A. 2), we said at page 1264: It has been the consistent view of this Court in cases where the stockholder is under no obligation to sell by reason of his contract, but has simply agreed to offer his stock to others on certain stated terms if he should desire to sell, that such an agreement does not have the effect of limiting the value upon which the Government may compute its tax to the amount at which the stock is to be offered if the owner decides to sell. See Estate of George Walker, 23 B.T.A. 663; *145 Michigan Trust Co. et al., Executors, 27 B.T.A. 556; Frederick A. Koch, Jr., Executor, 28 B.T.A. 363; Estate of James Smith, 46 B.T.A. 337. See also Kline v. Commissioner, 44 B.T.A. 1052; affd., 130 Fed. (2d) 742. Each of these cases is distinguishable from Wilson v. Bowers, supra; Lomb v. Sugden, supra; Helvering v. Salvage, 297 U.S. 106; and Commissioner v. Bensel, 100 Fed. (2d) 639, cited by petitioner. In those cases, on the date as of which the value was to be determined there had already been granted a valid, binding, irrevocable option to purchase, specifically enforceable. The holder had no choice to refrain from selling at the stipulated price. The stock was already impressed with the onus of the option. See also Henry K. Chapin, 33 B.T.A. 688; City Bank Farmers Trust Co., Executor, 23 B.T.A. 663. Even actual contemporary sales, where not under accepted standards of open, aware, arm's length dealing, have been held inconclusive of true value for estate tax purposes. Cf. Schnorbach v. Kavanagh, 102 F. Supp. 828 (D. Mich.). We cannot find from the record that in valuing this property respondent failed to consider, inter alia, the existence of the restriction on sales. *146 Accordingly, respondent's determination herein must be sustained. Issue 7. 611 Maryland Avenue The executors included in Schedule A, item 379 or 21 S.R., as property owned by decedent at death, an improved property at 611 Maryland Avenue, at a value of $1,400. Respondent adjusted this item by increasing its valuation to $3,500. It is now alleged in paragraph 4(h) of the amended petition that decedent had no interest in this property at the time of his death. Findings of Fact G. Daniel acquired this property from the receiver of the Erie Trust Company by deed dated February 11, 1938. On June 5, 1940, and prior thereto, Esther Allen, one of Isaac's daughters, lived in the house at 611 Maryland Avenue and paid rent to G. Daniel. In the negotiations preceding the 1940 transfers, George and Isaac insisted that Esther receive the place in which she lived. G. Daniel finally agreed, and by deed dated June 6, 1940, he deeded the property to Esther. This deed was recorded July 3, 1940. Subsequently, and on January 27, 1941, the deed from the receiver to G. Daniel was recorded. The foregoing deed from G. Daniel to Esther provided that "This conveyance is made subject to the taxes for the year *147 1940." It further provided, as in the deed to Margaret, that if at any time within 15 years from June 6, 1940, Esther desired to sell the property, she should notify G. Daniel and Mabel, or their heirs, who had the first right to purchase the property, free and clear of any encumbrance for $2,450, such purchase to be made within 30 days from the time of receiving the notice, if at all. Esther continued to live at 611 Maryland Avenue after June 6, 1940, but paid no rent. Opinion The facts surrounding this parcel, while largely similar to those relevant to the property located at 524 East 2nd Street, are different in several respects. Esther received the immediate benefit of the property by virtue of the fact that she continued to reside therein without further payment of rent. This, we think, is the equivalent of receiving the rental value, i.e., the income from the property if rented to others. And it does not appear that G. Daniel managed the property after execution of the deed. Thus, it appears that no benefits were retained by or remained in Isaac after the conveyance, and there is no evidence sufficient to overcome the presumption of delivery created by recordation of the deed. *148 To be sure, Isaac may have been willing to permit Esther to reside gratuitously on a property belonging to him, and there would be no reason for G. Daniel to manage such a parcel. We incline to the view, however, that there is on this issue a preponderance of the evidence in petitioner's favor. We thus hold that the inclusion of 611 Maryland Avenue was erroneous. Issue 8. G. Daniel's Accounting of June 1941 Statement of Issue and Findings of Fact Subparagraphs (n), (o), (q), (y), and (gg) of paragraph 4 of the amended petition all relate to the accounting rendered by G. Daniel in June of 1941 under the Management Agreement. The ultimate evaluation of this accounting, which will determine the indebtedness of G. Daniel to the estate or of the estate to him, is a single issue. Subparagraphs (y) and (gg), alleging error, respectively, in the inclusion of $625.37 as a debt due from G. Daniel and the denial of a deduction of $13,325.03 (now claimed to be $9,454.19), as a debt due to G. Daniel, both raise the question of the ultimate valuation of the accounting. Subparagraphs (n), (o), and (q), relating to specific items in the accounting, are merely subsidiary parts or phases of such valuation. *149 Paragraph 4(n) challenges the inclusion as accrued rents of $5,288.50 originally so included in Schedule A of the return, and additions by respondent in the amounts of $35 and $244. The addition of $35 is based on rentals from 232 East 29th Street (item 190 of Schedule A) and that in the amount of $244 was added as rentals on property jointly owned by decedent and G. Daniel. The amount of $5,288.50 reported in the return, the addition $35of, and another addition in the amount of $637 (hereinafter discussed in greater detail) comprise the total amount of $5,960.50 set forth in the accounting as "Rents, I.W.B. Prop. 5/9/41-6/1/41." The addition in the amount of $244 is based upon an item in the account in that amount designated "Rents, Joint Title 5/9/41-6/1/41, 1/2 Interest." Paragraph 4(o) alleges error in the inclusion of the foregoing item of $637,which respondent designated as "Additional accrued rent on property owned jointly with Florence E. Baldwin." Petitioner claims therein that the proper amount includible in the estate as a result of this item is $23.44. Although not reported in the return, this item of $637 was taken into account in evaluating G. Daniel's accounting. After *150 Isaac's death, rentals in the amount of $191 were received by the estate on properties given to Isaac and his wife as tenants by the entireties by James D. Baldwin, the father of Isaac and G. Daniel. Additional rent on such properties was received by Baldwin Brothers between May 3 and May 10, 1941, in the amount of $161.48, which was turned over to the estate. Of the total amount so collected, $45.48 was received in respect of rentals due for periods prior to May. The remaining $307 constituted rent for the month of May. No part of the foregoing rentals in the amount of $352.48 was accounted for in the return. The effect on the valuation of the accounting of these rentals is the subject of paragraph 4(q) of the amended petition. In Schedule C of the return, which relates to mortgages, notes, and cash owned by the decedent at the time of death, the executors reported a balance of $324.14 in Isaac's checking account in the Marine National Bank of Erie. Respondent made no adjustment of this item. Petitioner has alleged, in said paragraph 4(q), that decedent's interest therein at the time of his death was in the amount of $75.21. Prior to Isaac's death, Baldwin Brothers collected the rentals *151 on the aforementioned properties owned jointly by Isaac and Florence. These rentals were deposited in the "Isaac W. Baldwin" account with the Marine National Bank of Erie. The balance in this account on May 1, 1941, was $79.36. On May 5, 1941, the balance was increased to $324.14 by the deposit of $244.78, representing rentals collected by Baldwin Brothers for the period April 30 to May 2, 1941, inclusive. The previous balance of $79.36 arose from an earlier deposit of $201.26, consisting of rentals collected from such properties for the period April 17 to 26, 1941, inclusive. None of these rents was reflected in G. Daniel's accounting of June 1941. All were received prior to Isaac's death. The rents so collected and deposited were applicable to the month of May and to periods before and after May, as follows: Before
After
Amount
May
May
May
$244.78
$ 43.59
$198.59
$2.60
201.26
135.92
59.67
5.67
Total
$446.04
$179.51
$258.26
$8.27
The return as filed by petitioner both included an asset and claimed a deduction in respect of the accounting by G. Daniel. In Schedule F the amount of $625.37 was included as a part of the gross estate, while in Subschedule (A2) of Schedule K thereof a deduction in the amount *152 of $3,460.50 was claimed. Respondent accepted and left undisturbed the $625.37 inclusion, but denied any deduction. Paragraphs 4(y) and (gg) of the amended petition allege error, respectively in such inclusion and denial, the latter claiming a deduction in the amount of $13,325.03 to be proper. The deduction now claimed by petitioner is in the amount of $9,454.19. In his account of June 30, 1941, G. Daniel showed that decedent's estate owed him $264.77 as a result of his management of properties under the Management Agreement of June 5, 1940. However, the operation of the two market properties was accounted for separately and showed a net profit in the amount of $1,780.28, after payment of $10,000 on the principal of a mortgage. The amount of $625.37, the excess of one-half of $1,780.28 over $264.77, was thus claimed by decedent's estate to be due from G. Daniel. No payment was ever made under the account of June 30, 1941, by G. Daniel or by decedent's estate. Settlement of the account was postponed until October 1, 1941, at which time G. Daniel and the executors arrived at a basis for settlement, as hereinafter set forth in greater detail. The account rendered by G. Daniel in June *153 of 1941 showed the following receipts and expenditures for Isaac's account from June 5, 1940, to June 1, 1941, exclusive of those relating to the market properties: ISAAC W. BALDWIN ACCOUNT
RECEIPTS: Cash on Hand 6/4/40, 1/2 Interest
$ 1,850.00
Inventory 6/4/40, 1/2 Interest
6,297.38
Office Furn. (Inventory) 1/2 Interest
161.50
* Rents, I.W.B. 6/5/40 - 5/9/41
$132,262.58
* Rents, Joint Title 6/5/40 - 5/9/41, 1/2 Interest
3,876.50
* Rents, I.W.B. Prop. 5/9/41 - 6/1/41
5,960.50
* Rents, Joint Title 5/9/41 - 6/1/41, 1/2 Interest
244.00
142,343.58
Proceeds - Sale of Vacant Lots
7,170.00
Proceeds - Sale of 2209 Parade Street
5,000.00
House to Kenyon, 646 W. 3rd St., 1/2 Interest
1,750.00
Front & Wallace, 1/2 Interest in Mortgage
2,025.00
Allowance of 1/2 on Mortgage paid by I.W.B.
2,000.00
Refund on County Tax, Erie
4,745.44
* Net Income Misc. Property
4,532.97
$177,875.87
EXPENDITURES: Taxes
$ 60,723.00
Repairs
49,500.00
Interest
8,841.00
Salaries
8,649.00
Auto Expense
3,908.00
Light & Heat
1,050.00
Telephone
180.00
Water
140.00
Compensation
346.00
Office Supplies & Postage
166.00
Legal Expense
1,687.00
Recording Fees
30.00
Government Taxes
2,565.00
Paving Liens
525.95
Advertising
56.00
Insurance
117.00
Misc. Exp. Cash Book J.R.B. - J.D.B., Etc.
1,265.00
Misc. Exp. Auto Depreciation
250.00
Office Rent
780.00
Warehouse Rent
1,200.00
Garage Rent
300.00
Losses: E. D. Kenyon $3,250.00 1/2 of
R. T. Marsh 632.00 actual
Misc. 474.00 loss
4,356.00
(Brought Forward)
$146,634.95
Uncollected Water Rents Due
182.30
Florence E. Baldwin
7,650.00
* Miscellaneous Bills Paid
1,563.54
* Payments on Notes & Mortgages
11,500.04
DeFrancisco Taxes & Loss - 1/2 Interest
4,390.00
* Payments on Bills Due 6/4/40 - 1/2 Interest
3,719.81
Sara Weis - 1/2 Interest
2,500.00
$178,140.64
Less Income
177,875.87
Due from I.W.B. Est. $
$ 264.77
*154 Receipts and expenditures with respect to the market properties were stated as follows: Market Statement of Receipts & Expenditures
Receipts: Cash balance 6/5/40
$ 2,973.75
Rents - Twelfth Street Market
42,371.01
Rents - Central Market
33,273.60
Cash from tokens
1,842.30
$ 80,460.66
Expenditures: Equipment & repairs on equipment
$ 1,372.90
Coal
1,447.85
Advertising
8,623.58
Interest
4,205.69
Water
1,145.90
License tax law suit
800.00
Repairs
15,000.00
Gas
323.70
Electricity
9,120.03
Parking lot rent
3,375.00
Misc. operating expenses
1,120.01
Payroll
9,823.72
Taxes
11,258.00
Insurance
1,064.00
$ 68,680.38
Net receipts
$ 11,780.28
Required annual payment on Mtge.
10,000.00
$ 1,780.28 Thus, the June 1941 accounting purports to show a net indebtedness of G. Daniel to the estate in the amount of $625.37. Opinion Taking the figures contained in said accounting as true, it is nevertheless apparent that errors in computation have been made which, if corrected, would require substantial additions to the foregoing figure. A payment on the principal of a mortgage is in effect a part of the purchase price. It is too clear to require *155 citation that such payment is a capital expenditure, and must be disregarded in determining net profit or loss. G. Daniel's accounting shows such a payment in the amount of $10,000, which he erroneously deducted in computing the net profits realized under his management of market properties. In making this mortgage payment, one-half of which is attributable to decedent or his estate, G. Daniel may have acted properly. Nonetheless, the estate was increased by the amount of $5,000 or one-half of the amount by which the mortgage indebtedness was reduced. This fact must be taken into account in determining the taxable estate. Contrary to petitioner's contentions, the foregoing reduction of the mortgage indebtedness has not been offset elsewhere in the return. Petitioner argues that the accrued rentals reported in the return in the amount of $5,288.50, as well as respondent's respective additions thereto of $35 and $244 will be taken into account to whatever extent proper, and should not be included twice by inclusion as well in the real estate schedule (Schedule A) of the return. The same contention is made with respect to the item of $637 of accrued rent on property owned jointly with *156 Florence E. Baldwin. We agree with petitioner. The foregoing items will accordingly be excluded from Schedule A. We now must consider whether, taking all relevant items into account, respondent erred in determining that a balance of no less than $625.37 existed in Isaac's favor at the time of his death. Petitioner takes the position that the account included a net amount of $9,454.19 in which Isaac had no interest at his death, computed as follows: May rents attributable to period after
May 9, 1941
$ 6,748.80
June rents
772.68
Net income of parties other than
decedent
4,532.97
Total
$12,054.45
Less: Expenditures for period after
May 9, 1941
2,600.26
Net amount in which decedent had no
interest at death
$ 9,454.19
The item "Net income of parties other than decedent" apparently refers to income from those properties covered by deeds handed to Bryan and certain other properties, inclusion whereof is in issue. From what has already been determined, for the purposes of this proceeding we must view rentals from the properties covered by deeds delivered to Bryan as belonging to Isaac. Accordingly, and in view of our disposition, infra, of certain other issues, rentals therefrom may not be eliminated in valuing *157 the accounting. Petitioner has allocated merely $2,600.26 of expenses to the period after death, but produced no evidence supporting such allocation. Expenses do not necessarily occur in even amounts month after month, nor do they necessarily occur in the same proportion to income. Seasonal variations may substantially affect such expenses. There may well be many items of expense heavier at certain times of the year than at others. We do not know the actual date of payment of many large items of expense, such as taxes in the amount of $60,723, and repairs in the amount of $49,500, to name just the two largest items. We cannot merely assume that by far the greatest part of such expenses was paid or accrued before death. Petitioner bears the burden of proof here, and has simply failed to meet its burden. The foregoing deficiencies in the record make moot the question as to inclusion of prepaid rentals for periods subsequent to Isaac's death. A resolution of that question entirely in petitioner's favor would fall far short of counterbalancing its failure to show the date of payment of large items of expense, plus the additional $5,000 resulting from the mortgage payment previously discussed. *158 We cannot find error in respondent's ultimate valuation of the June 1941 accounting. His determination with respect thereto must be sustained, both in the inclusion of the amount of $625.37 and in the denial of the deduction of $9,454.19. Issue 9. Insurance Proceeds Paragraph 4(t) of the amended petition alleges error in respondent's action of including in the computation of the gross estate the amount of $142,314.25, representing the excess over the then statutory exemption of $40,000 of the proceeds of two policies of insurance on decedent's life payable to beneficiaries other than the estate. The pleadings which frame this issue are complicated and we feel that a full exposition will be helpful to understanding. The executors had originally included these two ordinary life policies [3] in Schedule D (Insurance) of the estate tax return, showing net proceeds of $81,622.25 and $100,692, from which they deducted amounts, in the same ratio as premiums paid prior to January 10, 1941, bore to total premiums paid, to arrive at a net total value of $11,228. From this last figure they deducted as an "amount receivable by beneficiaries, other than the estate, not in excess of $40,000.00" the *159 sum of $11,228 and thus included nothing in the Recapitulation (Schedule O) of the return. In the statutory notice of deficiency there appears only the following having any significance to this issue: Adjustments to Net Estate
Additions to value of net estate and
decreases in deductions: Insurance
$142,314.25
Transfers
126,050.00
Explanation of Adjustments
[Deter-
[Returned]
mined]
Insurance
Item # 1
Connecticut Mutual Life
Insurance Company,
Policy # 588,657
$ 8,014.00
$100,692.00
Item # 2
Massachusetts Mutual
Life Insurance Com-
pany, Policy # 835,186
$ 3,214.00
$ 81,622.25
Total
$11,228.00
$182,314.25
Less insurance exemp-
tion
11,228.00
40,000.00
$ 0.00
$142,314.25
It is determined that the net proceeds of insurance policy No. 588,657 issued in the name of the decedent by the Connecticut Mutual Life Insurance Company, and policy No. 835,186 issued in the name of the decedent by the Massachusetts Mutual Life Insurance Company should be included in the gross estate to the extent of the excess over $40,000.00 or $142,314.25. * * *
Transfers [45 parcels *160 of real estate which had not been included in the estate tax return are listed.] It is determined that the properties transferred on December 19, 1938 and December 27, 1939, located in Erie, Pennsylvania, having a fair market value of $126,050.00 should be included in the gross estate within the meaning of Internal Revenue Code, Section 811(c). The entire portion of the notice of deficiency under the heading "Insurance" has been quoted above. In his answer to the amended petition the respondent entered a general denial to paragraph 4(t), supra, and then pleaded: "Further answering the petition, respondent * * * alleges that: * * *
"8. If the Court holds that the decedent made a legally complete, valid and irrevocable transfer of all interest in the insurance policies in issue in paragraph 4(t) prior to his death without retaining any reversionary interest therein, then and in that event respondent alleges that the proceeds of said policies were property transferred in contemplation of death under the provisions of section 811(c) of the Internal Revenue Code of 1939, and further alleges that respondent has already determined, in the alternative, that such transfers, if valid, were in *161 contemplation of death." Respondent's treatment of this issue on brief may be summarized as follows: 1. Under the heading "Questions Presented" he includes: "2. Whether the creation of an nisurance trust constituted a transfer in contemplation of death." 2. Under the heading "Statutes and Regulations Involved" section 811(g) dealing with proceeds of life insurance is not included. 3. Under his Point II, respondent argues only that the creation of the insurance trust in December 1938 constituted a transfer in contemplation of death and states, inter alia, "On the basis of additional evidence and subsequent statutory amendments, respondent now concedes that the trust was not revocable or reversionary in nature." Thus respondent does not now contend that, independent of the contemplation of death issue, any amount representing proceeds of these insurance policies is includible in the gross estate and we shall consider no other theory. On this state of the pleadings petitioner argues with considerable force that the burden of proof is on respondent under our Rule 32. We feel that the record shows ample facts for our affirmative consideration of this issue and consequently it is unnecessary *162 to rule on this contention. Findings of Fact Decedent was 56 years old when this trust was created on December 5, 1938. He died 29 months later. Decedent had made a will on February 27, 1937, which he changed at his wife's request, executing his last will on September 5, 1940, all as set out by paragraphs numbered 31 and 32 hereof under the heading "General Facts." Specific findings relating to decedent's health and mental attitude are made at numbered paragraphs 26 through 30, supra. The trust was immediately funded by irrevocable assignment and delivery to the trustees of the Connecticut and Massachusetts policies described at numbered paragraph 48, supra. These were both so-called ordinary life policies with premiums payable annually, and on December 5, 1938, their combined cash surrender value was $34,183.50. The record is not clear as to who actually paid the premiums after December 5, 1938. There was no further funding of the trust prior to decedent's death. Pertinent portions of the December 5, 1938 trust are set out in full at numbered paragraph 49, supra. Decedent was greatly concerned over certain contingent liabilities more fully described under our general findings *163 at numbered paragraphs 46 and 47. He feared that these liabilities might eventually reduce or even wipe out his net assets. Opinion As this and other courts have stated many times, the determination of the question whether decedent gave or transferred "in contemplation of death" within the meaning of section 811(c), Internal Revenue Code of 1939, is one of fact, to be decided by all of the evidence. The ultimate question to be decided has been stated by the Supreme Court in United States v. Wells, 283 U.S. 102, 115: "While the interpretation of the phrase [in contemplation of death] has not been uniform, there has been agreement upon certain fundamental considerations. It is recognized that the reference is not to the general expectation of death which all entertain. It must be a particular concern, giving rise to a definite motive. The provision is not confined to gifts causa mortis, * * * The statutory description embraces gifts inter vivos, despite the fact that they are fully executed, are irrevocable and indefeasible. The quality which brings the transfer within the statute is indicated by the context and manifest purpose. * * * The dominant purpose [of the statute] is to reach *164 substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax. [Citing cases.] As the transfer may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor must be found in the transferor's motive. * * *" In Garrett's Estate v. Commissioner, 180 F. 2d 955, the court affirmed the Tax Court in holding that the proceeds of the 30 life insurance policies plus a proportionate part of a fund, income from which was to pay the premiums, had been given "in contemplation of death." The policies and fund had been irrevocably assigned to an inter vivos trust providing payments to beneficiaries only after settlor's death. In commenting on the context and nature of the trust and its funding properties, the court said at page 956: "Nevertheless, * * * it would go too far to say that a transfer of policies can never be other than testamentary, when the beneficiary cannot possibly profit by them, living the settlor, ordinarily such a transfer will be of that kind. A conveyance of property which the grantee can by no chance use until the grantor's death, will so commonly be in the main testamentary, that it is fair to infer that that was its *165 preponderating, if not indeed its only, purpose, unless there be affirmative evidence of other contributory motives. * * *" This and other courts have often found from the particular facts in a given case that there existed strong lifetime motives in the donations to trusts of life insurance policies and other properties even though all payments to beneficiaries were deferred until after settlor's death. Estate of Charlotte A. Hopper, 22 T.C. 138; Estate of Louis Richards, 20 T.C. 904; Estate of Frank W. Thacher, 20 T.C. 474; Estate of Edmund W. Mudge, 27 T.C. 188; Estate of Verne C. Hunt, 14 T.C. 1182. And in such cases the lifetime motives were found to be the dominant or moving ones and the property was not taxed. Regardless of which party bears the burden of proof as to this issue 9, we feel that since it has been shown from the very nature of this trust instrument that the beneficiaries' enjoyment is deferred until after settlor's death, it at least casts the burden of going forward to show lifetime motives upon petitioner. Cf. Garrett's Estate v. Commissioner, supra. Petitioner's principal contention is that a strong lifetime motive has been shown, to-wit, that Isaac *166 was genuinely concerned over the possibility that his net assets might be substantially reduced or even wiped out if certain contingent liabilities became payable. Such contingent liabilities were Isaac's liabilities on the mortgage guarantees made between 1919 and 1932 and his guarantees of the improvement liens on the Morrison and Dinsmore Subdivision, said guarantees made in the late 1920's. Respondent urges that such fears were groundless in view of the size of Isaac's estate and because claims based upon such guarantees had almost disappeared before the creation of this trust, but we find it unnecessary to weigh and consider such evidence because of the peculiar provisions of Pennsylvania law. Section 517, title 40, Pa. Stat. Ann. (Purdon), provides that the net amount payable under any policy of life insurance made for the benefit of or assigned to the wife or children or dependent relative of the insured shall be exempt from all claims of insured's creditors as to obligations created after passage of the act (June 28, 1923), whether or not the right to change the named beneficiary is reserved by or permitted to the insured. Such statute has been interpreted to exempt from the *167 claims of creditors the cash surrender value of life insurance policies during the insured's lifetime as well as the proceeds payable upon his death and that this was true whether or not insured had the power to change the beneficiary. In Re Rose, 24 F. 2d 253 (E.D., Pa.); In Re Lang, 20 F. 2d 236 (E.D., Pa.); Dussoulas v. Lang, 24 F. 2d 254 (C.A. 3), certiorari denied 277 U.S. 593. It is thus apparent that the strongest lifetime motive urged on us by petitioner has fallen by the wayside. The life insurance policies with which Isaac funded this trust could have been made equally as secure from creditors by the simple expedient of removing G. Daniel as a named beneficiary and leaving only Florence or by naming as beneficiaries the identical persons named by the December 5, 1938, trust. Thus in so far as protecting his assets against possible contingent liabilities was concerned, Isaac's creation of this trust was unnecessary. This is not to say that Isaac's estate is to be taxed on the basis of what he could or might have done but is simply to illustrate that petitioner's evidence of a lifetime motive has little value. Petitioner also urges as lifetime motives that this trust was *168 created in partial fulfillment of Isaac's promises to his children to reward them for past services and deprivations, and that this trust was a part of the general scheme of his December 1938 division of properties with G. Daniel. We do not look upon either argument as forceful. These purposes could have been easily realized by the removal of G. Daniel as a beneficiary and substitution of the children. This, too, would have completely removed G. Daniel from all control over the policies and their later proceeds, a desirable result not accomplished by the trust since G. Daniel was named as one of the trustees. In view of the above, we conclude that the burden of going forward with the evidence to show a dominant lifetime motive in the creation of this trust was upon petitioner, that no such motive appears in the record and that respondent's determination with respect to this issue must be sustained. Issue 10. 925-931 West 6th Street In Schedule E of the return, the executors reported as item 9 therein that decedent owned a one-half interest in properties located at 925-931 West 6th Street, and valued this interest therein at death at $11,875. They claimed that decedent and his wife *169 were joint owners and that his wife owned the other one-half interest. In the deficiency notice, respondent determined that decedent owned the full interest in these properties at his death, and valued such interest at $23,750. Paragraph 4(v) of the amended petition alleges that respondent erred in such determination, and that the value of decedent's one-half interest in the properties in question was overstated by respondent in the amount of $13,750. Petitioner now claims that decedent should be viewed as the owner of 925 West 6th Street with an alleged date of death value in the amount of $14,250, and that the property at 931 West 6th Street belonged to Florence alone. Findings of Fact The properties, measuring 123 3/4 feet by 165 feet, were acquired by Isaac and Florence as tenants by the entireties by a deed dated October 20, 1924, and recorded April 27, 1925. The property at 925 West 6th Street consisted of two lots, on one of which was built a brick house which was used as the residence of Isaac and his family. The property at 931 West 6th Street comprised one lot improved by a two-family brick flat (a building with two floors suitable for separate families). In 1912, Florence *170 received $1,000 from the estate of her father. Isaac used this money in the partnership business for about 2 years. It was then used to purchase "flood lots" near Mill Creek, which were deeded to Florence in November 1915. The deed, which was recorded November 18, 1915, described the "flood lots" as a parcel of land, 32 1/2 feet by 165 feet, and the consideration therefor as $800. The other $200, plus the accumulated interest, was used by Baldwin Brothers in the construction of a two-family, frame dwelling house on the lot. The cost of this frame house and the date of its erection are unknown. On October 5, 1916, Florence conveyed this improved property to Pawel Lipinski, et ux, for $3,400, subject to the leases then on the property with rent from November 1, 1916. Prior to the sale the partnership accumulated the rentals from this property, the amount of which is unknown. The proceeds of the October 5, 1916, sale and the accumulated rentals from the Mill Creek property were held by Baldwin Brothers until 1923 when a lot, 44 1/4 feet by 165 feet, was purchased at 341 West 9th Street and a two-family brick flat with double garage was erected thereon. The amount invested in the lot *171 and the improvements at 341 West 9th Street is unknown. Florence believed that she received this property in consideration for the accumulated rents on and the proceeds from the sale of her Mill Creek property, but she does not know whether her understanding is correct. She had no knowledge of or experience in business. Florence collected the rents on the property at 341 West 9th Street until April 1, 1929. Prior to March 26, 1929, G. Daniel asked Florence if she would be willing to let him sell 341 West 9th Street and take in exchange a flat at 950 West 6th Street. Florence agreed, and on March 26, 1929, G. Daniel, as attorney in fact for Florence and Isaac, sold the property to "Marshall G. Pratt UX," the deed being recorded the same day. The consideration stated in the deed was $1. Thereafter, and on May 28, 1929, G. Daniel and his wife conveyed the property at 950 West 6th Street to Florence. The deed described this property as a lot 41 1/4 feet by 165 feet improved by a two-family brick flat and double garage, and the consideration as $1. After the transfer of 950 West 6th Street to her, Florence collected the rents thereon. Neither the selling price of 341 West 9th Street nor *172 the value of 950 West 6th Street at March 26, 1929, and May 28, 1929, respectively, is known. When this proceeding was heard, Florence was still the owner of the property at 950 West 6th Street. The transfer of the property at 950 West 6th Street was said by G. Daniel to be free from all encumbrances, but Florence learned 2 or 3 years prior to Isaac's death that there was a mortgage on it. The mortgage, originally to secure payment of $8,000, covered 950 West 6th Street and the adjoining property. The adjoining property had apparently been released therefrom prior to the transfer to Florence, but there is no evidence of any apportionment of the mortgage as between the two properties. After such release of a portion of the mortgaged property, a payment of $4,000 was made on the mortgage debt on or about November 10, 1931. On or before February 5, 1941, Isaac paid the $4,000 balance. Florence had some sort of oral, informal understanding of uncertain date with her husband that, as between themselves, the flat at 931 West 6th Street belonged to her. At the beginning of their marriage, she used rent from the flat above them to carry on the expenses of Isaac's household. It does not appear *173 that any contribution was made by her with respect to acquisition of the property where they first lived. After acquisition of a two-family flat at 341 West 9th Street, as hereinbefore noted, Florence had rentals from three apartments with which to meet household expenses. As the family increased in size, other properties were acquired by Florence and some rentals therefrom used for household expenses, property taxes, and incidentials. The rentals from 341 West 9th Street, 950 West 6th Street, and 931 West 6th Street were so used. Rentals from some of Florence's properties were collected by Baldwin Brothers and used in its business, but there is no evidence of such use prior to the purchase in 1924 of 931 West 6th Street, with the exception of the rents invested in such purchase. Florence thought that the flat at 931 West 6th Street was in her name alone since she handled the property, collected the rents, and was billed for and paid the taxes thereon. It was after Isaac's death that she learned that the flat was still held by Isaac and herself as tenants by the entireties. The value of the properties at 925-931 West 6th Street at the date of death was $23,750. Florence did not contribute *174 to the purchase price of 925-931 West 6th Street. Opinion Section 811(e) of the Internal Revenue Code of 1939 requires the inclusion in the gross estate of, inter alia, interests held by a decedent and spouse as tenants by the entireties. There may be excluded only that part of the value "as may be shown to have originally belonged to * * * [the survivor] and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth * * *." It goes without saying that it is here incumbent upon petitioner to prove the fact and amount of any part of the value of the assets in controversy excludible from the gross estate. Florence testified in an attempt to do so, but her testimony falls far short of achieving its goal. She had no experience in or knowledge of business matters, and could trace funds belonging to her only in a vague, general and unsatisfactory manner. Much of her testimony consists of what her opinions and understandings were, but we do not know if such views were correct. To the extent she did trace her funds, she traced them to 341 West 9th Street and thence to 950 West 6th Street, which latter *175 property she still owns. And her private understandings were, by her own admission, incorrect in more than one instance. She thought 950 West 6th Street was free and clear, but later learned that it was subject to a mortgage, and she erroneously believed that 931 West 6th Street stood in her name alone. Nor is petitioner aided by testimony of rents collected by Florence. Such rents appear to have been used for household and other expenses. If traceable at all to a capital item, they are traced to 341 West 9th Street and thence to 950 West 6th Street. Moreover, it would appear that Florence received the major part of these rents after the acquisition in 1924 of 925-931 West 6th Street. We sympathize with petitioner, and appreciate the difficulty it faces in proving such matters. Nonetheless, it must prove them. We cannot find that it has successfully done so here. Petitioner seems now to claim a partition, whereby Isaac became the owner of 925 West 6th Street and Florence received sole ownership of 931 West 6th Street. Of course, the best evidence of a partition would be recorded deeds to that effect, but such proof may not necessarily be essential. Cf. Lipsitz v. Commissioner, 220 F.2d 871 *176 (C.A. 4), certiorari denied 350 U.S. 845. Petitioner argues that a parol partition is valid for estate tax purposes. The entire record here, however, does not satisfy us that such partition in fact occurred. Moreover, respondent has made timely objection to evidence of partition, and, claiming surprise, asserts that the pertinent allegation in the amended petition (paragraph 5(bb)) is inconsistent with that theory. Paragraph 5(bb) reads as follows: "The Commissioner has included in the jointly-owned property schedule of the gross estate the full interest, at a value of $23,750, in two properties located at 925-31 West 6th Street, which were shown as item 9 of Schedule E of the return. The decedent and his wife owned these properties as tenants by the entireties at the time of his death. Each of them supplied out of his or her separate property approximately one-half of the consideration paid for these properties. The full value of these properties was $20,000 at death. The value of the decedent's one-half interest therein at death was $10,000." Petitioner seeks to avoid the effect of the above inconsistency by stating that it claims merely an equitable, not a legal partition. But *177 however characterized, petitioner wants it to have sufficient legal effect to be recognized by us for tax purposes. And the underlying theory is of partition whether equitable or legal, not of contribution by Florence to property held as tenants by the entireties, as set forth in the amended petition. This present theory is inconsistent with paragraph 5(bb). Thus, even were the evidence sufficient to establish a partition or agreement by whatever name called to separate ownership of the properties, and we find as a fact that it is not, we would have to refuse it such effect, as being beyond the scope of the pleadings. There is no present controversy as to the date-of-death value of the assets, both parties accepting $23,750 as the proper figure. In view of the foregoing respondent's determination in respect of this issue must be sustained. Issue 11. Personal Property Interest in Markets Paragraph 4(X) of the amended petition alleges error in the inclusion in the computation of the gross estate of the amount of $6,500 in respect of a one-half interest in market stores, on the ground that decedent owned no such interest at the time of his death. Findings of Fact In Schedule F of the *178 return, entitled "Other Miscellaneous Property," the executors included the foregoing $6,500 as the value at death of decedent's one-half interest "in stores" in the Twelfth Street Market and the Central Market. This represented decedent's interest in personal property at such markets as distinguished from his real property interest therein. Respondent accepted this valuation as correct in his notice of deficiency. When G. Daniel submitted his June 1941 accounting, the last page thereof was entitled "Market Statement of Receipts & Expenditures." This statement showed total receipts from the market properties of $80,460.66, total expenditures of $68,680.38, and net receipts of $11,780.28. G. Daniel charged the net receipts with $10,000 for "Required Annual Payment on Mtge." The Management Agreement was limited to real estate, and did not mention the management of grocery stores or other separate enterprises. The data in G. Daniel's account of June 1941, related to the real properties comprising the markets, and not to the operation of the stores. After Isaac's death, and under date of June 28, 1941, the executors entered into a contract with G. Daniel employing him at a salary $300of *179 per month to manage their portion of the two markets for 19 months from June 1, 1941, to January 1, 1943. The executors granted "complete authority" to G. Daniel "to make leases with tenants of said markets, to make repairs or alterations, to make additions or to add equipment, to continue the merchandising business conducted therein and to add such other legal business as may in his judgment be advisable." They insisted on managing Isaac's other properties without G. Daniel's assistance. For the period June 1 to October 1, 1941, G. Daniel reported a deficit of $9,216.70 from his management of the market properties, which included a $1,200 charge for management. In the settlement of October 1, 1941, between G. Daniel and the executors and trustees of decedent's estate, this market deficit was one among the many obligations that were settled and disposed of by the parties. As a part of that settlement the executors conveyed to G. Daniel an undivided one-half interest in the two markets and "Also all personal property including groceries and merchandise used in connection with said markets and all leases and accounts contracted for or incurred in connection with said markets." The personal *180 property mentioned included the groceries and fixtures of Modern Grocery in the Twelfth Street Market and of Economy Grocery in the Central Market. The inventory item of $6,297.38 listed as a receipt by G. Daniel in his accounting of June 1941 represented building supplies and materials. Such item did not represent the value of decedent's personal property in the Twelfth Street and Central Markets. Neither the market stores, nor the proceeds of any sale of such stores, was included in the accounting of June 1941. Decedent had an interest in the market stores at the time of his death, having a value of $6,500. Opinion Petitioner argues that decedent did not have an interest in market stores at the time of his death other than as reflected in the June 1941 accounting. Respondent, however, has chosen to accept as correct petitioner's original action of including such an interest "in stores" in the return as filed, with a date-of-death value in the amount of $6,500. The record does not show respondent to be in error. In its requests for findings of fact petitioner seems to admit that Isaac "may" have had such an interest prior to June 5, 1940. Petitioner does not show, however, how, if *181 that be the case, he was divested of it prior to his death. The repeated urging that this interest "merged" into his real property interest, unsupported by anything other than petitioner's ipse dixit, does not establish any such "merger." The Management Agreement by its terms refers only to real property, and there would accordingly seem to be no reason for the inclusion in the June 1941 accounting of any reference to the operation of grocery or similar enterprises. Thus it is not at all apparent that the "inventory" item in that accounting refers to market stores (as distinguished from the properties as real estate). Petitioner must bear the onus of such uncertainty. George testified that G. Daniel represented that he had sold or otherwise disposed of the stores, and applied the proceeds under the Management Agreement. But as we have already noted, that agreement is limited to the management of real property. Furthermore, the June 1941 accounting does not appear to list the proceeds of a sale or other disposition of any such interest. Petitioner chose to include the interest in question in the return in August of 1942, long after the alleged representation by G. Daniel of its supposed *182 disposition. And finally, testimony of a representation by G. Daniel to the witness is not sufficient here to prove the truth of the matter represented. Two documents in addition to the return, both signed by the executors, point to the existence of the interest at and after Isaac's death. The contract of June 28, 1941, authorized G. Daniel, inter alia, to continue to operate a "merchandising business" on the premises, and the Settlement Agreement of October 1941 purports to assign to G. Daniel the very interest in question. George testified that Bryan had computed the $6,500 item, and that he (George) didn't know of what it was composed. Petitioner again admits its ignorance of the facts of this matter at page 53 of its reply brief. Bryan was called by it as a witness, and was not asked about it. As we have previously mentioned, a statement by petitioner's counsel in a brief that he knows that Bryan could not recall the facts is unacceptable. In any event, a failure by the witness to remember the facts cannot serve as a substitute for testimony that they were as asserted by petitioner. It is difficult to understand how petitioner can seriously urge the Court to find that decedent *183 did not own the interest in controversy at his death, when by its own admission it is ignorant of the facts, and the one person who knows or knew the facts has, for whatever the reason, failed to enlighten us. Respondent's determination must be sustained with respect to this issue. Issue 12. Equity Suit Against G. Daniel and Others In the notice of deficiency, respondent included as other miscellaneous property owned by decedent, claims against G. Daniel and others, as set forth in a bill of complaint filed with the Court of Common Pleas of Erie County, in equity, February Term, 1945. Respondent determined the fair market value of such claims as of May 9, 1941, to be $1,000,000 and increased the gross estate accordingly. Petitioner alleges in paragraph 4(aa) of the amended petition that the claim was not conceived until 1944, that its existence was unknown and unascertainable at the time of Isaac's death, and that it had no value at that time. Findings of Fact The circumstances which led up to the filing of the aforementioned bill of complaint were, briefly, as follows: After entering into the October 1, 1941, agreement with G. Daniel, the executors prepared and filed an estate tax *184 return for decedent's estate. Upon examination of such return, one of respondent's revenue agents proposed an additional estate tax. The executors employed special tax counsel to represent them in this matter. After investigating the estate's tax problems, the special tax counsel discussed with the executors the advisability of filing suit against G. Daniel. He presented arguments for and against such suit, and indicated that it might force G. Daniel to furnish evidence important to the estate tax case. However, he made no recommendation as to whether such a suit should be brought, but suggested that such decision should be made by a Pennsylvania attorney. The estate's attorney, C. T. Bryan, had recommended the signing of many of the instruments which would be attacked as part of the fraudulent conduct of G. Daniel. In view of these considerations and his relationship to G. Daniel as the latter's attorney, the executors knew that Bryan would not prosecute such a suit. They did not know whether any other acceptable Erie attorney would do so. However, such an attorney was found, one William B. Washabaugh, Jr., who had previously successfully prosecuted G. Daniel for rent control violation, *185 a fact which had received considerable publicity. After listening to the executors and reading the brief prepared by special tax counsel, he agreed to bring the action. In December 1944, Florence and George, as executors and trustees under the decedent's last will, and individually, along with James, Richard, Esther, and Margaret, brought an action in equity in the Court of Common Pleas, Erie County, Pennsylvania, against G. Daniel, his wife, Mabel, his adopted sons, Robert and Arthur, and Gladys A. Riede, who was then and had been for a substantial period employed as a bookkeeper at the office of Baldwin Brothers. [4] *186 The suit was based largely upon fraud and breach of trust committed during decedent's lifetime, which acts were discovered by the executors in the marshalling and reduction to possession of the assets of the estate and the ascertainment of estate and inheritance tax liabilities, all in the ordinary course of administration. It was also alleged that fraudulent conduct was practiced by G. Daniel against the executors after Isaac's death. The action sought to recover the value of property alleged to have been taken from the decedent and the complainants by G. Daniel through breach of trust and fraud in operating the partnership between Isaac and G. Daniel and in managing the property of Isaac and of the complainants; to set aside all agreements and accountings between Isaac and the complainants on the one hand, and G. Daniel on the other; to set aside all conveyances by Isaac and the complainants to G. Daniel; to secure from G. Daniel an accounting of all partnership properties and transactions and of G. Daniel's property management; and to have the defendants declared constructive trustees of all properties found to belong to any of the complainants. Thereafter, in November 1945, G. Daniel brought an action in the same court against Florence and George, as executors and trustees under the decedent's last will. He alleged therein that the defendants had failed in violation of their covenant to do so, to pay all state and Federal death taxes with respect to certain properties *187 conveyed by the defendants to the complainant, and prayed that the defendants be ordered to perform their covenant to pay such taxes. In November of 1946, G. Daniel Baldwin died at the age of 70. Thereafter, on February 26, 1947, an agreement (hereinafter called the "Compromise Agreement") settling the two causes of action referred to above and all claims between the two groups was entered into between Florence, individually and as executrix of decedent's estate; George, individually and as executor of decedent's estate; and decedent's other children, James, Richard, Esther, and Margaret; and Robert, individually and as executor of the estate of G. Daniel; Mabel, individually and as executrix of the estate of G. Daniel; Arthur; Mabel as trustee for Arthur; Tenth Street Building Corporation of Erie; and Gladys A. Riede. The Compromise Agreement signed by all the parties thereto, was referred to as an agreement between the members of two groups, "The Isaac W. Baldwin Group" and "The G. Daniel Baldwin Group." It provided, in part, as follows: That the G. Daniel Baldwin Group would execute and deliver to the Isaac W. Baldwin Group, or its nominee, a lease of an exit to a certain property; *188 that the G. Daniel Baldwin Group would cause a release to be executed and delivered to the Isaac W. Baldwin Group, or its nominee, wherein certain parking rights would be relinquished; that the G. Daniel Baldwin Group would execute and deliver to the Isaac W. Baldwin Group, or its nominee, quitclaim deeds to properties at 421 Beverly Drive (referred to erroneously in the agreement as 711 Lincoln Avenue) and 611 Maryland Avenue, thus releasing the aforementioned restrictions on sale within 15 years which G. Daniel had included in the deeds to those properties; that the G. Daniel Baldwin Group would execute and deliver to the Isaac W. Baldwin Group, or its nominee, special warranty deeds to certain real properties; that the execution of the agreement should constitute a complete and absolute settlement of all disputed issues between every member of each group; and that all pending suits by any member of one group against any member of another group should be immediately dismissed with prejudice. The Compromise Agreement also contained an agreement by the G. Daniel Baldwin Group to furnish information and afford access to records showing the disposition made by G. Daniel of all income *189 which he collected through May 9, 1941, from properties managed by G. Daniel and purportedly owned by Isaac's children. Certain other provisions of a noncompensatory character were set forth whereby, principally, one or both groups agreed to perform certain acts of courtesy or reciprocity. The benefits of the settlement extended to the various members of decedent's family individually as well as to the estate and trust under his will. A number of the provisions in the Compromise Agreement had no material or fair market value. The fair market values on February 26, 1947, of the several pieces of real estate which were to be conveyed by the G. Daniel Baldwin Group to the Isaac W. Baldwin Group, or its (nominees), by special warranty deeds, were found by the Commissioner of this Court who heard this case, to be as follows: Fair Market Value
Description of Property
February 26, 1947
Single house and lot, 913 West
32nd St.
$ 4,800
Single house and lot, 917 West
32nd St.
4,800
Duplex house and lot, 807-809
West 22nd St.
9,500
Duplex house and lot, 2611-13 Hol-
land St.
9,000
Duplex house and lot, 830-32 West
5th St.
9,800
Duplex house and lot, 220-24 West
5th St.
9,500
Garage property, 158-160 East 12th
St.
40,000
Total
$87,400
*190 There is some conflicting evidence as to these values. We have reviewed it and adopt the Commissioner's findings. Prior to May 9, 1941, Clarence T. Bryan had represented both Isaac and G. Daniel for many years. Isaac's will had requested that Bryan be appointed attorney for the estate. Bryan was not only familiar with the agreements of December of 1938 and June 5, 1940, but also with G. Daniel's lack of cooperation in the administration of Isaac's estate. G. Daniel was a valuable client of his, and Bryan had no desire to bring an equitable action against G. Daniel. Had the executors requested the bringing of such an action he would have refused to prosecute. Bryan turned over a large part of his files on decedent's estate to the executors after they employed other counsel to prosecute the equity suit. After G. Daniel's death, Bryan became the attorney for the G. Daniel Baldwin Estate, and entered his appearance as attorney of record for that estate in the equity proceeding. Bryan encouraged a peaceful settlement of the various differences between the members of the two Baldwin groups and assisted them in reaching the February 26, 1947, settlement. He was opposed to the suit against *191 G. Daniel from the time it was started, depreciated the chances of its successful prosecution, and maintained that even had the suit been commenced in 1941 it would have had only a nominal or nuisance value. Bryan had acted as attorney for both sides in many of the transactions with which the equity suit was concerned. He was anxious for personal reasons, as well as a sincere desire to see peaceful relations established between all the Baldwins, to make peace between the two groups. He was aware of and embarrassed by his ambiguous position. Bryan was not familiar with all of the facts respecting the relationship between the two elder Baldwins. Isaac and G. Daniel had used other attorneys as well as Bryan, although the latter may have been used more frequently than any other. In addition, many important agreements were negotiated without the aid of an attorney. G. Daniel at various times would draw documents using stationery of an attorney without the latter's knowledge. Petitioner's attorney, Washabaugh, did not share Bryan's expressed views with respect to the equity suit. He thought that the chances for a substantial recovery were good, although he felt that G. Daniel's death in *192 1946 damaged the position of the Isaac W. Baldwin Group, since it brought into effect certain restrictive rules of evidence making it far more difficult for plaintiffs to prove their case. The estate sought a recovery of $2,000,000 from G. Daniel in the equity suit based principally on events taking place and facts in existence prior to Isaac's death. G. Daniel's countersuit was based principally on events occurring after Isaac's death. Although not fully advised in respect of his legal rights, Isaac was aware long before he died that G. Daniel had not fully satisfied his duties toward him as his partner. Isaac at least suspected the possibility of legal redress, and at one point went so far as to consult an attorney, but his condition was such that he could not coherently state his problem. The bill of complaint is predominantly concerned with alleged wrongs in the nature of fraud and breach of fiduciary obligations suffered by Isaac during his lifetime at the hands of G. Daniel. Such position is amply supported by testimony given here on behalf of petitioner. Accordingly, we find that a cause of action in Isaac's favor existed against G. Daniel on the date of the former's death. Opinion *193 Petitioner in fact does not seem to deny the foregoing; its argument is rather to the effect that the cause of action had no value at the time of Isaac's death. It argues that the executors then had no knowledge thereof, and in fact were concerned rather with the cost of acquiring G. Daniel's cooperation, which appeared essential to an orderly administration of the estate. Petitioner points to the Settlement Agreement of October 1941 and to another agreement with G. Daniel in 1942, both of which resulted, in its view, in further diminutions of the estate. And it places much reliance upon Bryan's earlier pessimism and his present testimony respecting the equity proceeding. It is far from clear that Florence and George were ignorant at the time of Isaac's death that an action would lie against G. Daniel. They as well as Isaac had been long aware that G. Daniel was conducting himself unfairly. Isaac in fact knew or suspected enough to consult an attorney, but could not then coherently state his problem. It does not appear that George, who was otherwise conversant with his father's affairs, especially where G. Daniel was concerned, was ignorant of Isaac's suspicions or did not share them. *194 In fact, the record affirmatively shows the contrary. It is possible, however, that the executors were not aware at the time of Isaac's death that such claim against G. Daniel had a very substantial value, and knew nothing of its chances for success. Even if the executors were totally ignorant of the claim, we do not agree that it would for that reason be without value. An estate may possess many assets, tangible and intangible, of which the deceased's representative or even the deceased himself may be unaware, and which may not become apparent until the lapse of a substantial period of time after death. Such property is for that reason no less an asset of the estate, nor can it necessarily be said to be valueless at the date of death. This is particularly true where, as here, the asset is one which by its nature is discoverable in the ordinary course of administration of the estate. Of course, an undiscovered asset may never come to light, or may be discovered too late, as a claim barred by laches or limitations. It was possible as of May 9, 1941, that for these or other reasons nothing might be eventually realized on account of the claim against G. Daniel. These matters, however, *195 are merely factors to be taken into consideration in determining the amount includible in the gross estate, and we have taken them into consideration in valuing the claim against G. Daniel as of May 9, 1941. We do not believe that Bryan acted in bad faith, but his relationship to G. Daniel prevented him from exercising complete objectivity in evaluating the foregoing equity suit. After G. Daniel's death he entered his appearance as defense counsel in the suit brought by the Isaac Baldwin Group, and for the most part withdrew from the Isaac Baldwin estate. G. Daniel, and thereafter his estate, was obviously the more valuable client, and this could not but color Bryan's judgment. We have not ignored Bryan's opinion and testimony on this point and have taken it into account in arriving at a valuation, but we do not find it as weighty and convincing as petitioner might wish. Petitioner argues that the fact of a substantial recovery in 1947 has no probative value because due to "various intervening developments which could not have been anticipated at death." This argument is correct, but proves too much. The most significant of all such "intervening developments" was G. Daniel's death *196 in 1946, which greatly weakened the plaintiffs' case. We have taken into account G. Daniel's age and whatever the record shows of his physical condition at the time of Isaac's death. Nevertheless, he was then very much alive, and his subsequent death pendente lite was an event which "could not have been anticipated at [Isaac's] death." The executors have commented upon the adverse effect of G. Daniel's death from their point of view as plaintiffs in the equity proceeding. In a brief filed in 1947 in connection with an income tax matter of the estate, they make the following statement: "From the outset it was recognized by the executors and their counsel that their suit against G. Daniel involved many difficulties. If such an action had been brought and vigorously prosecuted by Isaac, the prospects for success would have been excellent. But Isaac's death, the settlement of October 1, 1941, the lapse of time with a consequent question as to the timeliness of the suit, and delays caused by the fact that two of the defendants were in the armed forces, all made the case difficult. Nevertheless, until G. Daniel died in November, 1946, there was a reasonable likelihood of a substantial recovery. *197 His death, however, raised a serious question as to whether some of the most important evidence was admissible. It then became the opinion of the plaintiffs' attorney, Washabaugh, that any settlement which yielded a substantial recovery would be better than trial. It was recognized also that G. Daniel's suit against the executors held some dangers for the estate, but on the whole there was not very much fear of that action." It thus appears from the above and from additional evidence that the case was delayed because of military service of Robert and Arthur. While at the time of Isaac's death the Selective Training and Service Act of 1940, 54 Stat. 885, and the Soldiers' and Sailors' Civil Relief Act of 1940, 54 Stat. 1178, were both in effect, the United States was not at war. There was a distinct possibility, but no more, that a defendant would eventually so qualify as to delay the trial of the equity suit until after G. Daniel's death. We have taken such possibility into account. In Bank of California v. Commissioner, 133 F. 2d 428 (C.A. 9), cited by petitioner, the court held that the value of a tax refund claim must be determined as of the date of decedent's death, and is not *198 controlled by the size of the eventual recovery. And cf. Schnorbach v. Kavanagh, 102 F. Supp. 828 (D. Mich.). We agree, and hold the rule to apply with equal force where, as we find here, the value of the claim on the date of Isaac's death exceeded the later actual recovery.[5]
Petitioner also argues that the 1947 settlement was motivated by family considerations. It apparently seeks to imply that the G. Daniel Baldwin Group yielded to such considerations, and adopted less than an exacting position. But it is just as reasonable to suppose that if any softening of position took place, the Isaac W. Baldwin Group made the concessions to family harmony. In the instant case, the value of the claim was substantially reduced after decedent's death by the death in 1946 of G. Daniel. To a lesser extent, the military service of Robert and Arthur also had that effect. No event or combination of events occurring after Isaac's death resulted in anything approaching a commensurate increase in such value. Taking into account all facts of record relating hereto, we find as a fact that *199 the net value of the claim at the time of Isaac's death was in the amount of $150,000, and we so hold. Issue 13. Transfers in 1938 and 1939 of 45 Parcels Paragraph 4(bb) of the amended petition alleges error in respondent's action of including in the computation of the gross estate the value of 45 separate parcels of real property, determined by him to have an aggregate value in the amount of $126,050. The item number in the notice of deficiency, description, grantee, stated consideration and value determined by respondent with respect to each parcel are as follows: Stated Con-
Value
Item No.
Description
Grantee
sideration *
Determined
1
1704 Cranberry St.
Richard
$5,000
$2,000
2
522 Wayne St.
2,000
3
2615 East Ave.
Esther
5,000
3,100
4
2621 East Ave.
2,800
5
821 W. 2nd St.
Florence
5,000
2,500
6
121 Walnut St.
2,500
7
231 Goodrich St.
Margaret
5,000
2,500
8
2614 Goodrich St.
2,500
9
954 West 16th St.
2,100
10
956 West 16th St.
James
5,000
2,100
11
960 West 16th St.
2,100
12
962 West 16th St.
2,100
13
226 West 16th St.
Richard
5,000
4,500
14
234-4 1/2 West 16th St.
4,500
15
240 W. 16th St.
Margaret
5,000
4,500
16
244 W. 16th St.
4,500
17
246 W. 16th St.
Esther
5,000
4,500
18
248 W. 16th St.
4,500
19
521 W. 3rd St.
1,500
3,000
20
207 W. 26th St.
George
2,500
3,000
21
1108 E. 12th St.
1,500
1,800
22
1249 E. 20th St.
Richard
1,600
2,500
23
1529 Buffalo Road
2,400
2,800
24
928 E. 12th St.
James
1,000
800
25
1828 E. 12th St.
3,000
1,800
26
447 E. 2nd St.
Esther
2,000
2,500
27
309 E. 4th St.
2,000
1,800
28
917 Hess Ave.
Margaret
2,000
2,000
29
507-9 Reed St.
2,000
1,750
30
351 E. 4th St.
James
3,000
3,500
31
355 E. 4th St.
Esther
3,000
3,500
32
1212 E. 30th St.
Margaret
2,500
3,200
33
1142-46 E. 12th St.
Richard
4,000
5,500
34
2933 Cochran St.
Arthur
5,000
3,200
35
225 Goodrich St.
2,200
36
1111 Cranberry St.
2,500
37
1115 Cranberry St.
J. Robert
5,000
2,500
38
1118 W. 11th St.
3,300
39
831 Holland St.
J. Robert
2,000
2,000
40
458 E. 19th St.
2,000
1,800
41
2210 German St.
Arthur
2,000
1,800
42
1009 E. 26th St.
2,000
3,000
43
1708 Cranberry St.
Richard
**
2,000
44
1209 W. 17th St.
2,000
*200 Findings of Fact Item 45 was a parcel located at 711 Lincoln Avenue, which Richard purchased from persons other than members of either Baldwin family. The consideration stated in the deed is $800. Respondent now concedes that this item is not includible in the gross estate. Deeds naming Isaac as grantor, and covering 19 of the foregoing 45 parcels of real property, are dated December 16, 1938, and were recorded 3 days thereafter. The parcels included therein are items 1 to 12, inclusive, 34 to 38, inclusive, 43 and 44. Each deed stated a consideration of $5,000, regardless of the number of parcels mentioned therein. No limitation, condition or restriction was contained in any of these deeds, and all except that in favor of James contain a recitation that the properties were improved by frame dwelling houses. Another 6 parcels were described in deeds executed in *201 favor of Richard, Margaret and Esther, naming G. Daniel as grantor, dated December 17, 1938, and recorded 2 days later. These properties consisted of items 13 to 18, inclusive. Each deed stated a consideration of $5,000 and was without limitation, condition or restriction. Each property was improved by a brick house. On December 15 and 18, 1939, Isaac executed deeds to an additional 13 parcels, consisting of items 19, 22 to 29, inclusive, and 39 to 42, inclusive, of those above listed. George and Robert received outright grants of those properties above noted as transferred to them, but the transfers for the benefit of Richard, James, Esther, Margaret and Arthur were in trust, with George and Robert acting as trustees. Each parcel was improved by a house, and deeded without limitation, condition, or restriction. The trustees had full power to manage, sell and convey the property, to invest and reinvest income and proceeds of sale, and to distribute principal or income at any time after 10 years from December 18, 1939. Finally, 6 parcels, consisting of the above-enumerated items 2, 21, and 30 to 33, inclusive, were transferred out of the name of G. Daniel on December 16 or 18, 1939, *202 and recorded December 27, 1939. The deeds were without limitation, condition, or restriction. The notice of deficiency did not include property conveyed to Arthur at this time in the same manner. After the foregoing deeds were executed, they were retained by the partnership and, after its termination, by G. Daniel. The grantees never received the deeds prior to decedent's death, and learned of the transfers only through inspection by James and George of the Washburn Confidential Reporter. The deeds were recorded by G. Daniel or someone from the partnership designated by him, and were thereafter kept in a safe in Baldwin Brothers' office. Rentals on properties which had been transferred to the children before 1938 had been turned over to the transferees, either directly or by way of deposit in their bank accounts. This procedure continued with respect to such properties previously transferred, even after December of 1938. Rentals from the 44 properties here in controversy were treated quite differently, as hereinafter described. From the time of the purported transfers of the 44 properties until after Isaac's death, first the partnership and then G. Daniel managed these properties and *203 collected the rentals therefrom. When George inquired about such rentals, G. Daniel told him that they would be held by Baldwin Brothers for credit to the children, and used to purchase other properties in the future, pointing out that the rentals he collected for his adopted sons, Robert and Arthur, were being handled in the same way. In the division of partnership property, pursuant to the Assumption Agreement of June 5, 1940, at least a part of the transfers in controversy was charged to Isaac's account. The records of Baldwin Brothers did not reflect these deeds until after October 1940. No part of the income from any of these properties was paid over to the children during decedent's lifetime. Rentals collected prior to June 5, 1940, from the properties have never been accounted for. G. Daeniel accounted for rentals collected during the period June 5, 1940, to June 1, 1941, from the properties in his June 1941 accounting, in a schedule entitled "Miscellaneous Properties," crediting them to the estate. No accounting was made therein with respect to the 9 properties transferred to G. Daniel's adopted sons, Robert and Arthur. The accounting showed a net amount due from the remaining *204 properties of $4,532.97. In arriving at that figure, G. Daniel charged against the gross rentals in the amount of $13,779.89 the premiums paid on Isaac's life insurance policies with Connecticut and Massachusetts in the amount of $6,047, taxes paid on the properties of $3,161.76, and uncollected water rents of $38.16. After Isaac's death, George was unable to secure a satisfactory answer from G. Daniel concerning rentals from the properties in question. In the equity suit filed against G. Daniel in December 1944, Florence and the other grantees sought an accounting from G. Daniel for such rentals. After the settlement of the equity suit, Robert prepared statements from Baldwin Brothers records, and otherwise, which purported to account for such collections. In March 1949, decedent's estate credited by book entries among the 6 named grantees, the net amount shown to be due ($4,532.97) in G. Daniel's accounting of June 1941. Prior to October 1940, the partnership records with respect to rental collections consisted of a daily cash book and tenant cards. All rental collections were entered in the daily cash book regardless of ownership. The collections were then posted from the cash book *205 to the tenant cards which were arranged alphabetically in a cardex file. Each tenant card showed the tenant's name, the property occupied, the rental term, the amount and date of the rental payment, and the month being paid. The other side of the tenant card reflected disbursements. In a separate cardex file, Baldwin Brothers maintained a property card for each property arranged alphabetically by streets without segregation between the different owners. In October 1940, Baldwin Brothers employed a new bookkeeper. G. Daniel explained to him that the partnership had been dissolved on June 5, 1940, that the books and records were inadequate, and that he wanted the properties separated between him and Isaac. The bookkeeper, in the course of his duties, discovered the undelivered deeds to Florence, Mabel, and the various children, and set up a separate drawer of property and tenant cards for each of the wives and children. The cash book being used by Baldwin Brothers in October 1940 was first put into use on or about January 5, 1940. When the bookkeeper started a new cash book on January 29, 1941, he separated the properties between Isaac, G. Daniel, and miscellaneous. The miscellaneous *206 properties covered rents collected from properties in the names of Florence, Mabel, and the children. Opinion Section 811(c)(1) of the Internal Revenue Code of 1939 reads in part as follows: "SEC. 811 GROSS ESTATE. "The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States - * * *
"(c) Transfers in Contemplation of, or Taking Effect at, Death. - "(1) General Rule. - To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise - * * *
"(B) under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (i) the possession or enjoyment of, or the right to the income from, the property, * * * "(C) intended to take effect in possession or enjoyment at or after his death." We cannot conclude from the evidence before us that respondent has here *207 erred, except as to item 45, with respect to which he concedes error. Petitioner, who bears the burden of proof, has not shown that Isaac did not retain until his death possession or enjoyment of the remaining 44 properties, and indeed, the record affirmatively shows that he did as to at least a part of them. Income, to the extent traceable, was credited to him or expended on his behalf. [6] This is in sharp contrast with the practice as to properties previously transferred to the children, a practice which continued as to those earlier-transferred properties even after the transactions involving the 44 parcels in controversy, and even while income from the latter properties was being treated in so different a manner. The 44 properties themselves, again to the limited extent the record sheds *208 any light, were charged to Isaac's account in the 1940 division of real properties. While this charge was prior to Isaac's death, it was subsequent to the purported transfers, and manifestly inconsistent with an earlier "no-strings-attached" transfer to the children. And the record is barren of evidence of any act between June 1940 and May 1941, which may be construed as a yielding up by Isaac of any retained benefits. Nor is it material that some of the properties had previously been in the name of G. Daniel rather than of Isaac. These transfers were, in effect, a part of the division of the real properties between the then partners. The properties here in question were charged to Isaac's account, and hence were in substance transferred through him to his nominees, to a sufficient degree that his enjoyment of the properties, by virtue of the foregoing use of income and crediting of corpus, was a "retained" benefit within the meaning of section 811(c)(1)(B). The facts here are indistinguishable from those in Estate of John W. Mortimer, 17 T.C. 579, where we held that delivery had not been made to the alleged grantees despite recorded deeds, absolute in form, where control and enjoyment *209 of the properties had not in fact been yielded over. In that case as here, the deeds were executed and recorded without knowledge of the grantees, there was no actual change in the control and management of the properties, the grantor (here Isaac through his agent, G. Daniel) retained possession of the deeds, and the grantor continued to enjoy the fruits of the ownership, i.e., the income from the properties. The only factual distinction is that in Mortimer the grantees remained ignorant of the existence of the deeds, whereas here they stumbled upon the facts, by a reading of reports of records at the county courthouse. We view this variation as a distinction without a difference in view of the informal, and indeed, fortuitous manner in which the grantees were made aware of the existence of the deeds. In any event, this variation, to the extent it tends to favor petitioner, is at least counterbalanced by the additional facts here, to petitioner's detrminent, that these properties were managed by G. Daniel under color of the Management Agreement, which did not cover properties of the children, and that income from the properties was treated in a manner patently inconsistent with such *210 treatment as to various other properties previously transferred to the children. In Pennsylvania, recordation of a deed constitutes prima facie, but rebuttable evidence of delivery. Chambley v. Rumbaugh, 333 Pa. 319, 5 A. 2d 171; Bush v. Genther, 174 Pa. 154, 34 Atl. 520. Here, as in Mortimer, however, such presumption has been amply rebutted. Full possession and enjoyment of the properties was not transferred to the children during decedent's lifetime. Except with respect to the concession by respondent as to 711 Lincoln Avenue, we cannot find erroneous respondent's determination here in issue. Issue 14. - Legal, etc., Expenses In Schedule J of the return, entitled "Funeral and Administration Expenses," the executors claimed a $10,000 deduction for attorneys' fees. The deficiency notice allowed attorneys' fees in a total amount of $5,600. This total compromised an allowance of $5,000 in the attorneys' fees schedule and an allowance of three items of attorneys' fees totaling $600 in the miscellaneous administration expenses schedule. Petitioner now claims in paragraph 4(cc) of the amended petition a deduction for all such expenses incurred, including those incurred during and after *211 the trial of this proceeding. Findings of Fact Attorneys' fees and related legal expenses incurred and paid by the estate fall into two groups, those incurred in the aforementioned equity suit and those incurred in all other phases of the administration of the estate. The total amount paid in respect of the equity litigation was $20,445.95. The total amount paid prior to June 1955 (the month in which began the hearing of the instant proceeding), on the other phases of administration, was $76,721.88. The legal fees paid to counsel in the equity litigation were paid under a contingent fee agreement. Respondent now agrees that the payment of legal fees and expenses unrelated to the equity suit in the amount of $76,721.88 is deductible. He contends, however, that payment of $20,445.95 in respect of the equity suit is allowable not as a deduction, but only as an offset to the recovery therein. That such amount was in fact paid and was reasonable is not contested by respondent. Opinion We have previously determined the date-of-death value of the equity claim against G. Daniel. In so doing, we took into consideration all matters bearing upon such value, including a reduction for probable *212 expenses involved in collecting the claim, inter alia, prospective legal fees and related expenses. It was virtually certain on May 9, 1941, that G. Daniel would not voluntarily honor his obligations arising from his acts of fraud and breaches of duty toward Isaac, and that as long as G. Daniel was in control the matter would have to be prosecuted by attorneys for the executors to at least the eve of trial. This fact affects the date-of-death value of the claim. The value we have placed thereon is a net value, and we have reached it by reducing the gross value of the claim by all prospective fees, costs and expenses probable as of the date of Isaac's death. The amount thus deducted included prospective legal fees and expenses in an amount exceeding that actually paid, inasmuch as the value of the claim on May 9, 1941, exceeded the amount eventually recorded as a result of the Compromise Agreement. Cf. Emma Peabody Abbett, 17 T.C. 1293; Austin Leigh Claiborne et al., Executors, 40 B.T.A. 722. In summary, in determining the value of the equity claim as of the date of decedent's death, we took into account the prospective costs, including legal fees and expenses, of prosecuting that *213 claim. We did not deem the value of the 1947 recovery includible in the estate in addition to the value of the claim as of May 9, 1941. Likewise, having already taken into account prospective costs of collection, including prospective legal fees and expenses, we do not deem petitioner entitled to additionally deduct the actual legal fees and expenses incurred as a result of the actual recovery in 1947. Any additional legal and related fees and expenses incurred at and after trial, if not agreed upon in the Rule 50 recomputations, may be determined pursuant to Rule 51. Issue 15. Miscellaneous Administration Expenses In Schedule J of the return, the executors deducted $65.50 as miscellaneous administration expenses. In the notice of deficiency, respondent allowed a deduction of $68 therefor. The petitioner now claims a deduction for such expenses in whatever amount paid, in paragraph 4(dd) of the amended petition. At the hearing, petitioner submitted a voluminous schedule in which it claimed a total of $59,835.65 for miscellaneous administrative expenses paid from May 1941 through May 1955, classified as follows: Classification
Amount
Miscellaneous Administrative Ex-
pense
$ 2,780.85
Trip Accounts
3,672.45
Salaries - Prorated
44,182.00
Expenses
9,200.35
Total
$59,835.65
Petitioner *214 now concedes that the above item in the amount of $2,780.85 is duplicated in the above item in the amount of $9,200.35, and should be eliminated. Petitioner also concedes that various items described as "Donations," "Dance Tickets," "Testimonial Dinner," "Christmas Seals," etc., in the schedule in the aggregate amount of $103.40, should be eliminated from the total deduction claimed. Findings of Fact The foregoing item termed "Trip Accounts" represented travel expenses to and from Pittsburgh and Philadelphia in connection with the tax problems of decedent's estate, and included transportation, meals, hotel rooms, and other costs incidental thereto. No part of these travel expenses was allocated by petitioner to the management of individual or trust properties. Petitioner's Exhibit 75, introduced into evidence at the hearing, itemized salary payments to office personnel from 1941 to May 31, 1955, in the total amount of $180,560.76, and allocated $44,182 thereof as an expense in administering decedent's estate. In addition to matters involving decedent's estate, the office personnel dealt with matters involving properties owned by the individuals and by the December 1938 trust. The salaries *215 were prorated by George A. Baldwin who based his allocation upon his best estimate of the time that he and the office personnel devoted to matters pertaining to the decedent's estate. George prorated his own salary as follows: Total
Per
Amount
Period
Salary
Cent
Allocated
5/9/41-12/31/42
$ 3,434.00
80
$ 2,747.20
1943-4-5
8,205.72
40
3,282.28
1946
3,281.20
30
984.36
1947-5/31/55
33,889.40
20
6,777.88
Total
$48,810.32
$13,791.72 He allocated to miscellaneous administrative expenses 40 per cent of the salaries of the office employees for the period May 1941 through 1942, and 20 per cent of their salaries thereafter to May 31, 1955. After the equity suit was settled in 1947, the executors realized that a great deal of information would have to be obtained from the office of Baldwin Brothers. Gladys A. Riede, the bookkeeper for Baldwin Brothers and one of the defendants in the equity suit, was hired to work part time because she was best able to provide such information. Her entire salary of $10 per week for the period March 7, 1947, to June 28, 1951, or a total of $2,260, was charged to administrative expense. Exhibit 75 itemized under "Expenses - $9,200.35" expenditures for postage, office supplies, light and *216 gas, heat, rent, telephone, miscellaneous, and depreciation. This item includes depreciation on office furniture. For the period May 20, 1941 to December 31, 1954, the amount of depreciation on office furniture allocated to miscellaneous administrative expenses was 20 per cent, or an aggregate amount of $296.70. Such allocated amount was part of the depreciation deduction claimed by the Isaac W. Baldwin Estate on its income tax returns for the taxable years 1941 and thereafter. The allocated amounts of depreciation for office furniture for the taxable years 1944 to 1947, inclusive, were: $14,34, $15.97, $17.86, and $21.68, respectively, or a total of $69.85, which was allowed as deductions for income tax purposes. The income tax matters of decedent's estate for the taxable years 1944, 1945, 1946, and 1947 are no longer open. Such matters, however, remain open for the other taxable periods involved. Opinion If actual expenses of the administration of an estate are reasonable in amount, they are deductible under section 812(b)(2) of the 1939 Code, which does not require, as an additional qualifying feature, that they in fact have been allowed by a court. Cf. James D. Bronson et al., Trustees, 7 B.T.A. 127, *217 affd. 32 F. 2d 112, 114 (C.A. 8). Thus the absence of evidence that any part of the foregoing items has been allowed by the court having jurisdiction of the estate is not conclusive for tax purposes. We are satisfied that the amounts comprising the deduction claimed here were actually incurred or expended and were reasonable in amount. We are not satisfied, however, that the entire amount claimed as such deduction constituted expenses of administration. The figure claimed by petitioner to represent deductible administration expenses is largely composed of allocations of portions of larger items of expense between the estate and other matters. Petitioner bears the burden of proving the amount properly so deductible. The record falls short of establishing that the allocations were entirely correct, and petitioner in fact admits on brief that it erred in two respects, as above noted. Nonetheless, we are satisfied that expenses were incurred in the administration of the estate substantially exceeding the amount allowed therefor by respondent. Considering the size and complexity of this estate and taking the entire record into consideration, we find as a fact that reasonable administration *218 expenses were paid or incurred in the amount of $45,000. Some of the items making up administration expenses seem to have been also deducted by the estate for income tax purposes with respect to taxable years now closed. Respondent argues that such items must be now denied deductibility as administration expenses in order to prevent "double deductions," or in the alternative, that findings be made on the basis of which equitable recoupment may be had if a suit for refund eventuates. We do not believe either position tenable. Section 162(e) of the Internal Revenue Code of 1939 indeed shows an intent on the part of Congress to prevent double deductions, as between the income and estate taxes. But that provision acts by denying deductions for income tax purposes in respect of items allowed for the estate tax. The statute thus begins with the premise that the deduction must be allowed for estate tax purposes, and provides that it may then be disallowed for income tax purposes. We are not free to reverse the specific scheme for avoidance of double deductions chosen by Congress. Cf. House-O-Lite Corporation, 24 T.C. 720. Respondent's argument that the earlier deductions for income tax *219 purposes are equivalent to an "admission" by petitioner that the items in question were chargeable to income rather than corpus is, we think, overcome by the entire record. We are satisfied that those charges were at least equally appropriate against the corpus of the estate. And section 162(e) itself assumes that expenses may in fact be of such a nature that they are chargeable logically to either income or corpus. Nor does respondent's suggestion of equiable recoupment in a possible future refund suit stand on any stronger foundation. The very fact that Congress found necessary a specific statutory scheme to prevent "double deductions" of the type here before us militates against respondent's seeming view that apart from statute a form of offset is permissible. In any event, however, the Tax Court has no jurisdiction to consider recoupment ( Rothensies v. Electric Battery Co., 329 U.S. 296) even as to the same type of tax for different years ( Commissioner v. Gooch Co., 320 U.S. 418, affirming a Memorandum Opinion of this Court). If such recoupment is possible in another later action before a tribunal possessing general equity jurisdiction, a point we do not here decide, that tribunal *220 must make therein its own findings of fact upon which it may grant or deny respondent such relief. It would be inappropriate and a usurpation of the function of another court for us to make specific findings requested by the respondent, relevant only to an issue not within our powers to resolve. Accordingly, we hold deductible the amount of $45,000, which we find to have constituted reasonable expenses in the administration of the estate. Additional such expenses incurred at or after trial herein, if not agreed upon under Rule 50, may be determined pursuant to Rule 51. Issue 16. Debts to James and George In paragraph 4(ee) of the amended petition, petitioner claims error in respondent's failure to allow a deduction in respect of an alleged indebtedness owed tojames and George by Isaac. The amount so claimed was $1,300, but petitioner presently claims a deduction in the amount of $1,600. Findings of Fact In October of 1941, the executors transferred to James and George decedent's onehalf interest in 3615 Hazel Street, which interest they also included in the property schedules of the estate tax return at the now stipulated value of $1,600. No deduction was then claimed in respect of *221 any indebtedness allegedly satisfied by such transfer. Petitioner now asserts that decedent's indebtedness to James and George actually exceeded $1,600, but limits the claimed deduction to that amount. This issue arises as a result of the following sequence of events: In December 1939 G. Daniel handed to James and George checks in the amount of $2,500 each. They were required to and did endorse the checks and return them to G. Daniel. An identical transaction took place in December 1940. After Isaac died, George and James, through Bryan, asked G. Daniel to account for the money represented by the four checks and to remit the amount due them. G. Daniel alleged that the checks were additional salary, and were kept in an open account which he proposed to pay, that half of the obligation was his and half was Isaac's, and that he proposed to discharge his part of the obligation by deeding to James and George his one-half interest in 3615 Hazel Street. James and George accepted G. Daniel's proposal and by deed dated September 30, 1941, and recorded October 7, 1941, G. Daniel transferred his half interest in such property to James and George. G. Daniel wrote the following provision into *222 his deed: "By the acceptance of this deed parties of the second part [James and George] hereby release parties of the first part [G. Daniel and Mabel] from the payment of any sum or sums that might be due them, and this is a full and final settlement between the parties of the first part and parties of the second part." George A. Baldwin's account on the books of Baldwin Brothers showed a balance due the partnership on December 31, 1939, of $11,123.58 after various credits including one for $2,500 entitled "1939 Salary Check." On June 5, 1940, this account showed a balance due Baldwin Brothers of $1,617.85; and on December 31, 1940, a balance due George from Baldwin Brothers of $1,385.53, which included a $2,500 credit to the account for "1940 Salary." This account was closed out on June 1, 1941, by the following entries: Charges: Remittance thru I.W.B.
Est. Settlement 6/1/41
net
$1,063.38
One half interest in 3615
Hazel St. for Balance
due on account
882.15
$1,945.53
Credits: Balance due Geo. A. Bald-
win 12/31/40
$1,385.53
Rent collected 1/1/41 to
6/1/41
560.00
$1,945.53
0
The amount of $1,063.38 charged to George's account as "Remittance thru I.W.B. Est. Settlement 6/1/41 net" is the exact amount *223 of net income from properties claimed by petitioner to have belonged to George, but which were included in the June 30, 1941, accounting by G. Daniel in the schedule therein entitled "Miscellaneous Properties." The executors transferred Isaac's half interest in 3615 Hazel Street to James and George by deed dated October 3, 1941, and recorded October 7, 1941. They chose in so doing to accept as true G. Daniel's version of the transaction. As previously noted, the partnership was dissolved in May of 1940, prior to the second of the above-described check transactions. Opinion Petitioner apparently proceeds on the theory that James and George received their respective checks as salary, and endorsed them over to Baldwin Brothers, which thereafter held the proceeds for their respective accounts. Thereafter, according to petitioner, 3615 Hazel Street was deeded to James and George in satisfaction of this obligation. We find the record inadequate to satisfy us that the facts are consistent with that theory. An affidavit by George dated May 9, 1949, reads in part as follows: "10. In December, 1939, G. Daniel Baldwin handed me a check dated December 28, 1939, drawn on the Security-Peoples Trust *224 Company, Erie, by Baldwin Brothers payable to me in the amount of $2,500. He asked me to endorse the check and I did so and returned the check to him while he was standing at my elbow. He did not tell me why I should endorse and return the check to him, but, due to my habit up to that time of always following his demands, to my confusion over the exact purpose of some of the transactions with him and Baldwin Brothers, and to other circumstances, I did as he directed. In December, 1940, G. Daniel handed me another check dated December 21, 1940, also drawn on the Security-Peoples Trust Company, and payable to me in the same amount of $2,500. He asked me likewise to endorse and return to him this check, and I did so under circumstances and for reasons similar to those existing when I endorsed and returned to him the check handed to me the year before. The amounts of these two checks are credited to me in the account previously mentioned (Exhibit 31). "11. The circumstances are not such as to make certain the purpose for which G. Daniel Baldwin drew these checks and then had me endorse and return them to him. Inasmuch, however, as he had required me, as I recall, to give him a $2,500 note *225 for the cost of constructing the house at 233 Lincoln Avenue, and since he frequently said that properties would be transferred to my brothers and me for services, it seems quite possible, and perhaps altogether probable, that the $2,500 check handed to me in December, 1939, was intended to formalize the payment of salary to me, and that the construction of one of the houses on Oxford Street was considered by him to be in satisfaction of that salary. When the $2,500 check was handed to me in December, 1940, the settlement of May, 1940, had already taken place, and no prior construction of houses or property transfers could be considered as in payment of salary formalized by that check. Accordingly, after my father's death and the cessation of G. Daniel Baldwin's authority over me, I demanded payment of that check. In October, 1941, G. Daniel Baldwin, perhaps as a result of this demand, conveyed to me one-half of his undivided one-half interest in a residential property located at 3615 Hazel Street, and the executors (of whom I was one) of my father's estate likewise conveyed to me one-half of the undivided one-half interest which he had owned in the same property. The one-half interest *226 thus conveyed to me was probably worth about $1,600 at that time, but in the account between Baldwin Brothers and me (Exhibit 31), it is charged against me in an amount of only $882.15. It may be that the release of May 18, 1940, mentioned in paragraph '9' above, cancelled all indebtedness due from me to Baldwin Brothers at that time, and that the amount of $1,617.85 shown in the account as a debt due Baldwin Brothers by me on June 5, 1940, should be eliminated. If this amount were eliminated and the charge of $882.15 for this conveyance were disregarded, the indebtedness due me by Baldwin Brothers would amount to $2,500, somewhat in excess of the probable fair value of the one-half interest in the 3615 Hazel Street property. "12. In view of these circumstances, the impossibility of ascertaining all of the facts, and the fair degree of certainty that some property was constructed and transferred to me as compensation for services, I am willing to accept the abovementioned account as representing a reasonable accurate picture of the situation, and to consider that additional compensation amounting to $2,500 for each of the years 1939 and 1940 was paid to me through the construction *227 and transfer of property." Thus, even by 1949 George could do no more than speculate as to the purpose of the checks. His willingness to concede the receipt of "additional compensation" (italics added) of $2,500 in each year, while not necessarily inconsistent with his testimony that he declared those amounts as income on his returns for those years, requires some explanation. Standing unexplained, it weakens the value of his testimony which is uncorroborated by documentation. Other portions of the affidavit show that prior to its execution the cooperation of J. Robert Baldwin had given the Isaac W. Baldwin Group access to all available information and material previously denied them by G. Daniel. There is no evidence of any further elucidation between then and the date of George's testimony in 1955. We can only conclude that he was equally ignorant at both times of the actual purpose and significance of the checks. Since there is no separate evidence respecting James, the checks and transfers to him stand on certainly no stronger ground. Various other objections exist to petitioner's claim for a deduction, which the foregoing makes it unnecessary to discuss in detail. It should be *228 noted, however, that the 1940 checks were issued after the dissolution of the firm and would seem to be solely of concern to G. Daniel. If connected with his activity under the Management Agreement (a wholly gratuitous suggestion in petitioner's brief, based on no evidence of record), an item in the amount of $8,649 in the June 1941 accounting designated "Salaries" and nowhere else further explained, would seem to require us to conclude, in view of the burden of proof, that the estate has already received by virtue of that entry the benefit of a deduction for, at least, the amount of the 1940 checks. Also, a running account appears to have existed between Baldwin Brothers and the children. We have been shown no reason why these particular transactions should be treated separately from such accounts. The account of George shows a balance due to Baldwin Brothers as of the end of the year in 1939 and on June 5, 1940, and a balance due George as of December 31, 1940, in the amount of $1,385.53, including a credit for $2,500 designated "1940 Salary." Thus, not until after dissolution of the partnership did a balance appear in favor of George, and only by virtue of the December 1940 check, *229 which we may not, for reasons already set forth, treat to any extent as a liability of the estate. In view of all of the above we conclude that petitioner has not satisfied its burden of showing that respondent erred as to this issue. Issue 17. Indebtedness on G. Daniel's Notes In Subschedule B of Schedule K of the return, the executors claimed a deduction in the amount of $54,219.82, for one-half of the amount due on 10 promissory notes executed by G. Daniel, plus interest to May 9, 1941. In the notice of deficiency, respondent allowed a deduction of $19,098.17, representing a $19,000 note, plus interest to May 9, 1941, but denied any deduction on the remaining notes. Petitioner claims in paragraph 4(ii) of the amended petition a deduction in the amount of $44,670.73, or one-half of the total liability alleged to exist on the remaining 9 notes. Findings of Fact Shortly after Isaac's death, G. Daniel presented a "Summary of Obligations" to the executors purporting to show his and Isaac's obligations as of June 1, 1941. Among these obligations, G. Dan el listed 10 promissory notes aggregating $108,731.07, and demanded payment by the estate of one-half that amount. The notes listed, *230 and interest thereon, were as follows: Interest
Interest
Adjusted
Total
Payee
Amount
Paid to
to 6/1/41
Debt
Security-Peoples Tr. Co. (Paving Liens)
$21,424.53
3/31/41
$214.26
$ 21,638.79
Security-Peoples Tr. Co.
40,000.00
4/21/41
166.67
40,166.67
Security-Peoples Tr. Co. (Modern Grocery)
3,000.00
3/ 3/41
18.12
3,018.12
Marine Nat'l Bank
10,000.00
4/ 3/41
72.25
10,072.25
Marine Nat'l Bank
5,400.00
4/23/41
33.30
5,433.30
First Nat'l Bank
19,000.00
4/ 8/41
164.64
19,164.64
Albion Bank
1,900.00
4/ 1/41
19.00
1,919.00
C. T. Bryan (Mtg. Camb. Springs)
4,000.00
1/15/41
90.00
4,090.00
C. T. Bryan
1,500.00
5/11/41
4.75
1,504.75
J. T. Tobin
1,450.00
4/ 8/38
273.55
1,723.55
$108,731.07 The attorney for the estate (C. T. Bryan) and the executors accepted the foregoing summary, and treated the estate as obligated to pay one-half thereof. In the Settlement Agreement of October 1, 1941, the executors agreed to settle the $19,000 note and interest due thereon with the First National Bank and thus relieve G. Daniel of any liability on that note. The amount of this debt has now been allowed as a deduction. The Settlement Agreement listed the other 9 notes among the obligations less offsets which were taken into account in computing the amount of $86,810.24 *231 to be paid to G. Daniel by the estate. Some of the foregoing notes were executed by G. Daniel after June 5, 1940. It is not clear whether the note to J. T. Tobin was in fact executed or, if executed, its date. Respondent now concedes that the $21,424.53 note in favor of Security-Peoples Trust Company was in existence and owing at June 5, 1940, and at May 9, 1941, and that one-half thereof, together with one-half of the interest accrued thereon to the date of Isaac's death, is deductible. The $40,000 note dated April 30, 1941, was a renewal of a note dated January 14, 1941. The $3,000 note in favor of Security-Peoples Trust Company originated September 5, 1940; it was a direct obligation of Modern Grocery, was endorsed by Baldwin Brothers, and was renewed in full periodically. This note was also claimed as a deduction in Subschedule H of Schedule K of the return as part of decedent's alleged indebtedness for unpaid market bills. The $10,000 note was executed by G. Daniel on November 9, 1940. It cannot be determined from the record when the 4 remaining notes were executed. Opinion Although we may seem redundant in so doing, some of petitioner's arguments here require us to reiterate *232 that it bears the burden of proof. Respondent's concessions respecting two notes leaves for our determination only the eight remaining items. Petitioner's claim for a deduction with respect to these eight notes is limited to one-half of the principal and interest accrued on each to the date of death. The assumption-of-liabilities clause in the Assumption Agreement, executed June 5, 1940, was intended to and did relate solely to liabilities then in existence. Petitioner does not seem to challenge this interpretation. George stated in his testimony that such was his understanding, and it does not appear that he had a different conception of the clause at any relevant time. In a memorandum written in 1947 and attached to a brief in an income tax matter of the estate, the executors stated that they so understood the matter. They stated further that for that reason neither Isaac nor his estate was liable on the foregoing note to the Marine National Bank in the amount of $10,000, and that they acquiesced in its inclusion in the Summary of Obligations because "this fact of non-liability was overlooked." Respondent concedes that if Isaac was a "partner" in Modern Grocery at the time of his *233 death petitioner is entitled to a deduction with respect to the $3,000 note in favor of the Security-Peoples Trust Company and also that in the amount of $5,400 in favor of the Marine National Bank. We have previously found that Isaac had at the time of his death a one-half interest "in stores," which embraces Modern Grocery in the Twelfth Street Market. We thus conclude, irrespective of whether he was technically a "partner" as to his one-half interest, that petitioner is entitled to the deduction claimed on account of the notes in the respective amounts of $5,400 and $3,000. To avoid possible prejudice to respondent should an appeal result in a reversal of our determination that Isaac had such an interest "in stores" at his death, we hasten to add that our determination in favor of petitioner as to these notes results solely from our earlier conclusion as to Isaac's interest "in stores." Had we instead concluded that Isaac had no such interest, we would hold no part thereof deductible for the same reasons, hereinafter set forth, which compel us to deny any deduction in respect of the remaining six notes. Petitioner has failed to prove that any of the remaining six notes were in existence *234 on June 5, 1940, and thus within the scope of the Assumption Agreement, or that they were otherwise executed under circumstances imposing any liability on Isaac or his estate. Petitioner, as above noted, has actually admitted in an earlier document that at least in its opinion, no such liability existed in respect of the $10,000 note in favor of the Marine National Bank. Petitioner, faced with the complete failure on its part to prove that any of the notes still in issue existed as early as June 5, 1940, argues that Isaac would nonetheless be liable (1) where those notes were given after June 5, 1940, in respect of debts existing on or before that date, (2) where prior to Isaac's death G. Daniel actually paid a debt of Isaac for which he had not been reimbursed, and (3) where interest accrued on debts which either were in existence by June 5, 1940, or were incurred in satisfaction of such earlier debts. The short but complete answer to this argument is that the record does not establish as fact any of these or other various possibilities. Petitioner may not deduct items which may have been created under conditions consistent with liability on the part of Isaac or his estate. To hold *235 otherwise would be to shift the burden of proof to respondent. Finally, petitioner argues that it in good faith and after "adequate" investigation recognized the liabilities in question as obligations of the estate. But the mere fact that an executor has acknowledged and even paid an alleged claim against the estate is not binding for tax purposes, and is insufficient under the circumstances here. Cf. Smyth v. Erickson, 221 F. 2d 1 (C.A. 9); Estate of Frank W. Thacher, 20 T.C. 474, 485; Estate of Ambrose Fry, 9 T.C. 503; First-Mechanics Nat. Bank of Trenton, Executor, 40 B.T.A. 876, affd. 117 F. 2d 127 (C.A. 3). Executors need not litigate every claim, and need not here prove conclusively that liability existed. But they must do more than show merely that they recognized and honored a claim, and acted honestly in so doing. It is not clear to what extent petitioner is seeking to use good faith as the touchstone of deductibility. We wish, in any event, to make it clear that we reject such a standard. In order to justify the deduction claimed, petitioner must prove that at the time of Isaac's death an enforceable obligation existed against him, or at least that it is concluded, *236 reasonably and prudently, after the exercise of due care in examining and investigating the claim. If a payment in respect of a claim known or suspected to be spurious was necessary to the proper administration of the estate, such payment may conceivably be deducted as a proper expense of administration, as issue to be discussed hereinafter. But such claim is not thereby transformed into a valid indebtedness deductible as such. Petitioner argues that it took action with respect to these notes only after adequate investigation. But the evidence on this is conflicting. It also appears at times that no investigation was made, but the executors merely accepted at face value G. Daniel's Summary of Obligations. In view of the picture of G. Daniel's character, reputation and personality as painted by these same executors, we could not but hold such acceptance without more to fall sadly short of the standards of reasonable care and prudent conduct. The suggestion in the reply brief that there is a distinction between other representations by G. Daniel and those contained in the Summary of Obligations, i.e., that the executors did not deem other representations reliable but did so deem those *237 in the Summary, is simply incredible. Such distinction would require a naivete beyond belief, and would, in any case, be totally alien to reasonable and prudent conduct. In any event, and assuming that petitioner did go further than automatic acceptance of the Summary of Obligations, we must still determine whether it went far enough to satisfy the standard of reasonable and prudent conduct. This is necessary because of petitioner's failure to prove actual liability. The reasonableness of petitioner's conduct depends essentially upon the adequacy of its inquiry into the veracity and accuracy of G. Daniel's representations, consisting of the entries in the Summary of Obligations. When petitioner's witnesses or counsel assert that an adequate investigation was made, they are, in effect, stating that petitioner acted reasonably. Such conclusory statements are merely the opinions of the witnesses and counsel, their ultimate evaluation of petitioner's conduct, and are neither binding upon the Court nor even evidentiary. Petitioner is a party to a legal proceeding, and the reasonableness of its conduct is, in view of absence of proof of actual liability, a disputed issue of fact. That issue *238 is before this Court, and is for us, not petitioner, to resolve. Petitioner must tell us what it did, so that we may decide whether it conducted an "adequate" investigation and acted in a reasonable and prudent manner in acknowledging the claims. The aforementioned admission in 1947 of nonliability as to one of the very notes in controversy and that such nonliability was "overlooked" is damaging to petitioner's cause, and, at the very least, demands further explanation. It seems clearly to demonstrate the necessity of evidence as to what petitioner in fact did, i.e., the actual steps taken, as opposed to the self-serving conclusion that what was done was adequate. We cannot find from the record that an adequate investigation was made. As already noted, the record is conflicting even on the question of whether any investigation took place. And the record is barren of evidence of specific steps taken by petitioner to determine the propriety of G. Daniel's demands. Furthermore, there is testimony to the effect that the executors knew, even while agreeing thereto, that the terms of the Settlement Agreement, in which these and other alleged obligations were acknowledged, were unfair to *239 the estate. The executors themselves aver that they were not bargaining equals vis-a-vis G. Daniel, that acquiescence in the Settlement Agreement was motivated, inter alia, by considerations other than the merits of G. Daniel's allegations and representations, and that the estate gave up substantially more in value than it received. These facts seem to indicate a lack not only of any reasonable satisfaction on the part of the executors of the validity of the claims but even further, of a lack on their part of any actual belief therein, reasonable or otherwise. As noted, if the executors were forced by circumstances to satisfy invalid claims, even with knowledge of the lack of any merit therein, the cost of doing so may arguably be a deductible expense of administration, a matter to be considered in a later issue herein, but the claim would not thereby be rendered any the less spurious, or become deductible as a debt. Petitioner has also turned to the Management Agreement in an attempt to substantiate its position. We agree with petitioner that that agreement authorized G. Daniel to borrow, in his own name as well as otherwise, whenever reasonably necessary to the proper management *240 of Isaac's properties. However, the Management Agreement began on June 5, 1940, the "cut-off" date for the inception of liabilities to be shared under the Assumption Agreement. Isaac, and after his demise his estate, would be liable not for merely one-half, but for the full amount of obligations incurred on Isaac's behalf pursuant to the Management Agreement. Thus, petitioner's claim to a deduction of only one-half of the amount, plus interest, of the six notes still in controversy is itself inconsistent with this theory. In any event, there is no proof that these notes were related to activities under the Management Agreement. Our inability to find that any of the foregoing six items was in existence on June 5, 1940, or facts showing that the estate was otherwise liable thereon would seem to be a sufficient determination that, at least for the purposes of this case, and in view of the burden of proof, no such liability existed. Petitioner, however, seems to rely, apart from the question of reasonableness, upon the Summary of Obligations as evidence of actual liability.
That document, introduced into evidence as Exhibit 81, is incompetent for such purpose. It was admitted for the limited *241 purpose of showing that such a document had been presented to the executors, and what its contents were. It was not admitted as proof of the truth of the matters contained therein. Its incompetence for that purpose is too fundamental to require serious discussion. Even were it so admissible, petitioner has drawn too impressive a negative picture of G. Daniel's reliability to permit us to find the existence and validity of those alleged claims merely from G. Daniel's inclusion thereof in his Summary. We conclude that petitioner must prevail here with respect to the notes for $21,424.53 and $19,000 in favor of, respectively, the Security-Peoples Trust Co. and the First National Bank, to the extent conceded by respondent. Petitioner may also deduct one-half of principal and interest to the date of death in respect of the notes in the amounts of $5,400 and $3,000. Respondent's determination with respect to the remaining notes must be sustained. Issue 18. Indebtedness on G. Daniel's Life Insurance In Subschedule C of Schedule K of the return, the executors claimed a deduction in the amount of $38,486.82, representing one-half of the amount of alleged loans on life insurance policies on *242 the life of G. Daniel. The deficiency notice denied any deduction for these loans, and paragraph 4(jj) of the amended petitioner alleges error in such denial. Petitioner now claims $37,841.38 as the amount properly deductible. Findings of Fact On May 9, 1941, the date of Isaac's death, loans in the total amount of $75,682.77 were outstanding on two policies of insurance on the life of G. Daniel. The loans had been taken out at some unspecified time, and it is not clear whether they were outstanding on June 5, 1940. G. Daniel included the amount of $77,686.66 as "Policy Loans" in the Summary of Obligations presented to the executors shortly after Isaac died, and he asserted that Isaac was liable for one-half thereof. These loans were also included in the obligations listed in the Settlement Agreement of October 1941. Opinion For reasons already set forth at length, the Summary of Obligations is not probative of the truth of assertions contained therein. That summary, together with G. Daniel's extra-judicial assertion of the estate's liability, merely proves that such a claim was made. It does not establish that the claim was valid and the estate liable. The stipulated fact that policy *243 loans totaling $75,682.77 were in existence on May 9, 1941, on policies of insurance on G. Daniel's life may permit an inference that such loans were still in existence approximately 3 weeks later on June 1, 1941. It sheds no light, however, and will not support any inference, as to the date of inception of the loans. We cannot merely presume that they were in existence on June 5, 1940, the "cut-off" date of the Assumption Agreement. There is no convincing evidence that they were in fact then in existence or that they were otherwise taken out under circumstances imposing liability on Isaac or his estate. The Assumption Agreement itself cannot supply any of the missing elements of petitioner's proof. That agreement merely refers to policy loans in a generic sense as being within its coverage. It does not purport to state whether and to what extent any such loans were acually then outstanding. Even if we may assume from the inclusion of that clause that loans on policies of insurance on G. Daniel's life were then in existence, there is no proof of the amount of such loans, and we may not presume that the alleged loans listed in the summary are the same ones existing on June 5, 1940. Petitioner *244 asserts on brief that "after an investigation and failure to find any inaccuracy" in the Summary of Obligations, it recognized the estate's alleged share of these and other liabilities listed therein. As we have noted in discussing the previous issue, petitioner has not chosen to reveal to us the nature of its investigation, and we are thus unable to determine whether it acted reasonably in acknowledging liability. And, also as previously noted, other portions of the record seem to indicate that petitioner in fact made no independent investigation, but merely accepted the Summary of Obligations as correct on the strength of G. Daniel's representations. In fact, to the extent petitioner has shed any light on its "investigation" as to policy loans, that "investigation" appears to have been grossly inadequate. Petitioner admits that it did not seek verification from the insurance companies named in the summary as the lenders. It attempts to excuse this failure by a statement that it "had no authority" to receive such information from the insurance companies, and was therefore "entitled to rely on the demand for payment." This is utterly without merit. G. Daniel, the insured, unquestionably *245 had authority to obtain a statement from his insurers containing all relevant information respecting policy loans. We doubt that petitioner would seriously deny that he could also have authorized Florence and George, as executors, to demand and receive such information. The executors were not merely entitled to demand such authorization from G. Daniel; as executors their duty to the estate required them to demand such readily obtainable proof of the claim. We have agreed in previous issues that petitioner need not litigate every claim to establish its deductibility as a debt. Conversely, however, there are times when the only reasonable course is to litigate. Had G. Daniel refused to comply with a request to obtain verification of the policy loans from the lenders or authorize petitioner to do so, the only course open to the executors consistent with proper execution of their duties, would have been to resist the claim. The record is barren of evidence that any such request was ever made. Respondent's determination that no amount is deductible on account of the alleged policy loans must be sustained. Issue 19. Mortgages on G. Daniel's Properties In Subschedule D of Schedule K of the *246 return, the executors listed 25 mortgages on properties owned by G. Daniel, which with interest to May 9, 1941, aggregated $113,536.33, and claimed a deduction of one-half of that amount. In the notice of deficiency, respondent allowed deductions for mortgages on 3 of the properties totaling $12,617.20, which exceeded the $7,468.73 claimed thereon by the executors, but denied any deduction for the mortgages on the other 22 properties. Respondent's action is challenged as erroneous in paragraph 4(kk) of the amended petition. Findings of Fact On May 9, 1941, the total mortgage indebtedness on 21 of the other 22 properties owned by G. Daniel was in the amount of $96,560. The mortgages had been placed on the 21 properties in question prior to June 5, 1940. Interest thereon from the last interest payment to the date of Isaac's death was in the amount of at least $1,730.86. No record exists of the 22nd mortgage, allegedly in the amount of $308 on property located at 3535 Rose Avenue. G. Daniel included these mortgages in his Summary of Obligations. Respondent has conceded this issue, except with respect to 3535 Rose Avenue and a portion of the interest on the various mortgages. Opinion There *247 is no evidence in the record of a mortgage at 3535 Rose Avenue. The Summary of Obligations is not competent to prove its existence or that of the alleged underlying indebtedness. Nor may petitioner rely upon destruction of the alleged mortgagees' records. The burden upon it to prove the propriety of the deduction sought is not met by showing why it is impossible for it to do so. Furthermore, there are public records of mortgages. Nonrecordation of a mortgage would be rather exceptional. We cannot say that respondent erred in denying any deduction in respect of the alleged mortgage indebtedness on property located at 3535 Rose Avenue. Respondent also seeks to limit the deduction of interest. He would eliminate any interest accrued after June 5, 1940, on the theory that decedent was not liable therefor "unless shown not to be attributable to mortgage renewals." While petitioner bears the ultimate burden of proof on this issue, it does not follow that it bears the burden of negatively disproving every gratuitous suggestion by respondent of a possible factual pattern under which the deduction may be denied. There is before us no evidence whatever of renewals, although the existence thereof *248 would not appear to be difficult to prove. The real estate records are open to respondent as well as to petitioner, and respondent presumably satisfied himself from those or other reliable records of the genuineness of the mortgage indebtedness he has here conceded. He must have observed the terms of the various mortgages, including their due dates, and would more likely than not be aware of any extension or renewal. We think the relative shortness of time between June 5, 1940, and May 9, 1941, together with the foregoing considerations, permits an affirmative finding, if such be necessary, that no renewals occurred. One-half of the interest to the date of Isaac's death is accordingly deductible. Issue 20. Mortgage on 1249 East 20th Street In Subschedule E of Schedule K of the return, the executors deducted $509.49, representing one-half of the $1,000 mortgage, plus interest to May 9, 1941, on property at 1249 East 20th Street. In the notice of deficiency, respondent denied any deduction on account of this mortgage. This denial is alleged in paragraph 4(11) of the amended petition to have been erroneous. Findings of Fact This property was one of those involved in the aforementioned *249 transactions of December 1939. A deed recorded December 27, 1939, recites the transfer of 1249 East 20th Street by Isaac and Florence to George and Robert as trustees for the benefit of Richard. The property had a $1,000 mortgage on it in December 1939 and at May 9, 1941. The deed from Isaac and Florence to the trustees provided, in part, as follows: "And the said party of the first part [the grantors], their heirs, executors and administrators, do hereby covenant and agree to and with the said party of the second part [the grantees] their heirs and assigns, that they the said party of the first part their heirs, the above mentioned and described premises, with the appurtenances, unto the said party of the second part against the said party of the first part and their heirs, and against all and every other person or persons whomsoever lawfully claiming or to claim the same or any part thereof, shall and will warrant and forever defend by these presents." After Isaac's death the executors paid off the mortgage indebtedness with interest to May 9, 1941, in the amount of $1,018.98, and now claim one-half thereof as a deduction. This value of this property, as in the case of all but one *250 of the 45 properties involved in the 1938 and 1939 transactions was includible in the computation of the gross estate because of the same circumstances as we detailed and relied upon in deciding issue 13 hereof. Opinion We do not consider the lack of a granting clause in this deed as of much importance. This omission is obviously an oversight and could have been corrected. The value of this property was at the time of Isaac's death includible as a part of his estate, and the amount of the mortgage thereon must therefore be taken into account. Respondent's denial of the deduction sought here may be inconsistent with his earlier inclusion of the property in the estate, but was, in any event, necessary for protective reasons. Our holding that the value of the property must be included in the estate requires us to hold that respondent erred in denying the deduction here in issue. To avoid prejudice to respondent in the event of a reversal of our action of so including the value of the property, we make it clear that the deduction is held to be proper only because of such inclusion. Issue 21. Mortgage on 12th and Chestnut In Subschedule F of Schedule K of the return, the executors claimed *251 a deduction of $166.40, representing one-half of a mortgage indebtedness on property at 12th and Chestnut Streets in the amount of $332.80. In the notice of deficiency, respondent denied this deduction, but copied the figure to be disallowed as $116.40 through a typographical error. Petitioners allege error in such denial in paragraph 4(mm) of the amended petition. Findings of Fact There was no intention on respondent's part to allow a $50 deduction in respect of this item. The covering statement in the notice of deficiency merely denied the deduction claimed, but copied the figure at $116.40 rather than $166.40. Petitioner now computes the liability of the estate at $165.73. The payee of the mortgage, Workingmen's Building & Loan Association, destroyed its records after 7 years and no original record of the mortgage debt exists. Ownership of the equity in the property subject thereto is not disclosed by the record. This mortgage was included by G. Daniel in his Summary of Obligations, as of June 1, 1941, under "Mortgages on Property (Joint)." In the Settlement Agreement of October 1941 this mortgage was included in a larger amount, namely $1,02.60, and was included among the obligations *252 settled by the payment of $86,810.24 to G. Daniel. The property at 12th and Chestnut was not returned as an asset of the estate. Opinion Petitioner is here in the same position as it was with respect to an alleged mortgage on property located at 3535 Rose Avenue, and more fully discussed as part of issue 19, supra. The record is barren of evidence of the mortgage indebtedness in question. And the inability of petitioner to prove its case, however understandable, cannot permit of a finding in its favor. Furthermore, the indebtedness is claimed in respect of property which petitioner first alleged to be jointly owned by decedent and G. Daniel, yet no part of the property has been included in computing the gross estate. And there is no evidence that petitioner's more recent assertion, that the property belonged to G. Daniel alone, is correct. Petitioner has not proven error in respondent's determination as to this issue. Issue 22. Unpaid Partnership Bills In Subschedule G of Schedule K of the return, the executors claimed a deduction of $10,387.69 for one-half of 8 unpaid bills of the partnership. Respondent denied the deduction claimed, and paragraph 4(nn) of the amended petition alleges *253 such denial to have been erroneous, changing the amount claimed, however, to $10,197.08. Findings of Fact The 8 unpaid bills listed in the return as partnership obligations were as follows: Theo. Schick - $470; Pratt & Lambert - $9,782; Interest on Pratt & Lambert account - $1,237.43; Social Security & Penna. Unemployment Excise Taxes - $1,106.46; Services, G. Daniel Baldwin - $6,000; Mike Horan - $953; T. P. Dunn - $1,000; Dr. O. N. Chaffee - $226.50; Total - $20,775.39. Only the Schick, Pratt & Lambert, Horan, and Dunn bills were listed as "Unpaid Bills" by G. Daniel in his Summary of Obligations, as of June 1, 1941. All of such bills, except Chaffee, were listed as "Unpaid Bills" in and were part of the obligations settled by the Settlement Agreement. The executors paid 50 per cent of the Chaffee bill directly to the named creditor. Theo. Schick was a constable who served landlord warrants for Baldwin Brothers for some undetermined period from about 1936 to 1938 or 1939, and possibly to as late as 1940. Over the years Baldwin Brothers bought quantities of paint from Pratt & Lambert at a discount under special credit conditions. The partnership bought tires from Mike Horan. T. P. *254 Dunn was an attorney employed professionally by G. Daniel for partnership purposes. The executors accepted G. Daniel's statement as to the amount of each of these obligations. Petitioner has now abandoned its claim respecting Unemployment and Social Security taxes. Respondent, on the other hand, concedes the deduction claimed with respect to the Chaffee bill. The $6,000 item denominated "Services, G. Daniel Baldwin," resulted from the compensation provision in G. Daniel's favor in the Management Agreement, and claim therefor was made in G. Daniel's accounting of June 1941. Petitioner now seeks to deduct only a portion of such amount, based on a proration of the $6,000 between services prior to and after Isaac's death. This $6,000 charge was included as an unpaid bill in the Settlement Agreement. In the equity suit, the executors charged G. Daniel as follows "(4) Your Orators have now discovered that the following items (among others concerning which your Orators have no information) set forth in the Settlement Agreement of October 1, 1941, Exhibit 'F', representing alleged Unpaid Bills arising from the operation of the combined property holdings of the Defendant, G. Daniel Baldwin *255 and your Orators with one-half the amount of which combined maintenance expenses your Orators were charged by reason of the agreement to pay one-half of such combined operating expenses under the Dissolution and Management Contract of June 5, 1940, Exhibit 'E', were deceitfully, untruthful and fraudulently misrepresented by the Defendant G. Daniel Baldwin, in the said Settlement Agreement of October 1, 1941, Exhibit 'F', for the reason that many of them were never paid or intended to be paid by said G. Daniel Baldwin after collecting your Orators' share thereof, viz.: the $470.00 item of Theodore Schick was compromised as a result of a court litigation for collection by payment of the sum of $313.00; the $9,782.00 plus $1,467.30 interest item of Pratt and Lambert totaling some $11,200.00 was later compromised by the Defendant, G. Daniel Baldwin, on payment of $4,500.00; the $953.00 item set forth as due Mike Horan has never been paid and has been written off by the alleged creditor; the $1,000.00 item to T. P. Dunn, attorney, if paid, was for services rendered G. Daniel Baldwin, from which the Estate of Isaac W. Baldwin received no benefit, as any alleged services rendered by said *256 T. P. Dunn at said time were adverse to the interest of your Orators' Estate; the $1,106.46 item of Social Security and miscellaneous taxes was in relation to employees employed in Baldwin Brothers building operations, which had been operating for the exclusive benefit of the Defendant, G. Daniel Baldwin since June of 1940, and almost exclusively for his benefit since December 5, 1938; the $6,000.00 item for services represented as due G. Daniel Baldwin, under his management contract was not earned by reason of fraudulent and fiduciary violations of the Defendant, G. Daniel Baldwin, under his management contract of June 5, 1940, Exhibit 'E', as appears from his Accounting of July 1941 thereunder (Exhibit 'I') hereinafter described." Statements in the bill of complaint are admissible against petitioner as admissions by it. We so admit the allegations in the above-quoted portion of the bill of complaint. Opinion We held earlier that claims of the estate against others must be valued as of the date of death, and that such valuation may may produce a figure greater or less than any eventual recovery. We think the same rule must be applied to claims against the estate. Deductibility of *257 a claim and the amount deductible depends not upon actual payment or the amount paid, but upon liability enforceable under local law at the time of decedent's death. Cf. Commissioner v. Strauss, 77 F. 2d 401 (C. A. 7), affirming a Memorandum Opinion of this Court on this point; Estate of Walter Thiele, 9 T.C. 473, 482. Therefore, we deem the proper inquiry to be Isaac's liability at the time of his death, and not the subsequent disposition of the various matters in issue. Respondent argues that, assuming the G. Daniel bill to have been valid, at least to the extent of $5,602.21, apportionable to the period prior to Isaac's death, the pleadings limit this issue to joint obligations or those within the ambit of the Assumption Agreement of June 5, 1940. Paragraph 4(nn) of the amended petition reads as follows: "The Commissioner's omission from the debts of decedent and all other deduction schedules of an amount of $10,197.08, representing the decedent's liability at death for one-half of miscellaneous unpaid bills, eight in number, of Baldwin Brothers partnership and of the decedent and G. Daniel Baldwin." A cursory examination of the return makes it clear that the above paragraph *258 can have reference only to Subschedule G of Schedule K, which lists 8 items as follows: Theo. Schick
$ 470.00
Pratt & Lambert
9,782.00
Interest on Pratt & Lambert account
1,237.43
Social Security & Penna. Unemploy-
ment Excise taxes
1,106.46
Services, G. Daniel Baldwin
6,000.00
Mike Horan
953.00
T. P. Dunn
1,000.00
Dr. O. N. Chaffee
226.50
Total
$20,775.39
One-half above amount
$10,387.69 Respondent thus had ample notice that petitioner was asserting the G. Daniel management claim in the foregoing paragraph 4(nn). To be sure, that claim was not a partnership obligation, was not covered by the Assumption Agreement, and was not for any other reason shared by G. Daniel so as to make decedent and his estate liable for only one-half its amount. This error seems to have been made by G. Daniel to his detriment in the schedule attached to the Settlement Agreement of October 1941, and by petitioner to its detriment in this proceeding. Nonetheless, respondent was or should have been well aware of the nature of this claim and that it was intended as one of the 8 items mentioned in paragraph 4(nn). Whatever G. Daniel's defalcations, and irrespective of claims against him in Isaac's favor, G. Daniel was entitled in *259 any event to reasonable compensation for services under the Management Agreement. We do not think $6,000 per year excessive. The amount of $5,602.21, allocable to the period prior to Isaac's death, was accordingly a valid claim against the estate in existence on the date of Isaac's death. As a result of the return, pleadings and arguments, the deduction is to be limited to one-half of that amount, or $2,801.10, but such amount may be deducted as a claim against the estate. George testified, and we find, that Baldwin Brothers (meaning G. Daniel, who controlled financial matters) was slow to pay its debts, and that the firm was indebted to Schick for many fees. We are also convinced that G. Daniel would not hesitate to refuse payment of a debt known to him to be just, where he believed delay and even litigation would result in abandonment of the claim by the creditor or a compromise whereby a lesser amount would be accepted in full satisfaction. Schick's services terminated in 1940 at the latest. We find that substantially all of his services were performed prior to dissolution of the partnership, and that he was owed no less than $470 therefor at the time of Isaac's death. This was *260 an obligation of Isaac's, as a partner, and it was unnecessary to show payment by G. Daniel. The fact that G. Daniel later resisted the claim and settled it for a lesser sum, cannot change the date-of-death indebtedness of the estate. Petitioner is entitled to a deduction for one-half of the amount of $470 owed Schick as of May 9, 1941. The other items are on somewhat weaker ground. George was less familiar with the firm's dealings with the other creditors than with Schick. He testified in a general way, and we now find, that Baldwin Brothers purchased large quantities of paint from Pratt & Lambert and tires from Mike Horan, and used the legal services of T. P. Dunn. He (George) saw letters from Pratt & Lambert referring to an outstanding bill, but he could not give testimony based on his own knowledge as to the amount owed at any particular time, including that owed at the time of Isaac's death. At one point in his testimony he stated: "As to my personal knowledge as to the exact computation of how much they owed, I admit I relied upon the account given to me of the matter by G. Daniel Baldwin. I had absolute belief, absolute faith as to the accuracy of it." The voluminous uncomplimentary *261 evidence, including much testimony by George, of G. Daniel's character and ethical standards, and that those facts were well known to George prior to Isaac's death, make his asserted "absolute faith" in the accuracy of the Summary of Obligations utterly incredible. Furthermore, George, as executor, was required to exercise reasonable care in passing on claims against the estate, and to insist upon reasonably convincing proof. G. Daniel was in possession of material proving the validity and amount of these claims, and it was incumbent on George to demand such proof. Failure so to demand was inconsistent with reasonable conduct. In view, however, of credible testimony that the partnership did in fact deal with the foregoing creditors and was slow in paying its debts, we are satisfied that on May 9, 1941, partnership obligations were outstanding in favor of Pratt & Lambert and Mike Horan. We de not know their precise amounts, and neither the Summary nor the Settlement Agreement is competent evidence thereof. Proof that G. Daniel claimed an amount to be due is not evidence of the truth or correctness of such assertion. And any statements in the Settlement Agreement, while admissible against *262 petitioner as admissions, are not competent against strangers to the instrument. Judging as best we can from the evidence available, and bearing heavily against petitioner, whose weakness of proof is responsible for the present uncertainty, we find that on May 9, 1941, there existed in favor of Pratt & Lambert and of Mike Horan, partnership debts in the respective amounts of $5,000 and $500. The foregoing amount in favor of Pratt & Lambert includes the interest item. The estate was liable for and may deduct one-half of the above amounts. The alleged indebtedness of $1,000 in favor of T. P. Dunn requires separate discussion. That item was alleged in the bill of complaint to have been in respect of services rendered to G. Daniel alone, and in fact adverse to petitioner. We believe that allegation and accept it as a fact. Petitioner did not act reasonably in accepting without further inquiry G. Daniel's unverified allegations as to this item. We believe that a reasonable investigation would have disclosed the true nature of the services rendered. The executors were required to demand the right to fully investigate the claim, and to refuse to acknowledge or pay the claim if G. Daniel refused *263 to cooperate in that respect, including such waiver by him of the attorney-client privilege as might be necessary for a full inquiry. Petitioner is entitled to no deduction in respect of this bill. In summary, respondent erred as to the Schick and Chaffee bills, and petitioner may deduct one-half of their respective amounts. Respondent also erred in failing to permit deductions of one-half of $5,000 and one-half of $500, or a total deduction in the amount of $2,750, in respect of the Pratt & Lambert and the Mike Horan accounts, and in denying a deduction in the amount of $2,801.10 in respect of G. Daniel's claim for services. Respondent's determination as to the remaining items is sustained. Issue 23. Indebtedness on Market Bills In Subschedule H of Schedule K of the return, the executors claimed a deduction of $6,158.16 representing one-half of the alleged indebtedness on approximately 100 unpaid market bills. In the notice of deficiency, respondent denied any deduction for "Unpaid Bills (Markets) Open Accounts - $4,658.16," and this action is attacked as erroneous in paragraph 4(oo) of the amended petition. The $1,500 difference between that claimed in the return and that presently *264 in controversy represents the elimination of Isaac's half of a $3,000 note from unpaid market bills because of duplication. [7] Petitioner now claims a deduction in the amount of $178.47 with respect to this issue, or one-half of an indebtedness of $356.95: Findings of Fact In his Summary of Obligations, immediately after Isaac's death, G. Daniel listed "Unpaid Bills (Markets)" in the total amount of $356.95. In his accounting under the Management Agreement, G. Daniel showed in a schedule attached to such accounting that the markets showed net receipts of $11,780.28, payment of $10,000 on a mortgage, and a balance of $1,780.28. In the Settlement Agreement G. Daniel listed among the obligations settled by payment of $86,810.24, a market deficit of $9,216.70, without other reference to any unpaid bills of the markets. Petitioner contended in the equity suit that the foregoing market deficit was fictitious, in the following language: "6. The $9,216.70 item entitled 'Market Deficits,' hereinabove mentioned was based on the Supplemental Market Account, Exhibit 'K.' Said account shows a deficit between June 1, 1941 and October 11, 1941 of said $9,216.70 and is believed fraudulent and deceitful. *265 The defendant, G. Daniel Baldwin admitted an income from said Market properties during the period from June 1, 1940 to June 1, 1941 of $11,780.00 as set forth on the last page attached to his Property Management Accounting, Exhibit 'I,' hereinbelow described, and said $11,780.00 is averred to be an understatement of their share of the net revenues during said period." The unpaid bills (markets) listed in the Summary of Obligations were the first 8 of about 100 unpaid bills listed by the executors in Subschedule H. These 8 bills were for services, materials, or supplies furnished the Twelfth Street and Center Markets and the grocery store in each market. One-half of the amount of each bill constituted an indebtedness of the estate at the time of Isaac's death. Opinion The evidence on the subject of the market stores is hopelessly confused. We have found previously that Isaac owned at death an interest in such stores, and we are satisfied that this consisted of a one-half interest, the other one-half being owned by G. Daniel. Isaac was liable for one-half the amount of bills in respect of such stores unpaid at *266 the time of his death. Despite the paucity of evidence, we believe that market store bills in some amount remained unpaid at May 9, 1941, and that such bills were in not less than an aggregate amount of $356.95. Accordingly, petitioner is entitled to a deduction in the amount of $178.47, or one-half thereof. Issue 24. Improvement Liens on Properties of Isaac In Subschedule I of Schedule K of the return, the executors claimed deductions for one-half of the improvement liens on various properties owned by Isaac at May 9, 1941. In item 74 thereof, they listed liens on 3 lots aggregating $409.77, of which one-half was deducted. No change in this deduction was made by respondent in the notice of deficiency. In paragraph 4(pp) of the amended petition, the petitioner claims, in effect, a deduction for these liens of $400, or $195.11 more than the $204.89 allowed. Findings of Fact and Opinion The improvement liens on the 3 lots were sewer and paving liens, which totaled $1,979.88 at May 9, 1941. The value of the 3 lots, as reported in the return and accepted by respondent was $800. The petitioner now seeks a deduction on account of the lien indebtedness in the amount of one-half of the *267 foregoing total value of the properties. Respondent agrees with petitioner's new position and accordingly one-half the amount of the liens to the extent of one-half of the value of the property encumbered, or a total of $400, is deductible as a claim against Isaac's estate at the time of his death. Issue 25. Improvement Liens on Properties of G. Daniel Issue 26. Taxes on Property Held by Isaac and G. Daniel as Tenants in Common [8]
In Subschedule I of Schedule K of the return, the executors claimed deductions for one-half of 9 improvement liens on various properties owned by G. Daniel on May 9, 1941. The liens aggregated at least the claimed total of $2,958.15, one-half of which was deducted. Respondent disallowed the claimed deduction in the amount of $1,479.07, and petitioner alleges error therein in paragraph 4(qq) of the amended petition. In Subschedule K of Schedule K of the return, the executors claimed a deduction in the amount of $38.83, representing one-half of 1934 city and school taxes on property owned by Isaac and G. Daniel as *268 tenants in common. This claimed deduction was disallowed in the notice of deficiency, and is the subject of paragraph 4(rr) of the amended petition. Findings of Fact and Opinion Respondent has not unqualifiedly conceded these issues, but states on brief that if the Assumption Agreement is valid, the foregoing deductions were proper. We perceive no impediment to the validity and binding effect of that agreement or to its recognition for tax purposes. We accordingly hold that respondent erred in respect of these two issues. Issue 27. Taxes on Property of G. Daniel In Subschedule L of Schedule K of the return, the executors claimed a deduction in the amount of $6,692.43, representing one-half of city and school taxes for 1934 on properties owned by G. Daniel. Such deduction was denied in the notice of deficiency. In paragraph 4(ss) of the amended petition, the petitioner claims that decedent's liability for such taxes on May 9, 1941, was in the amount of $6,324.57. Findings of Fact Delinquent city and school taxes for 1934 in the amount of $12,022.83 were due at the time of Isaac's death on properties listed on the assessor's records as belonging to G. Daniel. Delinquent city and school *269 taxes for 1934 in the amount of $626.32 were also due at Isaac's death on 17 properties allegedly belonging to G. Daniel but carried in the names of others on the assessor's records. Petitioner has not established that title to the 17 properties carried in the names of others was in G. Daniel. Opinion This failure as to the 17 properties last mentioned precludes any deduction on account of taxes in the amount of $626.32 due thereon. On the other hand, the record establishes, and respondent does not seem to deny, that delinquent taxes for 1934 were due and unpaid as of May 9, 1941, in the amount of $12,022.83 on properties belonging to G. Daniel. These taxes were obligations existing on June 5, 1940, and therefore within the scope of the Assumption Agreement. Petitioner may deduct one-half the amount thereof. Issue 28. Gift Taxes In the estate tax return, the executors claimed no deduction on account of gift taxes or interest on such taxes, and respondent allowed no deduction therefor in the notice of deficiency. In paragraph 4(tt) of the amended petition, the petitioner claims a deduction for whatever gift tax liability plus interest thereon existed at Isaac's death. Findings of Fact *270 During the administration of decedent's estate, questions arose as to the value of property transferred by the decedent, the consideration for the transfers, and the resultant liability for gift taxes. In connection therewith, both gift and estate tax liabilities were discussed at conferences between representatives of decedent's estate and respondent. The parties finally determined that a settlement could not be reached, and the executors filed gift tax returns for Isaac for the years 1938 and 1939. The gift tax liability disclosed in such returns, with interest to May 9, 1941, was in the aggregate amount of $1,802.05, computed as follows: Item
Amount
1938 gift tax
$ 458.26
Interest on $458.26 to May 9, 1941
59.12
1939 gift tax
1,201.75
Interest on $1,201.75 to May 9, 1941
82.92
Total
$1,802.05
The amount shown in the returns as gift tax liability, together with interest thereon, was paid to the district director of internal revenue. Thereafter, a demand for payment of additional gift taxes was sent to the executors, who were subsequently advised that a mistake had been made, and that the additional assessments would be abated. The respondent has not yet determined whether the gift tax liability *271 reported should be accepted as correct. The properties treated as the subjects of gifts were the Massachusetts and Connecticut life insurance policies, and some of the real properties purportedly transferred by decedent in December 1938 and December 1939, all previously discussed in greater detail. The parties seem to agree that the amount of Isaac's gift tax liability at the time of his death plus interest to that date is deductible. Respondent argues, however, that the amount of such liability depends upon our determinations with respect to issues 9 and 13. We agree. Opinion Issues 9 and 13 raise questions as to whether the values of certain properties included in the gift tax return are includible in the computation of the gross estate. Gift tax liability existed at Isaac's death on account of all property which was given in contemplation of death; but obviously there was no gift tax liability as to property not subject of valid inter-vivos transfer. * *272 For that reason we must also take into account our determination in issue 5 as to the inclusion of 524 East 2nd Street. We have held that the two insurance policies were fully transferred by Isaac during his lifetime. The values thereof at the time of the transfer constituted taxable gifts, and were properly included in the 1938 gift tax return. The amount of any gift tax liability computed on the basis of such inclusion was a liability existing at the time of Isaac's death and is deductible. On the other hand, we held that the values of all properties discussed under issue 13, except the property at 711 Lincoln Avenue, must be included in computing the taxable estate because not completely transferred **. Accordingly, any of those properties included in either the 1938 or 1939 gift tax return must be eliminated therefrom. In accordance with respondent's concession, we held the property at 711 Lincoln Avenue excludible from Isaac's estate. But that result was due solely to the fact that title thereto had never been in Isaac. Isaac never owned the property, and hence could not and did not make it the subject of a taxable *273 transfer. The property located at 711 Lincoln Avenue must thus be eliminated from the 1938 gift tax return, where it appears, in computing the deductible gift tax liability. The 1939 gift tax return also listed property located at 524 East 2nd Street, at a value of $2,200, discussed under issue 5. We there held that Isaac had retained the enjoyment of the property until his death, and had, in any event, failed to make a completed inter vivos transfer thereof and sustained respondent's action of including its value in the estate. We now hold that no taxable gift took place with respect to this item, and it must be excluded in computing Isaac's gift tax liability. The precise amount, if any, of Isaac's gift tax liability as of the date of his death will be computed as a part of the recomputations to be made under Rule 50. Such liability, with interest to the date of Isaac's death, is an allowable deduction as a claim against the estate. Issue 29. Payment to G. Daniel under Settlement Agreement The executors claimed no deduction in the estate tax return for the payment by the estate to G. Daniel under the Settlement Agreement. In determining the deficiency herein, the respondent allowed *274 no deduction for such payment. In paragraph 4(uu) of the amended petition, the petitioner claims a deduction in the amount of the alleged excess consideration paid G. Daniel under the October 1, 1941, agreement. Findings of Fact In their fiduciary income tax return for the year 1941, filed March 16, 1942, the executors claimed a deduction of $23,205 as a loss from "Market Properties Trade." The amount of this loss was computed by assigning to the properties transferred an appraised value of $108,205. Respondent has not acquiesced in such deduction. The parties have stipulated that the values as of October 1, 1941, of the 4 properties which G. Daniel agreed to convey to the executors were as follows: Property
Value
1805-1817 Parade Street
$30,000
409 East 18th Street
2,500
102-104 E. 26th Street
8,500
120-124 West 8th Street
30,000
Total
$71,000
On May 9, 1941, Central Market was encumbered by a mortgage of $66,250, which with interest to May 9, 1941, totaled $66,599.66. In Subschedule F of Schedule K of the return the executors claimed a deduction of $33,299.83, representing Isaac's half of such indebtedness at death. Respondent has allowed this deduction in his notice of deficiency. The Settlement *275 Agreement, mentioned several times previously, reads as follows: "CONTRACT "MADE AND ENTERED INTO this 1st day of October, 1941, BETWEEN - GEORGE A. BALDWIN and FLORENCE E. BALDWIN, Executors and Trustees of the Estate of Isaac W. Baldwin, deceased, parties of the first part, "AND "G. DANIEL BALDWIN, party of the second part, all of the City of Erie, County of Erie and State of Pennsylvania. "WHEREAS, Isaac W. Baldwin at the time of his decease, to-wit: May 9, 1941, and G. Daniel Baldwin, were owners as tenants in common of certain real estate situate in the City of Erie consisting of property known as 'Twelfth Street Market' and 'Central Market', together with their appurtenances and equipment; also all certain properties lying on the east side of French Street between 12th and 13th Streets, owned by the parties hereto, and a house and lot known as 1404-06 French Street, and "WHEREAS, G. Daniel Baldwin, as Attorney in Fact for Isaac W. Baldwin and Florence E. Baldwin, conveyed to J. Robert Baldwin certain premises described in a deed recorded in Deed Book 406 at page 600 on the 20th day of December, 1940, and "WHEREAS, party of the second part prepared an account covering the transactions *276 between G. Daniel Baldwin of the second part and Isaac W. Baldwin and his Executors and Trustees, from June 5, 1940 to June 1, 1941, on or about the 30th day of June, 1941, and "WHEREAS, it is the desire of party of the second part to exchange the interest of parties of the first part in the properties described in the first paragraph of the premises hereof, for other properties hereinafter set forth, and "WHEREAS, it is the desire of both parties that all disputed matters which have arisen between them may be adjusted and settled. "NOW THEREFORE, in consideration of the sum of One ($1.00) dollar, and other more valuable consideration hereinafter mentioned and enumerated, parties of the first part agree as follows: "1. To convey unto party of the second part an undivided one-half interest in the following described premises: "(a) Twelfth Street Market, "(b) Central Market together with driveway about forty (40) feet wide leading from Peach Street eastwardly into said Central Market, Also all personal property including groceries and merchandise used in connection with said markets and all leases and accounts contracted for or incurred in connection with said markets, "(c) House and *277 lot known as 1404-06 French St., Erie, Pa. "(d) 1209 French St., Erie, Pa., 49 X 80 "(e) 1215 French St., Erie, Pa., IRR X 130 "(f) East side French St., 12th-13th Sts., Erie, Pa. "(g) Southeast corner 12th & French Sts., Erie, Pa. 72 X 85; together with any alleys or rights of way or easements in connection with the above properties. First parties' interest in said premises are to be conveyed subject to all liens thereon except taxes for 1941 which are to be prorated. "2. To convey by Executors' deed all their interest in premises described in a certain deed dated December 20, 1940 given by G. Daniel Baldwin, Attorney in Fact for Isaac W. Baldwin and Florence E. Baldwin to J. Robert Baldwin, and recorded in the Recorder's Office of Erie County, Pennsylvania in Deed Book 406 at page 600. Said premises are to be conveyed subject to all liens thereon. "3. To convey by quit-claim deed unto the City of Erie certain premises to be used as streets located in the vicinity of the premises mentioned and described in the preceding paragraph. "4. To accept a certain account prepared and filed by second party on or about the 30th day of June, 1941, covering the transactions between second party *278 and Isaac W. Baldwin and first parties from June 5, 1940 to June 1, 1941 as correct and satisfactory and to surrender and relinquish any right which they, the said first parties, might have to question said account in any Court. "5. To execute in favor of party of the second part a bond and mortgage to secure the payment of the sum of Eighty-six Thousand Eight Hundred Ten and 24/100ths ($86,810.24) dollars, and at the same time a Certificate of No-Defense is to be given by George A. Baldwin and Florence E. Baldwin, as individuals, with the said bond and mortgage, that personally have no offset or defense to the same either in law or equity. The said mortgage shall cover all of the property belonging to the Estate of Isaac W. Baldwin at the northeast corner of Ninth and Peach Streets, consisting of Nine (9) stores on the first floor and dwellings on the second floor, in the City of Erie, Pennsylvania; also the property situated on the south side of Tenth Street between State Street and Peach Street, having a frontage of sixty-five (65) feet on the south side of Tenth Street and running southwardly to the rear of the lot; also the property known as the Mohican property, having a frontage *279 of forty (40) feet on the east side of State Street and running eastwardly to the alley. The said bond and mortgage shall be given in payment of one-half of the following obligations less offsets as shown herein. The said bond and mortgage shall be dated October 1, 1941 and shall be paid as follows: Fifteen Thousand ($15,000.00) dollars to apply on the principal sum is to be paid on or before April 1, 1942, and Fifteen Thousand ($15,000.00) dollars to apply on the principal sum is to be paid semi-annually thereafter with interest to be paid semi-annually at the rate of six percent (6%). The Mortgagors reserve the right to pay any larger amount to apply on the principal sum at any time. "NOTES
Interest
Interest
Adjusted
Total
Payee
Amount
Paid to
to 10/1/41
Debt
Sec. Peo. Tr. Co. paving liens
$21,424.53
3/31/41
$428.50
$ 21,853.03
Sec. Peo. Tr. Co.
40,000.00
4/30/41
833.33
40,833.33
Sec. Peo. Tr. Co. Mod. Groc.
3,000.00
3/ 3/41
103.50
3,103.50
Marine Nat'l Bank
10,000.00
7/ 3/41
33.30
10,033.30
Marine Nat'l Bank
5,400.00
8/23/41
95.00
5,495.00
Albion Bank
1,900.00
4/ 1/41
57.00
1,957.00
C. T. Bryan Mtg.
4,000.00
1/15/41
170.00
4,170.00
C. T. Bryan
1,500.00
5/11/41
34.75
1,534.75
J. T. Tobin
1,450.00
4/ 8/38
302.55
1,752.55
Work. Bldg. & Loan Mtg. 12th & Chestnut
1,027.60
1,027.60
Difference in Taxes for the year 1934
3,813.76
Market Deficit
9,216.70
$104,790.52
POLICY LOANS
Aetna Life Ins. Co.
$49,723.76
$911.60
$ 50,635.36
Penn Mutual Life Ins. Co.
27,962.90
512.65
28,475.55
$ 79,110.91
UNPAID BILLS
Theo. Schick
$ 470.00
Pratt & Lambert
9,782.00
Interest on Pratt & Lambert
1,467.30
Mike Horan
953.00
T. P. Dunn
1,000.00
Soc. Sec., Pa. Unemp., Excise Taxes
1,106.46
Services
6,000.00
Interest
120.00
$ 20,898.76
Total obligations
$204,800.19
*280 "OFFSETS
Check
Date
No.
Payee - Description
Amount
7/17/41
3
Life Ins. Loan, Mass. Mutual Life Ins. Co., I. W. Baldwin
$ 9,641.00
7/17/41
4
Int. on Life Ins. Loan, Mass. Mutual Life Ins. Co., I. W. Baldwin
6,404.25
8/14/41
759
Wesleyville Boro dated 5/19/41 Return of Taxes Euclid Lots, used
to pay delinquent taxes on Rose Avenue
288.84
8/14/41
Wesleyville Boro dated 8/6/41 Return of taxes Euclid Lots, used
to pay delinquent taxes on Rose Avenue
534.44
Total Offsets
$ 16,868.53
Total obligations
$204,800.19
Total offsets
16,868.53
Difference between obligations & offsets
$187,931.66
One-half difference between obligations & offsets
93,965.83
Less credit on statement concerning properties deeded to Trust as of June 5, 1940
2,681.50
$ 91,284.33
Taxes Pro-rated on conveyed properties
525.91
$ 91,810.24
Compromise
5,000.00
$ 86,810.24
"6. Parties of the first part hereby release party of the second part from any and all obligations or liabilities, to pay any claims with respect to property owned by parties of the first part, other than obligations hereinbefore specifically set forth, and the said parties of the first part hereby agree to save harmless the said party of the second part from the payment of any taxes, tax liens, municipal *281 liens, judgments, mortgages, or other liens against any property owned by them prior to the execution of this contract. With respect to the obligation of Nineteen Thousand Four Hundred Eighty and 97/100ths ($19,480.97) dollars, to the First National Bank on which party of the second part is obligated on note due October 1, 1941, parties of the first part agree that they will forthwith settle this note or make an arrangement with the Bank in such a manner as to relieve party of the second part from any and all liability thereon or any mortgages in connection therewith, on property known as 138 East Twelfth Street, Erie, Pennsylvania. "IN CONSIDERATION of the sum of One ($1.00) dollar and other more valuable consideration, hereinbefore or hereinafter mentioned and enumerated, party of the second part agrees as follows: "1. To convey to said first parties the following described properties: "1805-1817 Parade Street, Erie, Pennsylvania; 409 E. 18th St., Erie, Pennsylvania; 102-104 E. 26th St., Erie, Pennsylvania; 120-124 West 8th Street, Erie, Pennsylvania. "Said premises are to be conveyed unto parties of the first part free and clear from all encumbrances by general warranty deed. "2. *282 To release parties of the first part from any and all obligation or liability to pay any claim with respect to any property owned by party of the second part other than the obligations hereinbefore specifically set forth, and which are being paid or secured by the giving of the hereinbefore mentioned bond and mortgage; and the said party of the second part does hereby agree to save harmless the said parties of the first part from the payment of any taxes, tax liens, municipal liens, judgments, mortgages or other liens against any property owned by him or by him and Mabel L. Baldwin, his wife, and the said party of the second part does hereby promise and agree that said first parties shall not be required to pay any portion of any accounts, bills, notes, judgments or claims of any kind or character except only as hereinbefore specifically provided, and agrees to save harmless the said parties of the first part from the payment of any accounts, bills, notes, judgments or claims of any kind or character not listed in paragraph five (5) of this contract. "3. To accept as full payment and settlement for all obligations of every kind due from parties of the first part as of October 1, 1941, *283 the above mentioned bond and mortgage. "4. Second party agrees to assign the lease or leases with respect to any property owned by first parties and to turn the management of said property over to first parties which he is now managing and the rents from which he is now collecting, at any time that he is relieved from all personal responsibility with respect to said property. The intention of this agreement is that first parties may by any proper means or method, relieve second party from all personal liability with respect to any particular property or properties, and upon so doing, shall be immediately entitled to have the lease or leases assigned to them and the management of such property or properties turned over to them. "IT IS AGREED by both parties hereto as follows: "1. That all conveyances mentioned herein and not hereinbefore provided for shall be made by general warranty deed describing the premises to be conveyed by metes and bounds. Said deeds shall be dated October 1, 1941 and the said premises described therein shall be conveyed subject to leases in existence with respect to said properties with rent earned from October 1, 1941. All taxes for the year 1941 with respect *284 to any properties mentioned herein and which are conveyed from one party to the other according to the terms of this agreement, shall be prorated as of October 1, 1941. The intention of this paragraph is that first parties shall pay three-fourths (3/4) of the 1941 taxes on property which they convey to second party, and second party shall pay three-fourths (3/4) of the 1941 taxes on property which he conveys to first parties. "2. That upon the execution of this contract, each party hereto shall be relieved from any and all obligations with respect to premises owned by the other party hereto, except only such instances as are specifically excepted from this agreement and that each party hereto will save harmless the other party hereto from the payment of any and all obligations with respect to premises owned by them or him or by G. Daniel Baldwin and Mabel L. Baldwin, his wife, always excepting such cases as are specifically mentioned in this contract as exceptions. The intention of the parties is that all obligations against first parties' real estate shall be paid by first parties, and all obligations against second party's real estate shall be paid by second party, unless there is *285 a provision which specifically provides otherwise contained in this contract. "3. Parties of the first part agree to accept and be bound by a certain contract made between party of the second part and Glen W. Carney, for the sale of certain printing equipment which is fully described in the said contract and to endorse a note at the National Bank and Trust Company, and relieve party of the second part from any liability on account of this note which is given to secure the payment of the said equipment together with accumulation of rent. This note is at the National Bank and Trust Company in the amount of Eleven Hundred Forty-nine and 23/100ths ($1149.23) dollars. "4. Nothing herein contained shall in any way effect the ownership in connection with the remaining property which is held in common in the name of the Isaac W. Baldwin Estate and G. Daniel Baldwin. "5. The said bond and mortgage to be given is to contain a clause providing for the payment by parties of the first part of the Federal and State Inheritance Tax or any other tax that might be assessed against the said Estate on account of the Decease of Isaac W. Baldwin and a substantial payment of Seventy-five Thousand ($75,000.00) *286 dollars is to be made within a period of fifteen (15) months from May 9, 1941, and as soon as this tax has been fully satisfied, the property occupied by the Mohican Company on the east side of State Street south of Twelfth Street, shall be released from this mortgage upon the payment of the death taxes as hereinbefore mentioned. "6. Parties of the first part to this contract are to receive the rent on the properties to be conveyed by party of the second part to parties of the first part from October 1, 1941 which shall include rent earned during the month of October, 1941, when this contract is actually signed and delivered and the said conveyances and bond and mortgage to be given is to be fully completed and delivered to the parties hereto on or before the tenth day of October, 1941. "7. Nothing contained in this contract shall be construed to render unnecessary an accounting by second party to first parties with respect to any property owned by first parties and managed by second party, and it is specifically agreed that party of the second part will account for the proceeds received from any properties heretofore managed by him and in which first parties have any interest, and *287 will make payment to said first parties of any balances due them in accordance with said account. "8. With respect to the parties hereto, this agreement shall constitute a final settlement of all items mentioned herein and both parties agree that they have no offset nor defense to the conditions herein contained nor the performance of any of the things mentioned herein and that they will perform all of the duties imposed upon them by this contract at the time specifically indicated herein or within a reasonable time thereafter should they be prevented by circumstances beyond their control. "IN WITNESS WHEREOF, parties to this contract have hereunto set their hands and seals the year and date first above written. (Signed) George A. Baldwin ( SEAL) (Signed) Florence E. Baldwin ( SEAL) Executors and Trustees of the Estate of Isaac W. Baldwin, deceased. (Signed) G. Daniel Baldwin ( SEAL) "October 1, 1941 "IT IS UNDERSTOOD AND AGREED that the real estate mentioned in the above contract and to which the terms of said contract apply, is the real estate that was owned by Isaac W. Baldwin on May 9, 1941, the time of his decease. (Signed) George A. Baldwin (SEAL) (Signed) Florence E. Baldwin *288 (SEAL) Executors and Trustees of the Estate of Isaac W. Baldwin, deceased. (Signed) G. Daniel Baldwin (SEAL)" Pursuant to the foregoing agreement, the executors conveyed to G. Daniel undivided one-half interests in the 8 real properties specified. The values of the one-half interests so conveyed in these properties, were as follows: Property
Value
12th Street Market
$ 75,000
1404-6 French Street
4,600
1209 French Street
4,500
1215 French Street
5,600
East side French Street, 12th
and 13th Streets
1,800
Southeast corner French and
12th Streets
7,700
Central Market
68,500
1509 Peach Street
1,800
Total
$169,500
The parties are in agreement as to the values of all but 2 of the above properties. The 2 exceptions, namely, the 12th Street Market and 1209 French Street, were valued in issue 1, supra, where we determined their values to be as above set forth. Opinion Petitioner agrees, with respect to the Settlement Agreement, that the payment to G. Daniel in the amount of $86,810.24 did not result in any gain or loss to the estate, as it was balanced by cancellation of certain liabilities and the attainment of various other benefits. Petitioner then argues, however, that the net consideration paid to G. Daniel *289 under the Settlement Agreement is deductible as an administrative expense. Respondent does not, in our opinion, answer that contention by urging that it is not deductible as a debt or as a loss. Petitioner does not claim for this purpose that the excess value flowed to G. Daniel in satisfaction of any valid indebtedness of Isaac or his estate. Petitioner openly admits that no such liability existed, but insists that it was forced, regardless of the merits of any legal claim or assertion of fact, to pay the net consideration to G. Daniel, before the estate could be administered. Nor does petitioner any longer claim a loss. The claimed deduction here is based upon an excess in the aggregate value of the physical properties transferred over those received. Petitioner avers that it transferred to G. Daniel such property worth more (regardless of its basis) than that received in return. Petitioner concedes, and even urges, that it was aware of such difference, and was, in effect, "paying off" G. Daniel. Petitioner's position is no different from that which would be taken had there been no exchange, but rather a direct cash payment of an amount to G. Daniel for the same purpose. Petitioner *290 claims that the amount so paid, whatever its form, was an expense of administration, and we agree. The record is overwhelming to the effect that it was necessary to reach some working arrangement with G. Daniel. His tactical position and the advantage he chose to take thereof made it impossible for the executors to intelligently administer the estate in the face of his hostility. To be sure, the executors could have remained adamant, and fought G. Daniel to the bitter end. Attorney fees and related expenses incurred therein would, we think, clearly have been deductible. But they believed, quite reasonably, that such action would prove far more costly and detrimental to the estate than the course of conduct actually taken. The net consideration paid to G. Daniel was in fact a necessary expense in the administration of the estate and particularly in the discovery and collection of the assets thereof. It is deductible as such. We must now determine the amount deductible. We have previously found the values of the properties transferred to have been in the aggregate amount of $169,500, and those of the assets received to have been in the aggregate amount of $71,000. There is no evidence *291 of any change in value between May 9, 1941, and any other date relevant hereto. The difference between the two sets of values, in the amount of $98,500, represents a cost of administration. The executors undertook the payment of the note and interest thereon in favor of the First National Bank in the approximate aggregate amount of $19,000. A deduction therefor has previously been allowed under issue 17, as a claim against the estate. Petitioner, of course, is not entitled to deduct the same item a second time, and thus may not add the amount of the note and interest or the amount paid thereon to the amount here deductible as an expense of administration. We cannot find that any other net item of demonstrated cost or value passed to G. Daniel pursuant to the Settlement Agreement. We therefore conclude that petitioner is entitled to a deduction for expenses of administration in respect thereof in the amount of $98,500. We find no merit in respondent's argument based upon a claimed loss deduction in the 1941 income tax return filed by the estate. That loss deduction has not been allowed by respondent, and the executors were thus free to protect themselves by claiming it here as well. *292 Our determination with respect to this issue should adequately protect respondent's position in respect of the income tax unless barred by limitations. Issue 30. Adjustments If Assumption Agreement Valid In general, the executors claimed only one-half of the decedent's own obligations as a deduction in the return, thus giving effect to the Assumption Agreement. The notice of deficiency did not recognize the provision for equal assumption of liabilities. As a result, respondent disallowed any part of the obligations of G. Daniel assumed by decedent, but allowed certain of decedent's own obligations in full as a deduction, although the executors had claimed only one-half thereof. Findings of Fact and Opinion We have recognized the Assumption Agreement as valid, and such recognition requires elimination of such additional allowances as follows: From Subschedule B, $9,549.09, representing mortgage indebtedness on 138 E. 12th Street; From Subschedules D and E, $20,847.74, representing mortgage liability on various properties; From Subschedule I, $3,842.50, representing liability for liens on various properties; From Subschedule K, $2,780.56, representing liability for certain 1934 taxes; *293 From Subschedule M, $176.07, representing liability for certain other taxes. In Subschedule C of Schedule K, the executors claimed a deduction of $8,022.63, representing decedent's half of a loan on his Massachusetts Life Insurance policy. Respondent denied the deduction as a debt under Schedule K, but treated the full loan as a reduction of the amount due under the policy, and thus included in the gross estate in Schedule D of the estate tax return only the net proceeds of the policy. In Annie S. Kennedy et al., Executors, 4 B.T.A. 330, 335, it was held that only the actual net proceeds of insurance policies payable to beneficiaries (i.e., face value less loans) were includible in the estate, and no separate deduction was allowed for policy loans. The then Board of Tax Appeals said, at page 335: "In the instant proceeding the insurance companies were able to deduct from the face of the policies, in making settlement thereunder, the amount of the loans upon the policies. * * * [Thus] there was no claim against the estate of the decedent for the payment of the loans, even though the decedent himself may have obligated himself to make payment. * * *" We have examined the policy in question, *294 and the instrument additionally executed in connection with the loan, and can find no reason to distinguish it from the policies and loans in the Kennedy case. Thus respondent's over-all treatment is correct. Decision will be entered under Rule 50. Footnotes
1. Petitioner's counsel failed to question Bryan as to many matters in which the latter participated, in respect of which the burden of proof is upon petitioner, and upon which the record is otherwise far from satisfactory. He sought to explain this by claiming in his brief that Bryan did not remember, and that it would serve nothing to ask him questions to which previous interviews have shown he could not be responsive. But a good reason for inability to prove a point is not a substitute for such proof. We may commiserate with petitioner, but we cannot find for it. Furthermore, to the extent Bryan's lack of recall of vital matters is relevant, we have only the unsworn ex parte statement of petitioner's counsel to that effect. If petitioner deemed this material, it was incumbent upon it, by asking Bryan the question, to demonstrate his inability to answer it. Nor can it avail petitioner to say that respondent could have asked Bryan. Respondent is not required to elicit petitioner's case, or to make petitioner's witness his own by eliciting on cross-examination matters not raised on direct.
2. Petitioner apparently recognized the truth and significance of this, for it admits in footnote 2 of its brief that these properties "entered into the June 5, 1940, settlement."↩
*. Schedule Attached. The $6,000.00 for Services as provided for in Contract is requested and remains unpaid.↩
3. "Ordinary Life Policy" No. 835,186 Massachusetts Mutual Life Insurance Company and "Term of Life Policy" No. 588,657 The Connecticut Mutual Life Insurance Company.↩
4. Although others were named as defendants along with G. Daniel, they were merely nominal parties or his instrumentalities and agents in respect of allegations directed against them. For that reason, the equity proceeding will sometimes be referred to as a suit against G. Daniel.
5. On brief respondent contends that the later actual recovery was $102,000. Petitioner contends that it was $89,175.↩
*. Many of the properties were not conveyed in separate deeds. Some deeds conveying more than one parcel mention a single amount as consideration, without apportionment. ↩
**. The same deed transferred these items and items 1 and 2, and the aggregate consideration of $5,000 stated therein was not apportioned among the four parcels.↩
6. The accounting shows that most of the income from the properties was availed of to pay premiums on insurance policies on Isaac's life held by the insurance trust. There is no evidence that the named grantees consented to or even knew of this practice. Such application of funds, even if to their theoreticol benefit in an economic sense, is inconsistent with their full ownership of the properties.↩
7. This item has already been allowed as the $3,000 note in issue 17, supra.↩
8. Issues 25 and 26 are governed by the same considerations to a sufficient extent that they may be expeditiously disposed of in a single discussion.↩
*. Previous sentence was deleted and new sentence added by an official order of the Tax Court dated November 13, 1959 and signed by Judge Forrester↩.
**. The words "because not completely transferred" were added by an official order of the Tax Court, dated November 13, 1959 and signed by Judge Forrester↩.